

**U.S. Department of Justice**

Civil Rights Division
NOTICE OF RIGHT TO SUE
WITHIN 90 DAYS

---

CERTIFIED MAIL
5058 6409

*950 Pennsylvania Avenue, N.W.*
*Karen Ferguson, EMP, PHB, Room 4239*
*Washington, DC 20530*

April 13, 2004

Mr. Vidal Cantu, Jr.
c/o Valerie R. Esparza, Esquire
The Esparza Law Firm
Attorneys at Law
P.O. Box 369
Harlingen, TX  78551-0369

Re:  EEOC Charge Against Brownsville Navigation District, et al.
     No. 360200300782

Dear Mr. Cantu, Jr.:

Because you filed the above charge with the Equal Employment Opportunity Commission, and more than 180 days have elapsed since the date the Commission assumed jurisdiction over the charge, and no suit based thereon has been filed by this Department, and because you through your attorney have specifically requested this Notice, you are hereby notified that you have the right to institute a civil action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e, et seq., against the above-named respondent.

If you choose to commence a civil action, such suit must be filed in the appropriate Court within 90 days of your receipt of this Notice.

This Notice should not be taken to mean that the Department of Justice has made a judgment as to whether or not your case is meritorious.

Sincerely,

R. Alexander Acosta
Assistant Attorney General
Civil Rights Division

by  *Karen L. Ferguson*

Karen L. Ferguson
Civil Rights Analyst
Employment Litigation Section

cc:  San Antonio District Office, EEOC
     Brownsville Navigation District, et al.

# BROWNSVILLE NAVIGATION DISTRICT
## INTEROFFICE MEMORANDUM

| | |
|---|---|
| **To:** | Vidal Cantu, Jr. |
| **CC:** | |
| **From:** | Deborah Lee Duke |
| | Director of Finance and Administration |
| **Subject:** | Disciplinary Action |
| **Date:** | December 8, 2003 |

I have had reports from several employees that on last Thursday, due to Petra Champion's absence, you were requested to cover the switchboard for the receptionist's lunch period. This occurred while I was out of the office at a seminar.

It has been reported to me that you made several statements regarding your opinion that this duty was unfair to you, and that you did not want to do it. You went to Vicky Mercado to request that she help you to get someone else in the department to cover this duty for you. You had a heated conversation with Cristina Valdez, during which you made several comments that resulted in her opinion that you were unwilling to do this duty. The result of this was that you informed Cristina that you had upset yourself to the point that you needed to leave for the afternoon, and subsequently did not relieve the receptionist for her lunch break.

I would remind you that you have agreed under our mediation agreement that you would accept the switchboard relief duty and would cease complaining about the duty in exchange for specific actions on the part of the District, including an increase in pay and training for the position you now hold.

This is not the first time that this subject has been brought up by you, and you have been reminded that this is your responsibility, and that you are expected to do this duty when requested.

Your refusal to cooperate with Cristina Valdez when she informed you that you needed to cover the switchboard at the noon hour due to Ms. Champion's absence is a serious disciplinary problem. There is no excuse for the amount of emotional trauma, including that to yourself, that this situation caused. You are responsible for taking on this duty when it is necessary, and there is no need for any discussion about whether or not you will agree to do it.

**You are hereby suspended for one day without pay. Your suspension will be on Tuesday, December 9, 2003. You may return to work as usual on Wednesday, December 9, 2003.**

I would hope that this disciplinary action will stress to you how important it is for you to control your reactions to your co-workers in the department. There is no place for the type of outbursts that occurred on last Thursday, nor will they be tolerated in the future.

Should you wish to dispute this disciplinary action, you have the right, under the District's Dispute Resolution Procedure, to request a review of the action. A copy of the District's Dispute Resolution Procedure is attached.

| SECTION FIVE | DISPUTE RESOLUTION |
|---|---|

## DISPUTE RESOLUTION PROCEDURE                                   Item 500

The following procedure will be followed when an employee wishes to present a grievance concerning his/her·wages, hours of work, or conditions of work (including disciplinary measures or termination):

1.  The employee will submit a request in writing for a resolution of his/her grievance, along with any other documents deemed relevant by the employee, to the immediate supervisor, with a copy delivered to the Level 2 Supervisor of the department in. which the employee works (if different) and to the Personnel Department. This request must be filed within 10 days of the occurrence of the cause. The supervisor will investigate the matter and notify the employee of his/her decision in writing within 3 working days after receipt of the request.

    If the grievance concerns sexual harassment, the employee has the option of skipping this step and proceeding with step 2.

2.  The employee may request an appeal of the supervisor's decision within five working days after the notification of the decision. The appeal will be made to the Director of Personnel and may include any evidence the employee wishes to submit.

    The Director of Personnel will appoint a Review Committee composed of the Director of Personnel, one Level 2 Supervisor and one Level 3 Supervisor, neither of whom shall be in the employee's direct chain of command. The Director of Personnel will serve as the chairman of the Committee. In the event the Director of Personnel is in the chain of command of the affected employee, the Port Director will appoint the Committee and name the chairman.

    The Committee will review any evidence or interview any individuals deemed appropriate. Only evidence or individuals which pertain to the issue in question will be considered. No character witnesses will be allowed. After considering the evidence and within 15 working days of the submission of the appeal and will notify both the employee, his Level 2 Supervisor and the Port Director of the decision in writing.

3.  If the employee wishes, he/she may appeal the decision of the Review Committee to the Port Director. Such appeal must be in writing, must list the areas in which the employee believes the Director of Personnel to be in error and must be submitted within 5 working days after notification of the decision by the Director of Personnel. New evidence will not be allowed. The Port Director will investigate the facts of the appeal and render a written decision to the employee and the Director of Personnel within 5 working days.

| SECTION FIVE | DISPUTE RESOLUTION |
|---|---|

**This decision shall be made on behalf of the Port Authority and shall be final.**

If the supervisor, Director of Personnel or Port Director are out of the office during the time allotted for reaching a decision due to a regularly scheduled vacation, an emergency, business travel or other similar bona fide reasons, the time out of the office will not be counted as part of the allotted days.

All requests for dispute resolution shall be maintained in a permanent grievance file to the extent that such documents are made available to or received by the Personnel Department.

# BROWNSVILLE NAVIGATION DISTRICT
## INTEROFFICE MEMORANDUM

**To:** Donna Eymard
**CC:** Jo Saban
**From:** Deborah Lee Duke
**Subject:** Response to Memo Dated 07/21/03 by Vidal Cantu
**Date:** July 28, 2003

My first comment to you regarding the memorandum from Vidal Cantu is that it represents a violation of the District's Dispute Resolution Procedure. As such, the proper response to Mr. Cantu is to direct him to file the proper request for review of the disciplinary action with the proper person, with a copy to the Personnel Department. This request should not have been directed to Ms. Saban but to me. This is typical of Mr. Cantu's handling of problems with discipline in the department, he by-passes the District's established procedures for handling these problems and takes them to the EEOC or to supervisors outside of the department.

With that said, I would address the disciplinary action that Mr. Cantu is disputing. The reprimand was not issued over work performance. It was issued over Mr. Cantu's manner in responding to my questions regarding a work-related issue. This was made clear to Mr. Cantu during our meeting to discuss the reprimand. This meeting was taped, and should this issue be pursued, a review of the tape will indicate that Mr. Cantu was informed that this was the basis for the reprimand, not the work issues.

In reading Mr. Cantu's memorandum regarding the use of tape recordings during any meeting, I agree that he should not be made to attend any meeting that he feels necessary to record, but I do not agree to be recorded in all of my dealings with Mr. Cantu. Any further communications that need to be made to Mr. Cantu will be made in a written memorandum, and he will not be allowed to attend any meetings that he would insist on recording. I will inform Mr. Cantu of this in a memorandum.

Mr. Cantu makes an issue of the cross-training in the department. This is standard in the department, and is necessary to the smooth operation of the department during vacation or other absences. The training for contracts that is referenced is the same training as is given for the open purchase orders. Mr. Cantu has the training, but he has not been assigned the responsibility. These are two separate issues.

Ricky Rodriguez was hired as an accounting clerk. One of the qualifications that he had that made him stand out in the hiring process was his training in payroll. He was hired specifically to run the payroll as one of his primary duties, at the same time that Mr. Cantu was assigned Accounts Payable as his primary duty. The clerical staff in the department has three areas of primary responsibility: Accounts Payable, Accounts Receivable and Payroll. As I do not have three Accounting Clerks, Accounts Payable and Payroll

currently have been assigned to the two Accounting Clerks, and Accounts Receivable is currently handled by the two Bookkeeping Specialists. In a previous filing with the EEOC, Mr. Cantu has charged me with discrimination in not assigning him the payroll duties. I responded to those charges then, as I do today, that Mr. Cantu has never requested of me that he be assigned to those duties. He did, however, file charges with the EEOC in his first complaint that he did not get training for the Accounts Payable duties. In response to the ruling from the first EEOC complaint, he has received the training, as well as the assignment of the responsibilities, for Accounts Payable.

I do not usually assign additional primary duties to the Accounting Clerk that is handling Accounts Payable. Mr. Cantu's case is no exception.

Mr. Cantu brings up the issue of the switchboard relief. In the first EEOC mediation, Mr. Cantu agreed to accept this duty in exchange for an increase in pay. He also agreed that this would cease to be an issue. The District increased Mr. Cantu's pay in accordance with the EEOC decision, yet Mr. Cantu continues to violate this provision by repeatedly bringing this up as an issue in his complaints. I understand that Mr. Cantu claims that his training for Accounts Payable was not started as required by the EEOC decision. I dispute this allegation. One of the skills needed to perform the Accounts Payable function in this department is a basic understanding of and ability to work with an Excel spreadsheet. Mr. Cantu was given additional worksheet projects to develop these skills. He continued to require assistance in these projects, even up to the time we began the Accounts Payable training. He continues to have some problems in working with Excel, and needs to have his formulas verified periodically.

Mr. Cantu compares the situation that Veronica Ramos had in dealing with past-due invoices to the situation we are now in. During Ms. Ramos' tenure in my department, the majority of the past-due invoices were due to a backlog of paperwork in the Facilities Maintenance Department. With her transfer into that department, she has cleared the backlog. Now, any past-due invoices are usually due to other factors. I have given Mr. Cantu instructions that he is to give Letty Trevino any and all invoices that are over three weeks of age that he is not able to immediately process for payment. She is to work on these invoices to resolve the issues that have caused the hold-up in payment. Our goal is to pay all invoices within the terms of 30 days. I have discussed with Mr. Cantu the fact that there are a large number of invoices that can be processed for payment without pending issues. These are to be his focus. Those that were not able to be processed were taking too large a part of his time, and were causing a backup of work.

Mr. Cantu brings up an issue with an invoice from the Bank of New York. This is for an investment-tracking software that I allowed the licensing to expire on in November, 2002. The Bank of New York has been invoicing the District in the hopes that we would re-license the software, but until we again began to invest our funds, there was no need for the software. (The software is not active until the registration key is received.) Mr. Cantu brought this invoice to me several times, and I had this discussion with him regarding the fact that I was not ready to pay it each time. In May, I processed the purchase requisition,

and passed a copy of the invoice on to Mr. Cantu. In late June, we received a phone call asking if we were ever going to re-license the software. At that time, I discovered that the purchase requisition had not been processed, and I asked Mr. Cantu if he had the invoice. His response was that he did not, nor did he remember ever seeing it. I made no further comments to him regarding this invoice at that time. I later found that Mr. Cantu had approached his co-workers to look for the invoice. Mr. Cantu later came into my office and told me I had better have the vendor fax a copy of the invoice because I never gave it to him. I told Mr. Cantu at that time that it was my decision how to get a copy of the invoice, and that I would handle it. I reminded him at that time that he had had the invoice, as he had asked me about it several times, and he responded that he had given the invoice to Letty Trevino.

One of the problems that Mr. Cantu is having in his position is the processing of the same invoice for payment twice. This is arising out of his use of copies of documents to substitute for originals. While this is permissible in limited instances, it does allow for the duplicate payment of invoices if it is not carefully monitored. I have instructed Ms. Trevino to be cautious when verifying a voucher that is based on copies of documents. Mr. Cantu takes exception to this verification, even though we are still catching duplicate vouchers at this point. He has been instructed to be certain that the original documents are not available to him before going to Ms. Gawenda to make copies of documents, but this instruction for caution causes a great deal of friction in the working of the department.

During our last discussion, Mr. Cantu reported feeling that his duties of Accounts Payable were preventing him from doing other duties in the department. We discussed a plan to have Ricky Rodriguez undertake the duties of Accounts Payable on Mondays and Fridays, and for Mr. Cantu to take over the duties performed by Mr. Rodriguez on those days as well as to be available for other job assignments. Mr. Cantu said at that time that he felt that would be very agreeable to him. We did discuss the fact that Mr. Rodriguez would be using his desk and files on those days, and Mr. Cantu indicated he understood and had no problem with that. Mr. Cantu did question me as to what Ms. Trevino was able to do to get the problem invoices resolved that he could not do. That was a valid question. We agreed that on the Mondays and Fridays that he was not going to be working on the Accounts Payable, that he would sit with Ms. Trevino as she worked on the problem invoices to see how she approached their resolution. I told Mr. Cantu I would consider this option during the week I was out. In reading the memo of July 21, 2003, Mr. Cantu seems to have taken exception to this part of the discussion. In light of this, I have reconsidered this plan to relieve Mr. Cantu of the stresses he reported to me from this position.

It is at Mr. Cantu's insistence that he was trained to the Accounts Payable. I believe that he has found that this job assignment is no more exciting than the one he held before. In this department, there are no easy or exciting assignments. Accounting work is tedious, repetitive work, no matter what the assignment. I find that there are certain personalities that find satisfaction in this type of work, and that there are those who do not.

At this point, I have assigned Mr. Cantu to job responsibilities that he is not handling well. The Accounts Payable duties seem to cause stress to Mr. Cantu which he is not able to cope with. At times, he is reasonable and easy to work with, at others, especially when he is under stress; he is a difficult employee to work with. The transfer to the Accounts Payable duties does not seem to have made Mr. Cantu any happier in his employment in the department. It has caused disruption in the operation of the department, as I have had to put additional support in place to assist with problem invoices. At this point, I would like to implement the following reassignments of duties; to put Mr. Cantu back into work he was able to be successful at:

**Duties – Vidal Cantu**

| | |
|---|---|
| Daily Roll Call | Voucher Copy Filing |
| Daily Cash Deposit | PUB Billing Log Book |
| Accts Payable Posting | Records Retention Assistance |
| Accts Payable Check Distribution | Dept. Mail Processing |
| Payroll Check Distribution | Capital Project File Copies |
| Accounts Payable Filing | Miscellaneous Copies |

**Duties – Ricky Rodriguez**

| | |
|---|---|
| Accounts Receivable Posting | EFT Filing |
| Leasing Invoicing/Services Billing | Accounts Receivable Filing |
| Agents Rebates | Payroll-Related Journal Posting |
| Service Charges | Invoice Register and Cash Book Posting |
| Payroll | Running Bank Balance Posting |
| Payroll Fund Transfer Vouchers | Bank Statement Reconciliation (except BND11) |
| BRG Fund Transfer Vouchers | Records Retention Assistance/Minutes Books |

**Duties – Letty Trevino**

| | |
|---|---|
| Accounts Payable | TxDOT Report |
| Accounts Payable Fund Transfer Voucher | Bank Statement Reconciliation (BND15) |
| Taxes Receivable Reconciliation | Backup for Purchasing Manager |
| Overweight Permit Log | Misc. G/L Reconciliations |

**Duties – Rosie Hinojosa**

| | |
|---|---|
| Accounts Payable Voucher Approval | Fixed Asset Reconciliation and Depreciation |
| Accounts Receivable Collections | Investment Interest Log |
| Review and Posting of Accounts Payable | Misc. G/L Reconciliations and Journal Entries |
| Review and Posting of Accounts Receivable | |

With your approval, I would like to implement these changes as soon as possible.



July 21, 2003

Port of Brownsville
Attention: Human Resources Department
1000 Foust Road
Brownsville, Texas 78578

Dear Ms. Jo Lynn Saban,

This letter is reference to the reprimand that I received on Tuesday – July 15, 2003. This letter is to let the Port know that I believe an injustice has been done to me and I would like for this reprimand to be taken out of my file and I am requesting that this be done in writing and with a written apology. **It is my belief that my boss, Deborah Lee Duke who has abused her power of authority and I do hold the Port liable for allowing her to make a decision based upon "Retaliation".**
This woman is constantly harassing me and without profitable cause. I will not be a victim of discrimination, harassment, or any wrong doings held at my expense. **From here on out any and all meetings that I am expected to be in will be recorded for me to use as evidence** otherwise I will not agree to be in any meeting and all recordings will be sent to the EEOC.

Ms.Duke has authorized Cristina Valdez to cross-train Ricky Rodriguez to do contracts payable, training which should of gone to me. Debby, Cristina, Rosie, and Letty Trevino have all trained Ricky for payroll. Ricky is an accounting clerk, not payroll.
In the years from May 14, 1994 to July 18, 2003 – I've never even been considered for such training simply because Ms. Duke wants it that way. This is an injustice to me.

On top of this Ms. Duke mentioned to me during the reprimand meeting that she intends to train Ricky Rodriguez to do Accounts Payable instead of saying, I'll start training you with your co-workers while it took me 9 years of my life to be considered for the accounts payable process which by the way wasn't much.

Countless of new training that Ms. Duke has offered to Ms. Trevino that Veronica Ramos use to do while the same opportunities have once again passed me by.

Entering cash receipts, entering sales transactions, Logging in vessel information, Reconcile the bank statements, Bank charges and Interest Forms. Mr. Rodriguez is an accounting clerk and so why doesn't he take care of the switchboard?

I come to work to work and if I'm left to do my job I will do it well. If there are any invoices not being paid, it is something I am working on. I don't seem to have any problems getting along with co-workers out of my department. But, then again co-workers out of my department have not backstabbed me either.

**page 2**

I never showed Ms. Duke an invoice from "The Monitor" such as she claims in her inaccurate reprimand. I showed her an invoice from the Brownsville Herald

The Brownsville Herald
     Reference #227495  First Run:    06-08-03
                           Second Run: 06-15-03

Ms. Duke is concerned about the Ports good credit and so am I. I give 110% to the Port everyday! I may have some issues with the Port; but I put these issues aside as best as I can on a daily basis. But, Ms. Duke is out for my job like a voucher and I do hold the Port accountable for this!

Ms.Duke has given me hard times and chewed me up over countless of things over the years and even up to date. I want to ask the Port where are they when this is happening?

It was my belief that we were going to pay the statement of the Brownsville Herald and then be reimbursed from Carter and Burgess. I learned different on Friday – July 19, 2003 (4 days after my reprimand) when Mr. Gutierrez came in to our department and addressed Cristina and I about this vendor. These events didn't have to lead to a reprimand especially when the reprimand is wrong!

The Brownsville Herald's statement was what Ms. Duke saw; but she claims that it was the monitor and the bottom line here is that as a supervisor she should of at least been accurate in what she was accusing me of especially when there is a reprimand involved at my expense.

Now, Ms. Duke placed some extremely hasty rules on me on the payment process, rules that she never placed on Veronica. She wants for me to hand over any invoices that are over three weeks old to my co-worker Letty Trevino. A co-worker who claims that I do not hand over statements to her when she is the one who opens up the mail. Cristina and Letty Trevino were sitting on Ricky's desk this past Friday and Cristina asked me if I had any statements from Office Depot and I said, no. And Letty's comment was but you gave me some statements the other time and I wasn't aware of them. I want to clear this misunderstanding once and for all. What happened was that Ms. Trevino didn't come to work some time ago and on this day I happen to open up the mail. When I opened up the mail I separated the checks, invoices, and statements. And when I did the mail on that day it was near to 5:00pm and I had left the statements on my desk because I wanted to hand these over to her myself and ever since then I've got Debby telling me as well that I do not hand over Letty Trevino her statements. My response to Ms. Duke how could Letty not receive the statements when she is the one opening up the mail.

I asked Ms. Duke that what authority, or resources does Letty Trevino have that I don't have in order to finish the payment process. If an invoice sits on my desk it is because I do not have the complete package involved in order for the payment process to begin. It is out of my control that Po's are not done by other departments before a purchase is done.

In the case of the Brownsville Herald, Ms. Duke responded to me in an unprofessional and hostile manner and she was ready for a fight. I do not deserve for her to approach me in such a way because I can comprehend just fine without her being at my face.

My job is to do accounts payable and this is the only thing I believe I am guilty of because that was all I was trying to do! I should be able to go with Ms.Gawenda and ask her for a P.O. because she is the purchasing manager. Here is the bottom line - I was trying to get an invoice paid which is my job and Ms. Duke attacked me for this.

I want to bring out another incident that Ms. Duke chewed me out about and I wanted for the outcome to be known. Ms. Duke insisted that I had this paperwork way over two months and that she had given me a P.O. for me to pay it out. I told Ms. Duke not only did I not have this paperwork that there was no P.O. for no such vendor and I also mentioned to Ms. Duke that it is Ms. Hinojosa and Ms. Valdez that usually are involved with any vendors with banks.

The Bank of New York that Ms. Duke was referring to was an invoice that was dated two months before I even started doing payroll and even at that time it was the second notice!

The Bank of New York
Invoice# 31277-232702   *Second Notice
Invoice Date: November 21, 2002
Invoice Amount: $4,800.

P.O. #48964   Date: 07-15-03   Amount: $4,800.00

Ms. Letty Trevino Issued out this P.O. when it should have been Irma Gawenda because after all it is Ms. Gawenda who is the purchasing manager. Ms. Trevino also came to my desk while I was at my desk and jotted down this P.O. in my logbook.

How's that for a cover-up? Note this in your files, Ms. Duke has been wrong two times at my expense. and not once admitted so.

Sincerely,

Vidal Cantu Jr.

# BROWNSVILLE NAVIGATION DISTRICT
## INTEROFFICE MEMORANDUM

**To:** **Vidal Cantu**
**CC:**
**From:** **Debby Duke**
**Brownsville Navigation District**
**Subject:** Reprimand – Interpersonal Relations
**Date:** July 15, 2003

You brought an invoice to me this morning from the McAllen Monitor. The dates of the publication were in early June. You informed me that you had just taken this back to Nino Gutierrez to see what the status of the invoices were.

I questioned why you still had this invoice as it was over three weeks old, and why you had not passed it off to Letty Trevino for resolution. Your response was that I had not told you to pass off problem invoices at three weeks, but at one month. You continued to make several comments indicating that you had spoken to Irma Gawenda regarding this invoice as well as to Nino Gutierrez. You admitted that you had not been able to get a straight answer to your questions regarding the invoice status, but had not asked Cristina Valdez, who resolved the same issue for the McAllen Monitor in May, Letty Trevino, who is assigned to assist you in these issues, nor myself. These are the three persons who are in a position to resolve your questions, yet you chose not to bring this issue to any of us. I would like to see you progress in your work to a point at which you can resolve these problem invoices, but you seem to go in circles by not using the resources you have available to you.

It has been a standing instruction to you since you were assigned the Accounts Payable position that you are to refer all items you cannot easily resolve to Letty Trevino. When I discovered, due to the fact that we were losing credit with some of our vendors, that you were not doing this, I was forced to set a time limit. **That time limit was three weeks, not one month as you claim.** We want to pay our invoices within the net 30 days terms, and therefore, if you wait one month before referring a problem item to Letty Trevino, you have allowed that item to become delinquent. To discover that you have an item that you claim you have been unable to get a straight answer that you have not referred to Ms. Trevino for resolution is an indication that we still have a problem in your work performance.

It is important to the smooth operation of this department that you fulfill your work assignments as instructed. Accounts Payable invoices are not to be held at your desk beyond three weeks. In fact, when you encounter an invoice that you cannot resolve, it should be referred to Letty Trevino as soon as you discover that fact. The District's credit rating is important to the financing of our large projects, and continued late payments affect our ability to sell bonds.

Please go through your desk and check to see that you do not have any additional unpaid items that are over three weeks past due. These are to be referred to Letty Trevino at once. In addition, you are to make sure that she receives the vendor statements as soon as they arrive in the mail.

This morning, you spoke to me in a tone that was disrespectful, despite several warnings to modify the tone you were taking with me. As your supervisor, and the Director of the Department in which you are employed, I have the responsibility to oversee your work. It is your responsibility to respond to questions regarding your work process, and to accept correction when you have not followed instructions. As I informed you this morning, I do not intend to accept this type of confrontation with you over work issues. You immediately jump on the defensive when approached regarding an error, and instead of listening to the correction or instructions being given, you attack your co-workers and myself. There is no conspiracy to undermine your work. This type of accusation does not help you concentrate on doing your work.

This memo is a letter of reprimand for the manner in which you responded to me this morning. Further instances of this type of behavior will result in further disciplinary action, up to and including time off without pay or termination.

As always, should you dispute anything in this disciplinary action, you have the right to request a review of the action following the District's Dispute Resolution Procedure, a copy of which is attached.

Deborah Lee Duke

TO:        VIDAL CANTU, JR.
FROM:      JO SABAN, PERSONNEL MANAGER
DATE:      April 23, 2003
SUBJECT:   Your memo regarding Ketta Garcia

I have received your memo dated April 23, 2003. It is not clear to me from this memo if you wish this to constitute a grievance against Ketta Garcia under Item 500 of the Employee Handbook. Specifically, your memo does not request a resolution of any grievance you may have.

Please inform me if you intend this memo to be a request for a resolution of a grievance against Ms. Garcia. If that is your intent, I will forward the memo to Ms. Duke, your immediate supervisor, for handling under the provisions of Item 500.

I would note that the Dispute Resolution Procedure requires Ms. Duke to inform you of her decision in writing within 3 working days after receipt of the request. As you know, Ms. Duke is out today, and may be out for another day or two. Therefore, the three - day period will not begin to run until she returns to work and actually receives your memo.

To: Ms. Saban - Human Resources

From: Vidal Cantu Jr.

Date: April 23, 2003

Reference: Harassment

Yesterday – April 22, 2003 – An upsetting experience occurred with a co-worker which made me so upset that I had to go home.  I was walking along the hallway outside the coffee area back to the receptionist desk when Ketta Garcia caught along side of me and said something to me while "pushing" me with her hand on my back forcing me to drag myself forward faster than what I was walking and I had to come to a halt and told her to stop it. She laughed thinking this was funny; but to me it was something that I didn't expect or deserved.  I don't feel this was right at all.

My boss Debby is not here at the time to report this incident to her; but since you are the human resource manager I am reporting it to you.

# BROWNSVILLE NAVIGATION DISTRICT
## INTEROFFICE MEMORANDUM

**To:** Vicki Cantu

**CC:**

**From:** Debby Duke
Brownsville Navigation District

**Subject:** June 27, 2003 Meeting

**Date:** June 30, 2003

I wanted to put down in writing the points covered in our meeting on Friday afternoon. We had discussed several items that had been brought to my attention by your co-workers regarding your interpersonal relations with them, and their request that I take some action to give them relief.

I requested that you take the following actions:

1. Please take care in your conversations with your co-workers to be professional and business-like at all times. Sarcasm and profanity are to be avoided at all costs.
2. When you have requested assistance from a co-worker, and they are providing it to you, please have the courtesy of not walking away until the end of the conversation.

To assist in alleviating conversations that have resulted in stressful situations, I have instructed your co-workers as follows:

1. All errors that need correction are to be brought directly to my attention. I will deal with them with you personally.
2. Conversations regarding the approval of voucher packets are to continue as needed so that the person approving the processing of the payment is comfortable that the payment is appropriate.
3. Any additional requests for information regarding voucher packets are to be routed through me.

Should the dispute resolution process be initiated, it is to be remembered that the process must be started within 10 days of the action under discussion. Prior acts are not subject to the dispute resolution process.

It is my hope that this matter will be resolved by following the above guidelines. Common courtesy extended to those you work with is what is being asked, and expected, of all of the department employees.



June 30, 2003


Brownsville Navigation District
1000 Foust Road
Brownsville, Texas 78578

Dear Debby,

This letter is a response to the meetings that held place on Friday – June 27, 2003 behind closed doors in your office. This letter will also go into details about how my co-workers have provoked me into confrontations that lead to the events that took place on Friday. I will also go into details the decisions that you have made to discriminate me and that has lead to the problems that you initiated to begin in my job.

On Friday – June 27, 2003 when I had a meeting with you behind closed doors before the lunch hour about the things that Letty Trevino had done and said toward me – your words to me were that Ms. Trevino knew how to push my buttons and that I hadn't done anything wrong and for me not to worry about anything. You also went as far as to tell me that you had relieved Ms.Trevino of countless of assignments and that you felt she did have the time to help out on any invoices I may be having problems with and you even told me that some of these problems that occurred were not my fault but had to do with things beyond my control.

Thursday – June 26, 2003
Ms. Trevino and I had some disagreements. You had instructed me to hand over invoices that I simply didn't have all the info needed to get these particular invoices out for payment. I did exactly what I was told and Ms. Trevino gave me a hard time when I went to her as she told me I am swamp with work and now I have to do your work and yet she has lots of time to be on the internet and to converse with fellow employees. Then later on this day she went over to my desk and looked at some files and she got upset because I had run out of some open Po's in my filing cabinet and she blew this out of proportion by telling me that's why I thought this P.O. had expired. In other words she didn't do her whole homework before of accusing me of something that could have been prevented by her not jumping on me but by asking me nicely which she didn't! It didn't stop here she even got Ricky involved as we looked into the computer that this payment was already made. Then she also got Rosie involved by telling her in front of me and I am going to quote what she said word by word. Ms. Trevino said to Ms. Hinojsa that if this continues I am going to have to talk with Debby because I am doing his work and maybe Debby should just make me the Accounts payable. Rosie nodded and agreed with her as I walked away and went to your office on this day and this is when I asked you that we needed to have another talk.

Friday – June 27, 2003
I'd like to know at what point just who initiated this meeting that was held in your office behind closed doors after the lunch hour. Did you and Cristina talk about me during my lunch hour or did Ms. Trevino hold a plot against me while I inside your office. Never the less this was an injustice motiye held at my expense to help you accomplish your goal of having me fired!

Friday – June 27, 2003
The following employees held a meeting with you behind closed doors and mislead you into believing that I am a monster!
1. Cristina Valdez
2. Rosie Hinojosa
3. Letty Trevino
4. Ricky Rodriguez

Lets talk about Mr. Ricky Rodriguez:
        This guy has called me a jackass, he has threaten me a total of three times by telling me in these words, not to mess with him. He has even gone as far as telling Letty Trevino just about Thursday that we have accepted his kind and we know all about his kind. Letty also made a comment when he said this except I didn't quite here what she had to say. Mr. Rodriguez has even walked up to me in a hostile manner ready to fight and told me off when he had about a month of employment while I am working on my 10th year. Mr. Rodriguez has even provoked me by telling me that his time in the army is .equivalent to my time at the Port.

Lets Talk about Ms. Rosie Hinojosa:
        This woman provoke me into a confrontation about some invoice and I walked away from her because I did not want to get into it with her and she made a big deal about me walking away from her as you brought this to my attention that this was very rude of me and was not acceptable!  Well, Debby let me ask you this – which would you have rather have me do get into a confrontation with her or just walk away. It made better sense to me to just walk away and yet you have even condemned me for making this call.

Lets talk about Ms. Cristina Valdez:
        This woman has been out to get me since day one and nothing I say or do is acceptable to her. This woman has been extremely vicious with me through the years and has plotted with you to help get me fired!

I am still not trained for doing everything that Ms. Veronica Ramos use to do. As a matter of fact I found out by Cristina on Thursday – June 26, 2003 that you are going to have Ricky do contracts payable when you should of trained me for this and so many other duties that you have decided to divide into Letty and Ricky when you had a mediation agreement to train me within ten days for all of these tasks since

Page 3

May 29, 2001. The only thing I have working against me is you and now all of my co-workers as well. Debby, you have made decisions not to cross-train me with my co-workers, to have me take care of the switchboard when this task should have been equally divided into all hourly employees. This decision alone is prove of how low you think my capabilities are and this in an injustice to me as a human being. You have decided to keep me in the same level for nine years while a new guy comes along this year as an accounting clerk and you decided prior when you had a meeting with me on December 18, 2002 that he was to take care of doing payroll. What does an accounting clerk has to do with payroll and if it does has something to do with it then why didn't you ever have me trained for this task in all of these years.

There are so many other things that the Port has allowed you to do against me growing within your department; but this meeting that all these co-workers had against me was a cruel intent as a form of harassment and retaliation to help you get me fired.
At this point I will no longer have any further meetings with any Port official without legal representation. Copies of this letter will be sent to you, human resources, and the EEOC.

This letter is also intent to let the Port know that it is my intention to seek legal action in a court of law on the following charges.
1. Breech of Contract
2. Harassment
3. Discrimination
4. The Equal Pay Act
5. Mental and Anguish
6. Retaliation

Sincerely,

Vidal Cantu Jr.

# BROWNSVILLE NAVIGATION DISTRICT
## INTEROFFICE MEMORANDUM

| To: | For the File |
|-----|--------------|
| CC: | |
| From: | Debby Duke |
| | Brownsville Navigation District |
| Subject: | Vidal Cantu |
| Date: | June 27, 2002 |

Today I had a meeting with Vidal Cantu in my office in the morning at his request. He was having problems with Letty Trevino in the manner in which she related to him in regard to approval of the Accounts Payable packets that he prepares. She was reported to state to him that she had a lot of work to do and that verifying the packets and problem invoicing was taking up too much of her time. She was reported to comment to Rosie Hinojosa that she probably be better off being the Accounts Payable Clerk as she was doing so much of the job.

I reassured Mr. Cantu that it was her assignment as bookkeeper to check and approve the accounts payable voucher packets and to assist him with any invoices that he was having trouble getting the documentation completed for payment that went over three weeks. I explained that I had relieved Letty Trevino of job assignments so that she did have the time available to do this.

One of the items that was discussed was the fact that on several occasions, Mr. Cantu had brought to me (and to others in the department) the same invoice or other item for assistance more than one time. Each time it is as though it is the first time he is working with the item, and he does not remember previous conversations regarding the item. I instructed him that he is to make notes and attach them to the invoice. This is for two reasons, one is to remind Mr. Cantu what steps and conversations have already taken place and the other is to notify any other department member of the status of the item if they need to respond to an inquiry.

I attempted to discuss this with Letty Trevino directly after the meeting with Mr. Cantu, but she was on the phone with a vendor at the time.

After lunch, Cristina Valdez, Rosie Hinojosa, Ricky Rodriguez and Letty Trevino requested that I speak with them. They stated that in the past, when they had reported that Mr. Cantu was disrespectful to them, that I had instructed them to treat him with care due to the fact that he seems to have a difficult time controlling his temper. They informed me that they were at the end of their tolerance for the treatment they have been receiving from Mr. Cantu in the department and were requesting that I take action to stop it.

I asked for specific examples of the behavior that was objectionable to them. Some of their responses were:

1. When Mr. Cantu asks them for assistance, he often times walks off abruptly with a sign of disgust, not listening to their answer to his question.

2. Passing by their desks mumbling under his breath. What they can understand of these comments are sometimes un-kind references to co-workers, but usually, none of the comments are understandable.

3. On at least one occasion, Mr. Cantu has come out of Cristina Valdez' office referring to Ms. Valdez a "bitch". This was overheard clearly by Ms. Valdez and Ricky Rodriguez.

4. Ending conversations regarding work with comments such as "I just can't win".

5. Responding in an angry manner and voice when a mistake is brought to his attention.

6. Questioning the fact that other employees, especially Letty Trevino, are getting involved in his business. (The fact is that Letty Trevino has as one of her assigned duties the review of work completed by Mr. Cantu and to assist him in problems he cannot easily resolve.)

7. Mr. Cantu has developed a habit of requesting assistance for an item, and when the co-worker gives instructions or advice on processing the item rather than taking the item to process themselves, they later find that the item has been returned to their desk (usually underneath other items on their desk and when they are away from their desk). When they return it to Mr. Cantu for processing, he then drops it on another co-worker's desk. The usual sequence it to Cristina Valdez first and then to Rosie Hinojosa, neither of whom has been assigned to assist in processing accounts payable.

8. Dismissing problem items with the comment "That's before my time" and refusing to accept responsibility for working on them.

9. In their review of completed work by Mr. Cantu, the employees find errors and return them to him for correction. He is sarcastic and abusive with them when this occurs. This is so distressing to the employees that they have begun to correct the errors themselves rather than confronting Mr. Cantu's behavior. In one instance, Mr. Cantu took documents showing that he prepared voucher packets for payment that would have resulted in duplicate payments of invoicing from Letty Trevino's desk where he knew them to be so that she could illustrate how these duplicate voucher packets were occurring to me. He then shredded the documents so that she could not show them to me.

10. He has told his co-workers that no one can touch him, that he is protected. He also talks to himself at his desk, using comments such as "I'll fix her" and has commented that he can talk (I would infer that he is referring to the EEOC grievances).

11. While they had not observed any directly threatening actions, all four expressed that at times they had concern for their safety. They had a hard time expressing specific actions that caused this, only a comparison to accounts of other employee-rage situations. Mr. Cantu is a loner, and generally very quiet and well-mannered, he seems to have episodes of the behavior noted above in which he is aggressive and lashes out at his co-workers. These episodes are followed by periods of time in which he is friendly and cooperative. The aggressive episodes seem to follow periods of stress for Mr. Cantu, and are especially pronounced when he is dealing with his personal financial problems or when mistakes are brought to his attention.

I discussed the fact that I could not take action without a written grievance. The group's comments were that grievances could be filed daily because the objectionable actions occurred frequently. I told them that if there was a problem, they needed to report it so that it could be resolved. I told them to have interaction with Mr. Cantu only in pairs, to avoid one-on-one interaction. I also instructed the employees not to incite any confrontation with Mr. Cantu. Errors that are discovered are to be brought to my attention so that I may address them with Mr. Cantu.

I discussed this problem with Jo Saban and Donna Eymard to give them a "heads up" on the situation.

I called Vidal Cantu into my office to discuss the concerns of his co-workers. I explained to him that his interactions with his co-workers were causing them distress. He expressed to me surprise that this was so. He disclaimed using profanity, and I reminded him that I had had a conversation regarding his use of profanity in the office in the past. In that instance, he had used profanity in my presence several times one day (and had denied it at the time as well).

He also denied ever being sarcastic with his co-workers. I asked him to be sure he really felt that he never was sarcastic, and he again replied that he was not. He later stated that his co-workers were sarcastic with him, and he was only giving them back what he received. When pressed, he denied being sarcastic, yet maintained that his co-workers were sarcastic with him so he was only being sarcastic back. (We went back to this subject a couple of times in the conversation, and each time the same answers were given, he was never sarcastic, but his co-workers were and he was returning it in kind.) I reminded him that I had overheard comments he had made regarding Letty Trevino, and had seen notes attached to voucher packets referring to the fact that Letty Trevino questioned the use of copies in lieu of original documents in the voucher packets. These questions are asked due to instructions that Ms. Trevino has been given by me to assure that duplicate payments are avoided. He continues to make these comments regarding Ms. Trevino despite the fact that I have explained to him on several occasions that she is instructed to do exactly what she is doing (and in fact, has prevented a number of duplicate payments by doing so). I explained that this was, to my mind, an example of the sarcastic comments that his co-workers were referring to, and he maintained that as Letty Trevino would not approve a voucher packet based on copies, he was justified in saying and writing the things he did. To my knowledge Letty Trevino does approve a voucher packet based on copies when she is satisfied that it is not a duplicate payment, and that all original documents have been removed from the system.

I reminded Mr. Cantu that the bookkeepers, Letty Trevino and Rosie Hinojosa, and the Accountant, Cristina Valdez, have the responsibility of the final check of the voucher packets prior to processing for payment. They affix their approval to the packet and therefore, I do not expect them to approve anything they are not comfortable with. As to the copies, they are aware that the use of copies is a leading contributor to the issuance of duplicate payments, and as such, I have encouraged

them to be certain that voucher packets that contain copies do so for legitimate reasons.

Mr. Cantu expressed to me that he felt he should have been allowed to attend the meeting with the other employees in which they brought their concerns to me, to defend himself. I reminded him that when he complained about his co-workers, he was given the courtesy of a private meeting, without me calling in the other party, and I extended the same to this group. (He had, in fact met with me that morning in private). He was being given a chance to hear their concerns, and to defend himself to me. I expressed to him my belief that had he been included in the meeting, personal attacks would have ensued, and that I would have been refereeing the meeting, a would not have been able to understand the issues raised. I would have been unable to hear either side.

He continued on to state that he was sure that his co-workers were conspiring against him, and were banding together against him. I asked why he thought they would do so, and he said it should be obvious because they met with me. I asked him again why he thought they would conspire against him, and he had no answer. I informed him that his co-workers had individually brought some of these concerns to me at various times, and I had asked them to try to work with Mr. Cantu in a manner that would not cause him to lash out at them. The fact that the four of them came to me together to express their disappointment in the way that I had heretofore handled this conflict indicated to me that they were at the end of their tolerance, and that I could no longer place the burden of resolving these conflicts solely on them. I must address this at the source, with Mr. Cantu, at this time.

Mr. Cantu expressed his feeling that his co-workers had knifed him in the back, and that as of this date, he was no longer their friend as they had shown they were not his. He would come in to work, do his job, and wanted nothing personal to do with them. I told him that this was what I expected. The workplace is not intended to be a social area, nor is it necessary for him to like his co-workers in order to get his job done. It is necessary for him to interact with them, and I informed Mr. Cantu that I expected his interactions with his co-workers to be business-like and professional.

I discussed with Mr. Cantu that the resolution of this problem was in his hands. He could examine his prior interaction with his co-workers to discover what was making them uncomfortable in their workplace, or he could ignore this meeting and continue to interact in the same manner as before. It is his choice at this point what path this matter takes. He said that he still did not feel that he was in the wrong, and that this was all an attempt by his co-workers to discredit him. I again asked him to what end they would want to discredit him, and he knew of no reason, just that they did. He stated that they could go ahead and file grievances against him, he would file them right back. I discussed with him my feeling that this was not the best course for the department, as it would interfere with the department's efficiency, and therefore threaten everyone's jobs. He said that he was not afraid of that, he knew what to do.

I again stated that I believed that his co-workers came to me with an intention to give me the opportunity to resolve this matter without having to resort to the grievance

procedures, and he expressed that he felt they had already filed a grievance against him. I responded that the grievance they had was against me at this point because I had failed to take action when they had brought earlier concerns to me. I had failed to request that they begin to file written grievances so that I would have to take action about the situation.

I again stressed that Mr. Cantu himself would determine the course that this issue would take. He was very agitated by this time, and we ended the meeting, with him leaving the office for home due to his distress. The time was 4:30.

I would note that the job assignment that Mr. Cantu holds is one that has a considerable level of stress associated with it. It is extremely repetitive work with no variance in the day-to-day activities. There is contact with other employees in regard to failures to submit paperwork as required, and some resultant stress. There are some items that require significant research and follow-up, demanding patience of the clerk handling them. The work for this position had a considerable backlog when Mr. Cantu took the position. This was cleared by transferring Veronica Ramos to the Facilities Maintenance Department where she worked on the backlog from that end, and by distributing the other items to the bookkeepers and accountant in the department for resolution. I am informed that in mid-May, Mr. Cantu announced to the department that he was completely caught up.

I have been informed that Mr. Cantu is still receiving assistance from the other members of the department. Errors are being caught and corrected without my involvement, so I have been unaware of the extent that Mr. Cantu may still be making errors in the processing of the accounts payable. I have instructed the department staff to bring all errors detected to me for resolution. I need to see if there is a significant gap in the accuracy that I expect from Mr. Cantu and what he is achieving.

I believe that the "statute of limitations" on the concerns brought to me by the four employees today have expired. I have informed them that I do not want to hear complaints of prior actions, only actions that occur in the future. I noted them down as a reference to what has been occurring in the past, so that I may refer to them to compare future occurrences. I neglected to make this point with Mr. Cantu in the meeting today.

I am documenting this memo to Mr. Cantu's personnel file. I am also issuing a confirmation memo to Mr. Cantu of the overall conversation I had with him today, in which I will remind him of the time limit in which to file a grievance (10 days).



# BROWNSVILLE NAVIGATION DISTRICT
## INTEROFFICE MEMORANDUM

**To:** **Vidal Cantu**
**From:** Debby Duke
**Subject:** Switchboard Relief
**Date:** March 8, 2002

---

This morning, I had a meeting with Ms. Mercado in which we discussed ways in which to bring the situation between you and Ms. Gonzalez to an end. We both agree that it is in the best interests of both of you as employees to be able to work in an environment that is as free of conflict as we can make it.

I had previously mentioned to you that I felt that by building up a period of time in which you had positive feelings regarding the switchboard relief would help to resolve this situation.

To that end, we have this morning made arrangements that are intended to give you some relief from the situation that has developed between you and Ms. Gonzalez.

Beginning on Monday, March 11, 2002, and continuing for a period of 6 months, you will no longer be the assigned relief person for the lunch hour at the switchboard. Another employee will be utilized for this duty. You will still be responsible for the morning and afternoon breaks. Ms. Gonzalez will call you when she is ready for you to relieve her.

Ms. Gonzalez may take additional time at either the morning or afternoon break to attend to duties that require her to be away from her workstation.

As you will no longer be required to be at the switchboard during the noon hour, you will now use this as your regular lunch break. Should you have a special need to have a lunch break from 1:00 to 2:00, you may request that from time to time.

In the event that either Ms. Gonzalez or the new assigned lunch relief person are absent, it may be necessary for you to assist in this relief duty during the absence.

I would anticipate that with the breathing room that you are being given that you will be able to work toward resolving your conflict and achieving a better working relationship with Ms. Gonzalez.

Debby

# BROWNSVILLE NAVIGATION DISTRICT
## INTEROFFICE MEMORANDUM

**To:** **Vidal Cantu**
From: Debby Duke
Subject: Switchboard Relief
Date: March 6, 2002

I wanted to reply to the concerns that you expressed to me in your memo dated March 5, 2002, regarding Ms. Letty Gonzalez. We have discussed them privately, but I understand your desire to have a written response as well.

We have discussed the fact that you and Ms. Gonzalez have not been able to establish an easy working relationship with each other. This is unfortunate due to the fact that it is an assigned part of your job to relieve Ms. Gonzalez at the switchboard several times daily.

I believe, gathered from my discussions with you and Ms. Gonzalez, and my own observations of the situation, that the majority of your problems with Ms. Gonzalez arise when Ms. Gonzalez takes it upon herself to correct you on small details either in your conversation with her, or in your performance of your duties. I agree that it is not her place to take this upon herself to do, nor have I noted anything in the performance of your switchboard relief duties that needs to be remarked upon. To that end, I have discussed this situation with Ms. Mercado and have requested that Ms. Gonzalez be instructed to cease these types of actions immediately. I know that this meeting has taken place.

Other points of discord between yourself and Ms. Gonzalez have been as varied as, and as difficult to pin down as, the tone of voice used in talking to you, facial expressions and body language. All of these, I agree, combine to give you a sense of what Ms. Gonzalez may be thinking, but, unfortunately, we cannot correct these things through discipline. We can, however, deal with the words that are spoken to you.

We have discussed the fact that you dread having to go to the switchboard, fearing an unpleasant confrontation or experience. This cannot help you to interact with Ms. Gonzalez in a positive manner, even when she is not being critical of you. We have discussed ways in which you can begin to build a better outlook on this duty and to help to diffuse this situation. I have instructed you that you are to stop having conversations with Ms. Gonzalez. When she begins to correct you for any reason, you are to excuse yourself and return to the department. I would expect that with a sufficient number of times in which you are able to come and go from the switchboard without a confrontation, you will be able to look forward to this duty without dread, and so approach Ms. Gonzalez with a more relaxed attitude.

While this does not change the way that Ms. Gonzalez may act toward you, I would hope that you can make a change in the way that you react to Ms. Gonzalez. We all tend to rub

each other the wrong way on occasion. I would hope that you will become able to see that it is not worth your worry and concern to react so strongly to Ms. Gonzalez in the future.

It is frustrating not to be accepted at face value by another person, which I believe is one of the reasons that this situation is so difficult for you. I would hope that you will eventually be able to accept this as the other person's problem, that they are missing out on a valuable working relationship with you, and that this is not a failing on your part. By taking the initiative to stop negative contact, you are taking control of the situation, instead of letting the situation take control of you. You will be happier in the long run when you do not feel that you are out of control in this interpersonal relationship.

Again, I would reiterate, Ms. Gonzalez cannot say anything to you that you will take offense to if you are not there to hear it. If a situation such as you have been describing to me starts, you have my permission, and encouragement, to walk away. You are not expected to allow any of your co-workers to speak to you in a manner that offends you or that you feel is intended to belittle you. You are the better person if you simply turn your back and walk away.

I hope that you will continue to bring these problems to me so that we can continue to monitor the progress of this situation. However, I believe that after a few occasions in which you have not let Ms. Gonzalez "get to you," that this situation may be resolved. Not especially because Ms. Gonzalez will change, but because you will. I would hope that you will take my encouragement to heart, and take charge of the confrontation by ending it.

Debby