1

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

```
VIDAL CANTU, JR.          )(
        Plaintiff         )(
                          )(
VS.                       )(      CIVIL ACTION NO. B-04-118
                          )(
THE PORT OF BROWNSVILLE   )(
and DEBORAH LEE DUKE       )(
        Defendants         )(
```

********************************************************

ORAL AND VIDEOTAPED DEPOSITION OF

VIDAL CANTU, JR.

JANUARY 27, 2005

********************************************************

          ORAL AND VIDEOTAPED DEPOSITION OF VIDAL CANTU,
JR., produced as a witness at the instance of the
Defendants, and duly sworn, was taken in the
above-styled and numbered cause on the 27th day of
January, 2005, from 9:21 a.m. to 2:36 p.m., before
MONA M. HAVENS, CSR in and for the State of Texas,
reported by stenograph, at the offices of Roerig,
Oliveira & Fisher, L.L.P., 855 West Price Road, Suite
9, Brownsville, Texas, pursuant to the Federal Rules of
Civil Procedure.

---

2

APPEARANCES

FOR THE PLAINTIFF:

    VALERIE R. ESPARZA
    THE GARCIA LAW FIRM, P.C.
    201 North 1st Street
    Harlingen, Texas 78550

FOR THE DEFENDANTS:

    ELIZABETH G. NEALLY
    ROERIG, OLIVEIRA & FISHER, L.L.P.
    855 W. Price Road, Suite 9
    Brownsville, Texas 78520

ALSO PRESENT:

    GILBERT DE LA GARZA, Videographer

---

3

INDEX

                                              PAGE

Appearances ...................................   2

VIDAL CANTU, JR.

Examination by Ms. Neally ....................    4

Changes and Signature Page ...................  165

Reporter's Certificate .......................  167

Attached to the end of the transcript: Stipulations


EXHIBITS

NO.     DESCRIPTION                           PAGE

 1      Southwestern Bell invoice              74
 2      Invoice dated 10/31/00                 78
 3      Letter dated 1/2/01                    78
 4      Memorandum dated 12/8/03               86
 5      Document dated 1/27/99                 86
 6      Memorandum dated 2/1/99                86
 7      Document dated 4/23/03                 87
 8      Document dated 4/23/03                 87
 9      Memorandum dated 1/19/01               87
10      Memorandum dated 3/6/02                91
11      Memorandum dated 3/8/02                92
12      Memorandum dated 6/30/03               92
13      Memorandum dated 7/15/03               94
14      Letter dated 5/1/94                   114
15      Medical record                        142
16      Mediation settlement agreement        147
17      Personal notes                        151
18      Miscellaneous documents               153
19      Memorandum dated 3/26/04              155
20      Memorandum dated 3/19/03              156
21      Normal assignments                    157
22      Performance review                    157
23      Performance review                    158
24      List of employees                     164

---

4

                    VIDAL CANTU, JR.,
having been duly sworn, testified as follows:
                    EXAMINATION
BY MS. NEALLY:
    Q. Could you please state your full name for the
record?
    A. Yes.  It's Vidal Cantu, Jr.
    Q. Mr. Cantu, my name is Elizabeth Neally.  I'm
the attorney for the Brownsville Navigation District.
Do you understand that?
    A. Yes, ma'am.
    Q. And for Deborah Duke.  Do you understand that?
    A. Yes, ma'am.
    Q. And you have filed a suit against them.  Do you
understand that?
    A. Yes, ma'am.
    Q. Okay.  Have you ever given a deposition before?
    A. No, ma'am.
    Q. Okay.  Everything you say today is the same as
if we were in front of a judge and a jury, okay?
    A. Yes, ma'am.
    Q. So if I ask you a question you don't understand
or you need me to repeat something, you need to, okay?
    A. Okay.
    Q. Otherwise I'm going to assume you're

---

1    understanding all my question all right?
2        A. Yes, ma'am.
3        Q. Are you taking any medication today?
4        A. Yes, ma'am.
5        Q. What are you taking?
6        A. Diovan. I believe it's 160 milligrams with an
7    81 milligram aspirin. I take it every morning and I'm
8    taking some ibuprofen because I had some -- an
9    infection on my right -- on my right ear and I'm taking
10   it for a couple of days until the pain goes away.
11       Q. Any other medicine?
12       A. Or the infection goes away.
13       Q. Okay. Any other medication that you're taking
14   today or that you took last night?
15       A. Last night I took that five day antibiotics
16   because it's a five day and I take it at night right
17   before I go to bed and I have not taken my -- my
18   depression medicine because I'm -- which is Zoloft
19   because I'm taking all this other medication and I
20   don't want to have all that stuff in me.
21       Q. Okay. Are you taking anything today that would
22   impair your ability to understand and answer my
23   questions?
24       A. No, ma'am, I don't believe so.
25       Q. Okay. If you need to take a break at any time,

1    please let me know, okay?
2        A. Yes, ma'am.
3        Q. The Diovan you're taking, that's for
4    hypertension?
5        A. For high blood pressure, yes, ma'am.
6        Q. And the Zoloft. When was the last time you
7    were prescribed medication for depression?
8        A. About -- about a month ago I would believe.
9        Q. And when was the last time you took it?
10       A. About like about -- the last time, which was
11   like five days ago possibly.
12       Q. When you started taking the -- the antibiotic?
13       A. It was on Monday night.
14       Q. Okay. But did you stop taking it because you
15   started taking the antibiotic?
16       A. I'm sorry. I didn't -- what was the question?
17   I'm sorry.
18       Q. Did you stop taking the Zoloft because you
19   started --
20       A. Yes.
21       Q. -- taking --
22       A. Yes.
23       Q. Okay. One of the other rules of a deposition
24   is that you have to let me ask all the questions even
25   if you think you know what I'm getting to, okay, before

7

1    you answer, all right?
2        A. Yes, ma'am.
3        Q. And that's because the court reporter can't
4    take us down if we talk at the same time --
5        A. Yes, ma'am.
6        Q. -- okay? Another thing is you need to answer
7    out loud because she also can't take down a nod of the
8    head. I know this is being videotaped --
9        A. Yes.
10       Q. -- but you understand this is a very serious
11   proceeding and because of that it's being recorded by a
12   court reporter so that we can use it in a court, okay?
13       A. Yes, ma'am.
14       Q. Where do you -- what's your date of birth?
15       A. 2/26/63.
16       Q. And where were you born?
17       A. In Brownsville, Texas in Mercy Hospital,
18   Brownsville Mercy Hospital.
19       Q. Okay. And where did you grow up?
20       A. I grew up in Port Isabel, Texas.
21       Q. Did you graduate from high school?
22       A. I went as far as the 11th grade and then I took
23   my GED.
24       Q. When did you take your GED?
25       A. In -- I believe it was in 1981.

8

1        Q. Okay. So you waited several years before
2    taking the GED or did you just do it?
3        A. No. As soon as the year finished when I was in
4    the 11th grade I took the GED that summer like a week
5    later.
6        Q. And why did you do that?
7        A. Because in -- in -- in first grade -- I stayed
8    in first grade and I was not going to graduate till I
9    was at least 19 1/2 and at that time I was very young
10   and I thought that was, you know, an old age to be in
11   high school --
12       Q. Okay.
13       A. -- you know. I was young at that time.
14       Q. So you were held back one time in the first
15   grade?
16       A. Yes.
17       Q. Is that the only grade you were held back in?
18       A. Yes.
19       Q. Where do you live now?
20       A. I live at South Padre Island, Texas.
21       Q. And what's your address there?
22       A. It's 107 West Tarpon Street.
23       Q. How long have you lived at that address?
24       A. I believe about ten years.
25       Q. Who lives with you at that address?

1     A. Just myself.
2     Q. Do you live in an apartment or a house?
3     A. It's an efficiency.
4     Q. Do you rent or own?
5     A. I rent.
6     Q. Okay. And you've lived by yourself for the
7  last ten years?
8     A. Yes, ma'am.
9     Q. Where do your parents live?
10    A. They live in -- in Laguna Heights in Port
11 Isabel, Texas.
12    Q. And what are their names?
13    A. Vidal Cantu, Sr. and Rachel G. Cantu.
14    Q. Do you have any siblings?
15    A. Yes, ma'am. I have four sisters, three older
16 sisters and a younger sister.
17    Q. Do they live in the Valley or outside the
18 Valley?
19    A. They're scattered.
20    Q. Okay. How many live in the Valley?
21    A. Two -- two live in the Valley.
22    Q. Okay. Where do they live?
23    A. They live in -- in Port Isabel, Texas.
24    Q. Okay. What are their names?
25    A. Frances Zoleta and Cynthia Cespedes.

1     Q. I'm s⌒. What was her last name?
2     A. Cynthia Cespedes. That's C-e-s-p-e-d-e-s.
3     Q. Do they work?
4     A. Yes.
5     Q. Where do they work?
6     A. One of them works. I'm sorry. My sister
7  Cynthia, she's the owner of a flower shop, A Blooming
8  Affair in -- in Port Isabel, Texas.
9     Q. How about your parents? Do they work?
10    A. My -- my parents are retired. My -- my mother
11 helps my sister at the flower shop.
12    Q. Okay. Have you ever been married?
13    A. No, ma'am.
14    Q. Do you have any children?
15    A. No, ma'am.
16    Q. Do you have any nieces or nephews that are of
17 work age?
18    A. Yes, ma'am.
19    Q. And where do they work?
20    A. Well, I have several. In the Valley?
21    Q. Yes.
22    A. In the Valley? Let me see. They're working
23 age, but I don't think none of them are working right
24 now.
25    Q. Okay.

11

1     A. I really don't believe none of them are really
2  working.
3     Q. But some of them are over -- is it 21 or 18? I
4  guess it's 18 you have to be to be on a jury. Are they
5  over 18?
6     A. Yes. I have several that -- about five or six.
7  I would have to count them on my fingers because
8  there's --
9     Q. That live in the Valley?
10    A. No. That live in the Valley there's about
11 five.
12    Q. Okay. Could you just state their names?
13    A. Yes, ma'am. Jason Cespedes and Jeremy
14 Cespedes. He's 18 years old. He's a senior. Daniel
15 Zoleta. He's a resident in Brownsville and Rachel
16 Zoleta and she's a resident in Port Isabel.
17    Q. Okay. After you graduated or after you took
18 your GED in 1981, did you start working?
19    A. Yes, ma'am.
20    Q. And where did you work?
21    A. I worked -- I believe at that time I was
22 working at the -- at the Tiki restaurant I believe.
23    Q. And what were you doing?
24    A. I was -- I was a dishwasher there.
25    Q. And how long did you do that?

12

1     A. Anywhere from -- I believe it was six months to
2  a year.
3     Q. Okay. What was the next job that you held?
4     A. The next job I held was at Port Family Center.
5     Q. Doing what?
6     A. I was a stocker.
7     Q. And that was in 1982, more or less?
8     A. Yes -- yes, ma'am, more or less.
9     Q. And what -- how long did you have that job?
10    A. About four and a half years.
11    Q. Okay. And the next job was in about 1986 or
12 '87?
13    A. Right, yes, ma'am.
14    Q. And where was that?
15    A. At the Blue Marlin Supermarket.
16    Q. And how long did you work as a checker at the
17 Blue Marlin?
18    A. It was a stocker.
19    Q. Stocker.
20    A. And then I was promoted to a receiving clerk,
21 so towards the end I was a receiving clerk. Nearly
22 seven years.
23    Q. Okay. And so in about 1994, where did you go
24 to work?
25    A. It would be 1990 -- actually 1992 at the

1   Sheraton Beach Resort.

2       Q. Okay. And how long did you work there?

3       A. I worked there ten months.

4       Q. Okay. Did you quit at Port Family Center?

5       A. They went out of business.

6       Q. Okay. Did you quit at the Blue Marlin?

7       A. Yes, ma'am, to go work at the Sheraton.

8       Q. Okay. And what were you earning at the Blue
9   Marlin?

10      A. At the Blue Marlin it was probably around $7 I
11  would say at that time.

12      Q. Okay. How about at the Sheraton Beach Resort?

13      A. I would believe it would be like $9 if I'm not
14  mistaken.

15      Q. Around $9?

16      A. I believe. It might --

17      Q. In 19 --

18      A. -- have been eight or $9.

19      Q. -- 92?

20      A. Eight or $9, 1992.

21      Q. Okay. And you worked there for ten months.
22  Why did you leave?

23      A. Because I started working at the port, at the
24  Port of Brownsville after that.

25      Q. Were you fired or did you quit?

1       A. No. I gave my two weeks notice and I
2   started working at the port. I applied for a position
3   at the Port Family -- at the Port of Brownsville and --
4   and I got -- and I got the position.

5       Q. Okay. You indicated in your answers to
6   interrogatories that you left the Sheraton Beach Resort
7   because you were unhappy with your job --

8       A. Right.

9       Q. -- in your responses to discovery, right?

10      A. Uh-huh.

11      Q. Why were you unhappy with your job?

12      A. I was working as a PBX hotel operator and there
13  was -- it was a little too hectic with the customers
14  coming in, customers calling in, you know, the guests
15  that were coming in and it was answering multiple lines
16  and I -- and since the position that I applied for was
17  also here at the -- at the Port of Brownsville was also
18  as a receptionist I thought, well, since I was already
19  doing that kind of work, you know, I might have a
20  better chance to -- to grow within the company of the
21  Port of Brownsville.

22      Q. So you applied with the port as a receptionist,
23  correct?

24      A. That's correct.

25      Q. Even though you were already unhappy doing that

---

15

1   at the Sheraton?

2       A. Yes.

3       Q. Okay.

4       A. That's correct.

5       Q. And it's your testimony that you were earning
6   approximately $8 an hour, eight to $9 an hour when you
7   started with -- at the Sheraton?

8       A. I would say so, ma'am. I'm not 100 percent
9   sure.

10      Q. Did you take a pay cut to go to the port?

11      A. I don't remember to be honest with you.

12      Q. What was your starting salary with the Port of
13  Brownsville?

14      A. I believe it was something like around -- it
15  was around 6.50 --

16      Q. Right.

17      A. -- if I'm not mistaken.

18      Q. So that would have been a pay cut, right?

19      A. That would have been a K cut -- a pay cut and
20  I'm not -- once again, I'm not real certain if that was
21  the amount that I was earning at the Sheraton. That
22  was quite a bit -- a long time ago.

23      Q. Did you take a pay cut when you left Blue
24  Marlin to go to work at the Sheraton?

25      A. No, ma'am, I don't believe I did.

16

1       Q. And you can't recall whether you had to take a
2   pay cut to go to work for the port?

3       A. I -- no. I really can't. This was a long time
4   ago.

5       Q. Okay. So you're not sure what you earned at
6   the Sheraton then?

7       A. I'm not 100 percent sure, no. I'm estimating
8   that it was around -- anywhere from seven to $9 an
9   hour.

10      Q. Yet you started at the Port of Brownsville at
11  6.50 an hour?

12      A. I believe.

13      Q. Okay. Now, when you started with the Port of
14  Brownsville you were hired as a receptionist, correct?

15      A. Yes, ma'am.

16      Q. And what were your duties there?

17      A. My duties there were to -- to answer the calls
18  that were coming in, to greet the people that were
19  coming in, to -- to do anything that -- if any director
20  needed something typed up or something like that, to
21  assist them with that and basically that was it.

22      Q. Okay. And you had worked -- the only
23  experience you had doing that was working ten months at
24  the Sheraton, right?

25      A. Yes, ma'am.

18

1    Q. Okay. Who hired you?
2    A. Irma Gawenda.
3    Q. And is Ms. Gawenda still there?
4    A. No, ma'am.
5    Q. Okay. When did she leave?
6    A. I believe about a year and a half ago.
7    Q. What was -- what was her position when she
8    left?
9    A. When she left she was the purchasing manager.
10   Q. Okay. And what was her position when she hired
11   you?
12   A. She was the secretary to the port director.
13   Q. She was the secretary to the port director, but
14   she hired you?
15   A. Yes, ma'am.
16   Q. Okay. You don't know whether or not this had
17   to go through -- was it Mr. Besteiro the port director
18   back then?
19   A. No, ma'am. It was Mr. Cruz.
20   Q. Mr. Cruz? Do you know whether or not it had to
21   go through Mr. Cruz when you got hired?
22   A. I don't believe -- I don't believe it did
23   because I only dealt with her when I got hired.
24   Q. Who did you -- how did you find out about the
25   job opening?

19

1    Q. Okay. And who hired you to work in the
2    account -- the finance department or the accounting
3    department?
4    A. It was Deborah Lee Duke. There was two
5    gentlemen that -- that applied for that position.
6    Actually it was given to this other gentleman, but at
7    the last minute he didn't want it and then they offered
8    it to me.
9    Q. Okay. You said there were two men that applied
10   for the position. Were you one of those men?
11   A. Yes, ma'am.
12   Q. Okay. And who was the other man, if you know?
13   A. Hector -- Hector Torres. He works at the
14   maintenance department.
15   Q. And why did he decide not to take it, if you
16   know?
17   A. I -- I don't know exactly why he -- maybe he
18   felt he wasn't qualified or something.
19   Q. Okay. And you two were the only applicants for
20   the position?
21   A. That I know of --
22   Q. Okay.
23   A. -- yes. I knew that we were the two
24   runner-ups.
25   Q. Okay. You don't know whether there were

18

1    A. It came out in the Brownsville Herald and I
2    applied for it through -- through mail. I sent my
3    resume and four days when I applied to it I -- I
4    received a call from her.
5    Q. Okay. And she was the only person you
6    interviewed with?
7    A. Yes, when I was hired as a receptionist.
8    Q. Okay. And did you have any relatives working
9    there?
10   A. No, ma'am.
11   Q. Have you ever had any relatives working there?
12   A. No, ma'am, not to my knowledge, no.
13   Q. When did your job duties change from being a
14   receptionist?
15   A. When I was -- there was a position available as
16   an accounting clerk.
17   Q. Okay.
18   A. And around -- it was in May 1994.
19   Q. May of 1994?
20   A. Yes, ma'am.
21   Q. Okay. So you stayed as a receptionist for --
22   for one year?
23   A. Yeah, basically. It was from -- from August
24   of -- of '93 to May 13th, 1994. May -- May 14th, 1994
25   I started working in the finance department.

20

1    outside people that applied?
2    A. I don't know, ma'am --
3    Q. Okay.
4    A. -- no, but I don't think there was because I
5    believe that that was posted in-house first. It was
6    posted in-house and they -- the way the port usually
7    does things is they post a position in-house for about
8    five days and then after that then they'll run it --
9    you know, they'll advertise it like in the Brownsville
10   Herald.
11   Q. But you don't know weather or not there were
12   other applicants that applied for that position
13   in-house, you just know of Mr. Torres; is that right?
14   A. That's correct, yes, ma'am.
15   Q. Okay. And how do you know that they offered it
16   to him first and then he turned it down?
17   A. Because he called me up and he said that he
18   knew -- he told me that he didn't want it while I was
19   up in the -- at the switchboard.
20   Q. Okay. And then did you have an interview with
21   Ms. Duke?
22   A. I believe it was, yes.
23   Q. And then how did you find out you had been
24   hired?
25   A. They gave me the letter of -- of the -- of the

1  promotion of switchboard sign⊙y her.
2      Q. And then did you start working with her?
3      A. Yes, ma'am.
4      Q. Who else was working in the department at that
5  time?
6      A. At that time? It was Debby Lee Duke, Cristina
7  Valdez, Enriqueta Garcia, Letty Garcia, which is now
8  Letty Richardson and -- okay. I believe that was it.
9      Q. So there were only four of you -- five of you
10  including you?
11      A. I'm sorry. Lupita Lamas, too.
12      Q. Okay. What was Enrique -- Enrique?
13      A. Enriqueta, Ketta Garcia, Ketta Garcia.
14      Q. Ketta? Okay. What was Ms. Garcia's position?
15      A. At that time she was insurance personnel clerk.
16      Q. Okay. Ms. Valdez, what was her position?
17      A. Her position was comptroller.
18      Q. Letty Garcia, what was her position?
19      A. I believe she was accounts receivable.
20      Q. And Lupita --
21      A. She --
22      Q. -- Lamas?
23      A. I believe she was accounts payable.
24      Q. And what was your position?
25      A. Accounting clerk.

1      Q. Who I⊙held the position of accounting clerk
2  prior to you, if you know?
3      A. I do not know that person.
4      Q. Was it male or female?
5      A. I don't -- I don't know who -- there was only
6  those women working there when I got switched there
7  that I can recall.
8      Q. Was this a position that they created? Was
9  this a new position as far as you know?
10      A. As far as I know, no. I don't know. I don't
11  believe so.
12      Q. Okay. You don't know?
13      A. I don't know.
14      Q. Okay. What were your duties as accounting
15  clerk when you first started there?
16      A. Yes, ma'am. It was entering transactions in
17  the software, software, called software, filing,
18  folding invoices for the accounts receivable, accounts
19  payable, like the monthly invoices and preparing them
20  for them to go out to mail, stuffing them in envelopes
21  and basically that took -- that was a job that took
22  kind of like all day. I don't know what -- I can't
23  recall what else it was. I believe those were my main
24  duties.
25      Q. Okay. When did those job duties change?

23

1      A. Those job duties changed around -- if I can
2  recall it was somewhere around I would say the year
3  2000.
4      Q. Okay. Now, from 19 -- let's see, 1994 --
5      A. Yes, ma'am.
6      Q. -- until 2000 you had those job duties and then
7  you also had the job duties to relieve the
8  receptionist?
9      A. Around -- that I can recall it started around
10  2000.
11      Q. That's when you were started?
12      A. I would take care -- I was asked to take the --
13  take care of the switchboard for the -- for her morning
14  break, the afternoon break and the lunch hour, just me.
15      Q. Okay. In 2000, who was employed in the finance
16  department?
17      A. 2002?
18      Q. No. In 2000.
19      A. I'm sorry?
20      Q. In 2000.
21      A. In 2000, okay.
22      Q. When you -- when you had the switchboard and
23  you were asked to do that, who was that employee there?
24      A. I don't remember if it was that year, okay? It
25  was Veronica Ramos.

24

1      Q. No, no. I didn't ask you who the receptionist
2  is. Who was employed in the finance department?
3      A. She started, Veronica Ramos.
4      Q. Okay. Who else?
5      A. We had -- okay. We had another gentleman. His
6  name was Sergio Elizondo.
7      Q. Sergio what?
8      A. Sergio Elizondo.
9      Q. Okay. Who else?
10      A. At that time that was -- that was about it.
11      Q. No. Did you still have all the people you've
12  already named? In the finance department, who was
13  employed in 2000? Was Deborah Duke still there?
14      A. Yes.
15      Q. Okay. Was --
16      A. Cristina was there.
17      Q. Valdez was there?
18      A. Yes. I believe Enriqueta Garcia was moved
19  from -- from there to -- to the foreign trade zone
20  department, but I don't remember if it was that year.
21  You know, there was some changes --
22      Q. Okay.
23      A. -- made.
24      Q. All right. But was Letty Garcia still there?
25      A. She was switched over to the harbor master

1    office.
2        Q. Okay. Was Lupita Lamas still there?
3        A. She -- okay. Let me -- Ms. Lupita Lamas was
4    transferred first to the -- to the foreign trade zone
5    department before -- before Enriqueta Garcia.
6        Q. Okay. So the only people that were -- that
7    were working there in 2000 were Ms. Ramos, Mr.
8    Elizondo, Ms. Duke, Mr. -- Ms. Valdez and you?
9        A. And -- yes, I believe so.
10       Q. Now, between 2004 and 2000, had you made any
11   requests for a transfer or had you applied for any
12   other positions that came open?
13       A. I applied for a position in 1997 for accounts
14   receivable.
15       Q. And that had been the position that Ms. Garcia
16   had been performing?
17       A. That was a position that Ms. Garcia was -- yes,
18   that's correct, uh-huh.
19       Q. Had you asked to get out of the finance
20   department?
21       A. No, no, ma'am.
22       Q. Have you ever applied for a position outside of
23   the finance department?
24       A. No, ma'am, but I was asked to.
25           MS. NEALLY: Object to the responsiveness

1    of the answer after no, ma'am.
2        Q. (BY MS. NEALLY) 1997 you applied for the
3    accounts receivable position. Was that because Letty
4    Garcia had left the position and it was open?
5        A. That's correct.
6        Q. Okay. And who was hired instead of you?
7        A. Rose Hinojosa.
8        Q. Rosie?
9        A. Hinojosa.
10       Q. Who else applied for that position besides you
11   that you know of, if anyone?
12       A. That I know of? I'm not aware of.
13       Q. You don't know?
14       A. I don't know. I don't know.
15       Q. Okay. In 2000, what were you earning?
16       A. I would say -- around $8 an hour I would say.
17       Q. Had you been getting consistent cost of living
18   raises during this time?
19       A. The last three years I believe, in 2001.
20       Q. Well, how about before that? You had gone up
21   and your salary had gone up since you started, right --
22       A. Yes, ma'am.
23       Q. -- in 1994?
24       A. Uh-huh.
25       Q. And had gone up consistently with the cost of

27

1    living raises that they gave to everyone at the port,
2    right?
3        A. That's correct.
4        Q. When do you recall getting any merit raises?
5        A. I believe I got a merit raise around -- I might
6    have gotten one around 2002.
7        Q. Any other merit raises that you can recall?
8        A. No, ma'am.
9        Q. Okay. And you've never applied for a position
10   outside of the finance department within the port such
11   as to the foreign trade zone or to the harbor master,
12   any of those positions?
13       A. No, ma'am, no. Just within the finance
14   department.
15       Q. And that was in 1997?
16       A. Seven. That was offered.
17       Q. Pardon?
18       A. That it was offered.
19       Q. What do you mean it was offered?
20       A. Well, it was up for posting.
21       Q. Okay. That was the only position that --
22       A. Yes.
23       Q. -- you ever applied for within the finance --
24       A. Yes.
25       Q. -- department, correct? You interrupted me, so

28

1    I'm trying to get -- that was the only position that
2    you ever applied for within the finance department
3    other than your initial job, which was in 1997 --
4        A. Yes, ma'am.
5        Q. -- correct?
6        A. That's correct, yes, ma'am.
7        Q. Okay. You said that in 2000 your job duties
8    changed and you were also added to do the
9    receptionist's duties, correct?
10       A. Yes, ma'am.
11       Q. Who had been doing them prior to you, the
12   relieving of the breaks? Who did them from 1994 when
13   you left the receptionist job until 2000?
14       A. Ma'am, I'm going to be very honest with you. I
15   don't know how they were doing it before. I really
16   don't know.
17       Q. Okay. Who was the receptionist from 1994 until
18   2000?
19       A. Okay. It was -- we had several receptionists.
20   Letty Gonzalez. From what year? I'm sorry.
21       Q. 1994 when you left and you went into the
22   finance department --
23       A. Oh, no, no, no.
24       Q. -- in 2000.
25       A. Okay. I'm sorry. It was Maria Elena, Maria

29

1  Elena. I don't remember her last name.
2     Q. When did she leave?
3     A. She was probably there like two years.
4     Q. Okay. So that's two years of that six year
5  period. Who else was the --
6     A. Then there was another one named Carmen
7  Gonzalez.
8     Q. Okay. And how long was she there?
9     A. She was there like -- like maybe three years --
10    Q. Okay.
11    A. -- but then she got switched to --
12    Q. I'll go over to where they ended up, but just
13 keep telling me who they were.
14    A. Yes, ma'am. Let me see. I believe after
15 Carmen it was Letty Gonzalez. There was a couple of
16 them in there.
17    Q. Okay.
18    A. There was another one before -- before Letty
19 and after Carmen. I can't think of her --
20    Q. Okay.
21    A. -- name.
22    Q. In 2000, who was the receptionist, Letty
23 Gonzalez?
24    A. I believe so, yes, ma'am.
25    Q. Okay. And when did she start? Do you know?

30

1     A. I would estimate around 2000, ma'am.
2     Q. Okay. About the same time that your duties
3  started?
4     A. I believe so, yes, ma'am, uh-huh.
5     Q. Okay. This other one, Maricela -- where did
6  she go?
7     A. She left the port.
8     Q. She quit?
9     A. Yes.
10    Q. Okay. How about Carmen? You said she got
11 transferred to another job?
12    A. She got transferred to another department there
13 within the port.
14    Q. Okay. And you don't know how they handled the
15 receptionist's breaks?
16    A. I don't recall, you know, before it --
17    Q. Okay.
18    A. -- it involved me.
19    Q. Do you know what department Carmen got
20 transferred to?
21    A. Yes. It was the assistant to one of the
22 commissioners. Her name was Evelyn Dale. She was one
23 of the commissioners.
24    Q. Okay. All right. Letty Gonzalez was -- how
25 long was she the receptionist?

31

1     A. About two to three years I would say.
2     Q. Okay. And then who's the -- who was the next
3  receptionist after that?
4     A. It's Mary Cuellar.
5     Q. Is she the receptionist today?
6     A. Yes, ma'am.
7     Q. And she started in about 2003?
8     A. Yes, ma'am. That sounds about right.
9     Q. Okay. When was the next time that your job
10 duties changed after 2000?
11    A. My job duties -- aside from taking care of the
12 switchboard and my regular duties? They -- they
13 remained the -- they basically remained the same. I
14 had some other inside the department tasks that I --
15 that I needed to do, that I was assigned to do.
16    Q. Are you still the accounting clerk?
17    A. Yes, ma'am, one of them.
18    Q. They now have another one?
19    A. Yes, ma'am.
20    Q. Is that correct? They have another one and
21 that's Rick Rodriguez?
22    A. Rick -- Ricky Rodriguez, yes, ma'am.
23    Q. Did they add people to the department?
24    A. Yes, ma'am. They added Petra Champion. She
25 was the -- the secretary to the engineer, which was

32

1  Richard Berry. Now, she's back in the finance
2  department.
3     Q. But did she take somebody else's job or did
4  they give a new -- did she have a new job?
5     A. It was -- when Irma Gawenda left they kind of
6  assigned some of the things that she did to -- to Ms.
7  Champion.
8     Q. Okay.
9     A. And they brought Letty Richardson back around
10 2003.
11    Q. That's Letty Garcia?
12    A. Letty Garcia, yes.
13    Q. Okay.
14    A. But now she's Richardson.
15    Q. And what was her position when she returned?
16    A. Her position is -- she's operations clerk. She
17 handles a lot -- the vessels that come in from the
18 port, you know, at the harbor master. Basically what
19 she was doing over there at the harbor master, I
20 believe she's doing it now in the finance department.
21    Q. Okay. What -- does she have a title?
22    A. Yes. I believe it's operations clerk. I'm not
23 too sure about her title.
24    Q. Okay. Who else is now at the department?
25    A. Okay. It's Petra Champion, myself, Ricky

**Page 34**

1  Rodriguez, Rose Hinojosa and ⬭ Richardson and Letty
2  Trevino.
3      Q. Ms. Valdez is still there?
4      A. Yes, ma'am, Cristina Valdez.
5      Q. And is Ms. Duke still there?
6      A. Yes, ma'am.
7      Q. What's Letty Trevino's position?
8      A. Letty Trevino's position is -- she's -- I'm not
9  sure what her position is. I'm not sure about her
10 title, ma'am. I'm sorry.
11     Q. You don't know Letty Trevino's position?
12     A. Title, no, ma'am.
13     Q. What does she do?
14     A. She does -- she does a little bit of the
15 utilities. She does things with the utilities. She
16 handles statements. She handles --
17     Q. Between -- okay. So you now have two extra
18 people than -- than you had before when you -- back in
19 2000, correct?
20     A. Yes, ma'am.
21     Q. And between 2000 and 2005, today --
22     A. Yes, ma'am.
23     Q. -- who else worked at the finance department?
24     A. That had gone or that had left or --
25     Q. Yes.

**Page 35**

1      Q. In approximately 2001, right?
2      A. 2002 approximately, 2001.
3      Q. She has now quit the port; is that right?
4      A. She -- she resigned.
5      Q. Okay. And do you know why she resigned?
6      A. Yes.
7      Q. Why?
8      A. She had a lawsuit with the port.
9      Q. For what?
10     A. I -- I'm not sure what it was about.
11     Q. Okay. How about these other people that you
12 have named? Veronica Ramos, she's no longer there,
13 correct?
14     A. That's correct.
15     Q. Where did she go?
16     A. She went to the maintenance department as an
17 inventory clerk, the position that Ms. Duke wanted me
18 to take.
19     Q. Okay. Do you know why she went there?
20     A. Because I -- I didn't want the position.
21     Q. Okay. How about Sergio Elizondo?
22     A. He's -- he's been gone for several years, in
23 these --
24     Q. Do --
25     A. -- five years.

**Page 36**

1      Q. Do you know where he lives?
2      A. San Benito, Texas. He resided in San Benito,
3  Texas. From what I had understood he was a native
4  there.
5      Q. Have you spoken to him in the last five years
6  since he left?
7      A. I spoke to him like once very briefly around
8  four years ago possibly. He called one time to --
9  to the -- to the finance department. We just spoke
10 very briefly, just wanted to know how we were doing and
11 stuff.
12     Q. Okay. You said Orlando Medina was there
13 briefly?
14     A. Yes, ma'am.
15     Q. And what was his position?
16     A. He was -- I believe he was something like
17 operations, director of operations or something like
18 that.
19     Q. Okay. How --
20     A. I'm not too certain about his title.
21     Q. You said he was only there a couple of months?
22     A. He was there, yes, very, very briefly.
23     Q. Did they replace him?
24     A. After he left from that office they brought Ms.
25 Gawenda from the office where she was at to that office

1      A. Okay, let me think. Okay. Irma Gawenda. She
2  left and I would say that was about it.
3      Q. Didn't you tell me Irma Gawenda was the
4  secretary to the --
5      A. To Mr. Cruz.
6      Q. Right.
7      A. To the port director and then they got
8  transferred from there around 2001 or so, maybe 2002
9  to -- no. Okay. They had transferred her to
10 purchasing manager. They placed her in an office back
11 in the -- behind the finance department there's another
12 office in the back that used to be the railroad. They
13 put her there and then when they made a -- when -- I
14 failed to -- to -- to let you know about one person
15 that was working there. His name was Orlando Medina.
16 He was the -- he was hired -- he was hired as a big
17 shot. He was hired like -- something like Debby's
18 boss, but he -- he left in a very short time.
19     Q. Okay. Let's back up a little bit. Who else --
20 my question to you was, who else worked at the finance
21 department between 2000 and 2005 other than the people
22 you've already told me about? You told me that Irma
23 Gawenda had been transferred over to the purchasing
24 manager; is that correct?
25     A. Yes. She -- yes.

37

1  and then they opened up a position for personnel
2  manager, which Ms. Saban is back there in the finance.
3      Q. I'm sorry?
4      A. Where Ms. Jo Lynn Saban is now at. That used
5  to be Irma's office.
6      Q. Okay. Who else was employed from 2000 and 2004
7  in the finance department that you haven't told me
8  about?
9      A. I believe those are the -- only -- we had
10 summer help. You know, we had summer help that would
11 come and go. They were just there, kids, during the
12 summer.
13     Q. Okay.
14     A. Do you want their names?
15     Q. No. I'm talking about full-time people.
16     A. No, ma'am. Basically that would be it.
17     Q. Okay. Lupita Lamas, did you tell me where she
18 went?
19     A. Yes. From the finance department she was
20 switched over to -- to the foreign trade zone manager.
21 She was helping Irma Gawenda at the purchase --
22 doing -- purchasing was being done back there at that
23 time --
24     Q. Okay.
25     A. -- where now the foreign trade zone is at.

38

1      Q. So she's still employed, but in a different
2  department?
3      A. Who?
4      Q. Ms. Lamas.
5      A. No, ma'am. She's been gone for several years.
6      Q. Okay. Now, you had the -- a position -- you've
7  created a couple of new positions, the accounting clerk
8  and you now have two accounting clerks, correct?
9      A. Yes, ma'am.
10     Q. And Ricky Rodriguez has one of those and you
11 have the other one?
12     A. Yes, ma'am.
13     Q. Okay. Who hired Ricky Rodriguez?
14     A. Deborah Lee Duke.
15     Q. Petra Champion, she's new, right?
16     A. She's not new. She just was transferred from
17 as an engineer to -- back to the finance department.
18     Q. Okay. And then Letty Garcia Richardson, she
19 came back. You don't know her position for sure,
20 right?
21     A. I don't know her position for sure. I don't
22 know her title.
23     Q. And then Rosie Hinojosa, you don't know her
24 position?
25     A. She's accounts receivable, Rose Hinojosa.

39

1  She's accounts receivable because they switched around
2  so many duties --
3      Q. Okay.
4      A. -- when they brought these people in.
5      Q. And when did they bring all these people in?
6      A. In the beginning of 2003.
7      Q. Now, were these positions that they opened up
8  and that they had people apply for or did they just
9  make transfers?
10     A. They made transfers and changes.
11     Q. Did they actually advertise for these
12 positions?
13     A. Not to my knowledge, no, ma'am. They were just
14 told that this is now their position from what I
15 understand.
16     Q. These were just internal transfers, correct?
17     A. Yes, ma'am, I believe so.
18     Q. Except for Ricky Rodriguez, correct?
19     A. Except for Ricky Rodriguez.
20     Q. Was Ricky transferred or did he actually apply
21 for the position?
22     A. I believe he applied for the position.
23     Q. Was it advertised in the newspaper or just
24 advertised within the port?
25     A. It was -- I don't believe it reached to the --

40

1  it got to reach to the Brownsville Herald because when
2  it was posted in-house Ms. Ramos was still there and
3  Ms. Ramos had told me that there was a new guy that
4  already had the position. While that -- while that was
5  posted up she -- she made a comment to me that there
6  was already somebody who had that position.
7      Q. And he hadn't -- but he was hired from the
8  outside?
9      A. From the outside.
10     Q. Okay.
11     A. His father-in-law works for the -- for the
12 shop.
13     Q. So his father-in-law could have told him about
14 the position. You don't know?
15     A. About 20 years. I believe so, yes.
16     Q. But you don't know?
17     A. I don't know.
18     Q. Okay. Now, when did your job duties change
19 after 2000? You said you have new job duties now?
20     A. Okay. With the exception of now that I'm doing
21 partial accounts payable work, at the beginning of 2003
22 now I'm doing partial of what Ms. Ramos was doing,
23 not -- not everything.
24     Q. Okay. Did that change in the beginning of
25 2003?

1    A. Yes.
2    Q. January 2003?
3    A. That's correct.
4    Q. How about when did you get relieved of the
5 receptionist's duties at lunch?
6    A. When Ms. -- Ms. Champion was transferred to
7 the -- to the finance department. Only -- only the
8 lunch hour.
9    Q. Right. When did that happen?
10    A. I would say around January 2003 I would say.
11    Q. As we sit here today, are you still doing
12 the -- the breaks, covering for the receptionist for
13 the breaks?
14    A. Yes, ma'am, the morning break, her morning
15 break and the afternoon break.
16    Q. And are those supposed to be 15 minutes?
17    A. Yes, yes.
18    Q. And Ms. Champion is now doing the lunchtime --
19    A. Lunch hour.
20    Q. -- relief; is that right?
21    A. That's correct.
22    Q. What happens when the receptionist is sick?
23 Who covers for her then?
24    A. That just started at the -- in -- in 2004 there
25 was a little bit of changes made as far as that is

42

1 concerned. Now, Ms. Duke started asking the other
2 department members to help with that and -- and she's
3 been dividing it whenever the receptionist leaves for a
4 week or so.
5    Q. Okay. How about before 2004? Who would cover
6 for her when she was sick or took a vacation? I'm
7 sorry?
8    A. Me.
9    Q. Okay. You need to answer out loud.
10    A. I'm sorry.
11    Q. Okay. So from 1994 until 2004 it's your
12 testimony that you covered for all absences by the
13 receptionist?
14    A. No. Around 2000 I believe.
15    Q. So from 2000 until 2004 is your testimony?
16    A. Right.
17    Q. Is that correct?
18    A. I believe -- yes, ma'am.
19    Q. Nobody else covered for her if she was out on
20 vacation or anything like that?
21    A. No, ma'am. I had to go out there.
22        THE REPORTER: I'm sorry?
23    A. I -- it was me.
24    Q. Now, Ms. Gonzalez was transferred you said to
25 another position?

43

1    A. Yes, ma'am.
2    Q. And what's her position?
3    A. She's the foreign trade zone clerk.
4    Q. Now, is the -- that department housed in the
5 same building as the receptionist?
6    A. No, ma'am. It's -- it's in the same building,
7 but it's toward the back of the building.
8    Q. Which ones of your co-workers have you
9 discussed your EEOC claims and your lawsuit with?
10    A. No one. I never have mentioned anything about
11 the EEOC nor lawsuit to anyone.
12    Q. Okay. So it's your testimony that you have not
13 mentioned the fact that you have a lawsuit pending
14 against the port --
15    A. I never had told --
16    Q. Excuse me. I need to finish my question
17 completely, okay? It's your testimony that you have
18 not discussed or spoken to any of your co-workers about
19 the lawsuit that you filed against the port or the EEOC
20 claims that you have filed and I'm talking about not
21 just the last one, but all of them, to any of your
22 co-workers at the Port of Brownsville; is that correct?
23    A. That's correct.
24    Q. Have you requested that any of your co-workers
25 testify on your behalf?

44

1    A. No, ma'am.
2    Q. How about any of your former co-workers? Have
3 you talked to any of your former co-workers about the
4 fact that you filed EEOC claims and a lawsuit?
5    A. No, no, ma'am. I -- I pretty much keep that to
6 myself.
7    Q. And you haven't requested that any of your --
8 your former co-workers testify on your behalf?
9    A. No, ma'am.
10    Q. Do you socialize with any of your co-workers or
11 your former co-workers?
12    A. Outside of work?
13    Q. Yes.
14    A. No, ma'am.
15    Q. Okay. You have brought suit alleging that --
16 well, in your interrogatory answers you -- you're
17 claiming lost wages, correct?
18    A. Yes, ma'am.
19    Q. And you said you've been making 9.95 since
20 April 2004. Is that still what you're earning?
21    A. Yes, basically, yes, ma'am.
22    Q. Now, what do you mean by basically?
23    A. It's like 9.95 or 9.97, something like that.
24    Q. Okay. And when do the raises come around?
25    A. In March, ma'am.

**46**

1    Q.  Okay.  So you don't know that your salary will
2  be for March '05?
3    A.  Well, I -- there's been talk that they're going
4  to give us the three percent cost of living this year
5  because it will be the last year that they're going to
6  do that and after this -- after this year they're only
7  going to be doing the -- the merit raises.
8    Q.  Okay.  But you're claiming that you should have
9  been making $12 an hour since January of '03; is that
10 correct?
11   A.  Yes, ma'am.
12   Q.  Why do you make that claim?
13   A.  Because I -- I feel I'm contributing enough to
14 the port and substantial to the port that -- that I'm
15 worth $12 an hour and everything and anything I'm --
16 I've been asked to do I've done it to the best of my
17 ability.
18   Q.  And that's your sole basis for claiming that
19 you should be getting $12 an hour since January '03?
20   A.  Yes, ma'am.
21   Q.  Okay.  And then you say, since 2002 I should be
22 making 65 cents more.  What's your basis for saying
23 that?
24   A.  Okay.  In the year -- I guess that was that
25 year in 2002 there was a budget that was held for that

1  fiscal year and there was two people that were going to
2  make -- they were going to be given like $1.20 raise
3  each.  Those two people was myself and Enriqueta
4  Garcia.  I ended up getting a 65 cent raise and in
5  that -- in that term that placed the receptionist at a
6  higher pay rate than I -- for that fiscal.
7    Q.  Okay.  Did you see the budget?
8    A.  Yes.  It was shown to me by -- by a co-worker
9  of mine.
10   Q.  Do you have a copy of the budget?
11   A.  No, ma'am.  It was just shown to me by a
12 co-worker.
13   Q.  Okay.  Which co-worker?
14   A.  Letty Trevino.  At that time she was doing some
15 personnel -- Ms. Duke was still personnel manager and
16 she was doing -- helping Ms. Duke with the personnel
17 duties.
18   Q.  And was the 65 cents a merit raise?
19   A.  That was like a merit raise, yes, uh-huh, yes,
20 ma'am.
21   Q.  Okay.  Because I think I asked you about what
22 merit raises you received and I thought you told me
23 about one that happened -- you only had gotten one and
24 that was earlier than that, so you've actually gotten
25 two merit raises, correct?

**47**

1    A.  Possibly, yes, ma'am.
2    Q.  Okay.  And do you know who made the decision
3  that you weren't going to get the $1.20 raise?
4    A.  Ms. Duke.
5    Q.  How do you know that?
6    A.  I believe that she based it upon the --
7    Q.  I don't want to know what you believe.  I want
8  to know what you know.  How do you know that Ms. Duke
9  made the decision?
10   A.  I don't know.
11   Q.  You have a theory about it --
12   A.  Yes, ma'am.
13   Q.  -- but you do not know, right?
14   A.  That's correct.
15   Q.  And you have not spoken to anybody about who
16 made the decision that you weren't going to get $1.20?
17   A.  That's correct.
18   Q.  Okay.  Now, that's the 65 cents in June '02,
19 right?
20   A.  Yes.  That sounds about right, yes, ma'am.
21   Q.  Okay.  And the $12 is just because you feel
22 like you've been there --
23   A.  Yes, ma'am.
24   Q.  -- and you should get that, right?
25   A.  That's correct.

**48**

1    Q.  Okay.  And you say in your answers -- let's
2  see.  Which receptionist was making a higher hourly
3  rate than you?
4    A.  Letty Gonzalez.
5    Q.  Okay.  And how do you know that?
6    A.  I -- I saw her -- I saw her -- what she earned
7  in -- in -- I used to put the checks together, the
8  payroll checks, and I just saw what she earned.
9    Q.  Had she been at the port longer than you?
10   A.  No, ma'am.  I have.
11   Q.  Did she start in 2000?
12   A.  Around so, yes, ma'am.
13   Q.  Do you know what her experience is before she
14 got there?
15   A.  No, ma'am.
16   Q.  Do you know what her education is?
17   A.  No, ma'am.
18   Q.  Okay.  You say, I believe I should be getting
19 paid $12 an hour since January 2003 because I know that
20 our carrier made as much a few years back and I always
21 compare his work of importance to mine.  Who is the
22 carrier that you're talking about?
23   A.  Luis Lopez.
24   Q.  And who -- what is a carrier?
25   A.  Carrier is someone -- his job is to run errands

1 for the port.
2    Q. Okay. And how do you know he made $12 an hour?
3    A. I looked at when I was stuffing the envelopes.
4    Q. Okay. Do you know how long he had worked at
5 the port?
6    A. He has about ten years.
7    Q. So he's been working there since approximately
8 1995?
9    A. That's correct, yes, ma'am.
10    Q. He started around the same time you did or a
11 few years later?
12    A. About one or two years later, ma'am.
13    Q. Okay. You said you had to pay off a school
14 loan?
15    A. Yes, ma'am.
16    Q. And what school loan was that?
17    A. The one from South Texas Vo-Tech. They were
18 taking out on a weekly basis from my -- from my check.
19    Q. When did you go to South Texas Vo-Tech?
20    A. In 19 -- 1991, 1992 I believe.
21    Q. Okay. So that was before you came to the port?
22    A. Yes.
23    Q. Did you ever speak to Ketta Garcia to see if
24 she got the $1.20 raise?
25    A. No, ma'am. I never talked to -- spoke to her.

---

1    Q. Did you ever see any evidence that she got the
2 $1.20 raise?
3    A. Yes.
4    Q. And what would that be, when you were looking
5 at people's payroll checks when you were stuffing them
6 in envelopes?
7    A. That's correct.
8    Q. You refer in your documents -- in your answers
9 to discovery that your boss signed an agreement when
10 she gave you the position of accounting clerk in 1994
11 that you were no longer responsible for receptionist
12 backup. Where is that agreement?
13    A. That was the letter of when I was given the
14 position of accounting clerk.
15    Q. Do you have a copy of that letter?
16    A. We have a copy of that letter.
17        MS. ESPARZA: It's probably in --
18        MS. NEALLY: I have not seen a copy of
19 that letter. You know, I've looked at what's been
20 attached and there's no letter dated 1994.
21        MS. ESPARZA: There's a letter --
22        MS. NEALLY: The letter says --
23    A. I have the letter.
24    Q. Does the letter specifically say you will no
25 longer have to do receptionist's duties?

---

51

1    A. Yes.
2    Q. Okay. That was 1994, right?
3    A. Yes, ma'am.
4    Q. And six years expired in 1996, right, I mean,
5 until 2000 when you were reassigned those duties; is
6 that right?
7    A. Yes.
8    Q. Okay.
9        MS. ESPARZA: We'll look through the
10 documents during a break and -- and he may have it and
11 if we do I'll produce it to you.
12        MS. NEALLY: Okay.
13    Q. (BY MS. NEALLY) Ricky Rodriguez doesn't do the
14 receptionist's duties, right?
15    A. That's correct.
16    Q. Did Mr. Lopez, the other --
17    A. Luis Lopez?
18    Q. No, the other man that was employed at the --
19 I'm sorry. Sergio Elizondo, did he ever do the
20 receptionist's duties?
21    A. No, ma'am.
22    Q. In your responses to interrogatories you refer
23 to a meeting with Deborah Duke in -- on December 18th,
24 2002?
25    A. Yes, ma'am.

---

52

1    Q. Was anyone present at that meeting besides you
2 and Ms. Duke?
3    A. It was just us two.
4    Q. Okay. What -- what was the purpose of that
5 meeting? Why were you -- did you ask for the meeting
6 or did she ask you to come in?
7    A. No, ma'am. She asked me to come in. She
8 had -- she brought to my attention that she believed
9 that there was a new position that was going to be
10 coming up approximately six months from that time in
11 the maintenance department, that of inventory clerk and
12 she thought it would be perfect for me, that she could
13 not offer anything else other than what I was doing in
14 the finance department.
15    Q. Did she say why she couldn't offer you anything
16 else?
17    A. Because she -- she didn't say why. She just
18 said that and -- and that if I didn't take that
19 position, then I would have to be doing the accounts
20 payable and that she had her reservations about me not
21 being able to pick that up and that in -- if I didn't
22 pick it up while she was able -- while she was willing
23 to come up with some time for me to pick that up that
24 she would have to fire me.
25    Q. Say that -- say that last part again about the

1  accounts payable, that you -- ha(  )u started doing the
2  accounts payable?
3      A.  No, ma'am.
4      Q.  So she was telling you, I'm going to start
5  training you for the accounts payable?
6      A.  If I didn't take that position of the -- of the
7  inventory clerk at that -- you know, at that time.
8      Q.  Okay.  And that if you didn't pick it up that
9  you would be fired, right?
10     A.  Right.
11     Q.  And that was back in December --
12  18th, 2002.
13     Q.  -- 2002, right?
14     A.  Yes, ma'am.
15     Q.  And you're still employed there, right?
16     A.  Yes, ma'am.
17     Q.  And now you're doing some of the accounts
18  payable, right?
19     A.  Yes, ma'am.
20     Q.  Okay.  You asked for damages of $15,000 in
21  back pay.  You have been continuously employed with the
22  Port of Brownsville since 1994, correct?
23     A.  1993.
24     Q.  I'm sorry, 1993.
25     A.  Uh-huh, yes, ma'am.

1      Q.  Okay.  (  )d there's never been a time you've
2  been suspended?
3      A.  Yes.
4      Q.  You have been suspended?
5      A.  Yes, without pay.
6      Q.  When were you suspended without pay?
7      A.  In --
8      Q.  Oh, that's right.
9      A.  -- December of 2002.
10     Q.  That's right.  December 2002?
11     A.  Yes, ma'am.
12     Q.  And how long were you suspended without pay?
13     A.  For one day.
14     Q.  For one day.  And what is one day of suspension
15  without pay worth?
16     A.  Approximately $80.
17     Q.  Okay.  And other than that one day you've been
18  continuously employed, correct?
19     A.  Yes, ma'am.
20     Q.  You've been paid every day that you're due,
21  correct?
22     A.  Yes, ma'am.
23     Q.  Okay.  Now, December 2002, why were you -- why
24  were you suspended without pay?
25     A.  Well, Ms. -- Ms. Duke was out on a -- on a

55

1  seminar.  Ms. -- Ms. Valdez was in charge and at that
2  time Mr. Luis Lopez had a heart attack and one of the
3  guys, a young guy from the shop, was taking his place
4  at the -- in the -- you know, cleaning up and stuff
5  like that because he also does a little bit of cleaning
6  up and stuff and he wanted to -- he had asked the --
7  the lunch -- the receptionist to take -- he was going
8  to invite her out to lunch for a special lunch hour
9  other than her normal lunch hour and I had a lot of
10  work to do back in the accounting department and Ms.
11  Valdez wanted me to -- to cover for the receptionist,
12  you know, for that -- for that special lunch hour that
13  they wanted to take and I argued with -- Ms. Valdez
14  approached me and I had -- I had tried to come up with
15  another -- a method to see if someone else could help
16  during that lunch hour because I was very swamped with
17  my -- my work that I do and so we argued back and forth
18  and I -- and I expressed to Ms. Valdez because I didn't
19  think that that was fair how they wanted just me to
20  cover for the receptionist every time she wanted, you
21  know, a special lunch hour or what have you and she
22  said, well, you made an agreement with the EEOC.  Yes,
23  but Ms. Duke also breached that agreement with the
24  EEOC.
25          MS. NEALLY:  I'm going to object to the

56

1  responsiveness of the answer.
2      Q.  (BY MS. NEALLY)  You refused to perform the
3  duties of the receptionist on that date, correct?  Is
4  that the date that -- on the -- in December, right?
5      A.  Well, yes, I guess, yes.
6      Q.  Okay.
7      A.  But she --
8      Q.  And Ms. Valdez was in charge of the department?
9      A.  At that time.
10     Q.  At that time, right?
11     A.  Yes.
12     Q.  She was your immediate supervisor, correct?
13     A.  That's correct.
14     Q.  And she gave you an order to -- to fill those
15  duties, correct, and you refused?
16     A.  There was circumstances around that.
17     Q.  I understand there were circumstances, but
18  that's -- that's the bottom line --
19     A.  That's the bottom line.
20     Q.  -- give to you?
21     A.  Uh-huh.
22     Q.  Okay.  Other than that $80, how do you come up
23  with $15,000 that you're owed in back pay?
24     A.  I've had -- I've had -- like, for example, like
25  that one -- when that day that I was arguing with Ms.

57

1    Valdez she was raising up my blood pressure and she
2    just kept on arguing with -- we kept arguing back and
3    forth and I could hear my heart pounding real fast and
4    I believe that if I would have stayed there arguing
5    with her more I would have dropped dead, so I had to
6    get out of there just --
7            MS. NEALLY: Object to the responsiveness
8    of the answer.
9        A. I'm sorry.
10       Q. I'm just asking you -- I'm not asking you about
11   mental anguish or your medical bills. I'm asking you
12   about back pay right now. You've given a figure in
13   your responses to interrogatories that's sworn to where
14   you said that you're owed $15,000 in back pay and I
15   want to know where you come up with that figure. How
16   do you get to $15,000? Have you done any calculations
17   to figure out exactly how much you're owed in back pay?
18       A. No, ma'am.
19       Q. Okay. So that's just an estimate on your --
20       A. That's correct.
21       Q. -- your part, right?
22       A. Yes, ma'am.
23       Q. It's not supported by any hard figures,
24   correct?
25       A. That's correct.

58

1        Q. Medical bills, you've given a figure that you
2    are owed $10,000. Have you done any calculations to
3    determine how much you've spent in medical bills?
4        A. No, ma'am.
5        Q. Do you have insurance with the -- the port?
6        A. Yes, ma'am.
7        Q. Okay. And so what's your co-pay?
8        A. My co-pay is $15 for a doctor visit and $10 for
9    medicine, for each medicine prescribed.
10       Q. Have you done any calculations to determine how
11   much money you've expended on doctors' visits in the
12   last five years for that?
13       A. No, ma'am. I haven't, not -- no.
14       Q. Have you had any other out-of-pocket expenses
15   that you blame on the port for medical expenses?
16       A. No, ma'am.
17       Q. Okay. Now, you've given a figure for $250,000
18   for mental anguish. Have you -- and you are taking
19   medication for -- Zoloft, right, for depression?
20       A. Yes, ma'am.
21       Q. And you blame all of that on the port?
22       A. Yes.
23       Q. Are there any other contributing factors for
24   your depression? Do you have an unhappy home life?
25       A. No, ma'am.

59

1        Q. You live alone; is that right?
2        A. That's correct.
3        Q. Do you date?
4        A. No, ma'am.
5        Q. Do you have any outside activities other than
6    your work?
7        A. Yes, I do. I have some friends that I go
8    visit.
9        Q. Okay. Other than these friends that you go
10   visit, do you have any hobbies, anything like that?
11       A. I like to go bicycle riding. I like to walk
12   for my blood pressure. I do that basically on the
13   weekends and --
14       Q. You work a 40 hour week?
15       A. Yes, ma'am.
16       Q. What are your hours?
17       A. 8:00 a.m. to 5:00 p.m. Monday through Friday.
18       Q. Do you work much overtime?
19       A. No overtime.
20       Q. So you work 8:00 to 5:00 Monday through Friday,
21   correct?
22       A. Yes, ma'am.
23       Q. Okay. On the weekends you like to exercise.
24   You still do that, right?
25       A. Yes, ma'am.

60

1        Q. Anything else that you do for a hobby,
2    relaxation?
3        A. Relaxation, go to a movie.
4        Q. And you do do those things, correct?
5        A. Yes, ma'am.
6        Q. Other than the settlement agreement that was
7    mediated by the EEOC, the conciliatory agreement, have
8    you -- are you aware of any other contracts?
9        A. No, ma'am. That's --
10       Q. The only one?
11       A. Yes, ma'am.
12       Q. Have you applied for any other positions since
13   working for the Port of Brownsville? Anywhere else?
14       A. Outside of the Port of Brownsville?
15       Q. Well, yeah. We've already discussed what you
16   did inside the Port of Brownsville, right?
17       A. Yes, ma'am.
18       Q. Okay. So outside of the Port of Brownsville,
19   have you applied for any other position?
20       A. Yes, part-time job, for a part-time job like in
21   the evenings.
22       Q. And where was that?
23       A. I applied at Wal-Mart.
24       Q. Anywhere else?
25       A. I was working at Time Warner Cable in Harlingen

1  for about a year or so, a part-time and then at H-E-B
2  when -- in Port Isabel when it first opened part-time.
3      Q. Anywhere else?
4      A. That's it.
5      Q. Are those the only places you've applied? I'm
6  not talking about just work. Are those the only places
7  you've applied for other positions?
8      A. I applied for -- about three years ago for a
9  position at -- in -- in Brownsville, the -- near the
10  Social Security, that they were looking for an
11  accounting clerk, which was about like probably three
12  or four years ago.
13      Q. Did you get hired for that position?
14      A. No, I didn't.
15      Q. The job at Wal-Mart, what were you doing for
16  them?
17      A. No. I applied there. I didn't get it. I
18  didn't get it.
19      Q. You didn't get hired?
20      A. Right, uh-huh.
21      Q. H-E-B you applied, but you didn't get hired?
22      A. I did get hired.
23      Q. And what were you doing for them?
24      A. A stocker, night -- night stocker.
25      Q. Okay. And how long did you do that?

1      A. I would say something like six months.
2      Q. And how about Time Warner Cable? How long did
3  you work? You worked there for about a year?
4      A. For about a year and a half, yeah, I believe.
5      Q. When was that?
6      A. What year?
7      Q. Yeah.
8      A. I would say probably like 2000, 2001.
9      Q. How about at H-E-B?
10      A. That was around probably 2002.
11      Q. Time Warner Cable, what was the position you
12  held for them?
13      A. It was a sales representative, answering the
14  calls for people that wanted to subscribe to cable.
15      Q. What were your hours with them?
16      A. It was something like 6:00 to 10:00 Monday
17  through Thursday. Then I get like a Friday off and
18  then I work on the weekend. I work like -- something
19  like 3:00 p.m. to 11:00 p.m. on Saturday and Sunday.
20      Q. Okay. And in 2002 you worked as a stocker.
21  What were your hours then?
22      A. It was around -- I would say like 6:00 to 10:00
23  from what I remember.
24      Q. How many days a week?
25      A. It was like 20 hours a week, possibly four days

1  a week.
2      Q. If it was 20 hours a week you would be working
3  five days a week.
4      A. Mainly it would be like -- I believe it was on
5  the weekends. It was like a Friday, Saturday and
6  Sunday I was putting the hours.
7      Q. Okay. Anywhere else -- any other jobs you've
8  held in the last -- even before 2000 while you've been
9  working at the port?
10      A. No, ma'am. Those are -- those are the jobs
11  that I've had.
12      Q. Have you -- have you applied anywhere in 2004
13  or 2005?
14      A. Other than the Wal-Mart, no.
15      Q. Yeah. Is this at the new Wal-Mart that they're
16  building or the Wal-Mart that they have?
17      A. This Wal-Mart by the port, the new --
18      Q. The new one?
19      A. Yes.
20      Q. Now, is that someplace you just applied for
21  or --
22      A. I applied. I stood in line for about four and
23  a half hours on the -- it was, you know, like for
24  part-time and I -- and I went and applied for the one
25  in Port Isabel when it opens when -- you know,

1  part-time.
2      Q. And the one in -- when was it that you applied
3  at this -- this new Wal-Mart that's going up?
4      A. When it came out in the -- it was probably like
5  three months ago. It came out in the paper that -- had
6  to wait in -- at the Cameron Works.
7      Q. Okay.
8      A. You know, there was a lot of people in line.
9      Q. Have you ever been arrested for anything?
10      A. Yes.
11      Q. When?
12      A. 19 -- I would say it would probably be 1999.
13      Q. And what was it for?
14      A. It was for PI.
15      Q. Was that in Port Isabel?
16      A. No, ma'am. That was in Harlingen, Texas.
17      Q. And what was the outcome of that?
18      A. It was -- it was just a -- a misdemeanor.
19      Q. Did you plead guilty?
20      A. I pled guilty.
21      Q. And were you fined or what?
22      A. It was -- yeah. There was a fine.
23      Q. And that was in 1999?
24      A. Approximately, yes. I don't remember exactly
25  the year.

1    Q. Any other arrests?
2    A. That -- that would be it.
3    Q. What were you earning at Time Warner?
4    A. I believe it was something like 6.40.
5    Q. And how about at H-E-B?
6    A. Like $6 I believe.
7        MS. NEALLY: Okay. Let's take a short
8    break. I need to get some copies made real quick.
9        THE WITNESS: Okay.
10       (Off the record.)
11   Q. (BY MS. NEALLY) Mr. Cantu, you've produced a
12   number of documents in response to your discovery. One
13   of the things that we've produced -- well, you know, I
14   just don't think it's a good idea to put a coke on a
15   carpet, you know? It's fine where --
16   A. I just --
17   Q. Yeah. I think he asked you to move it out of
18   the way just to -- okay. One of the things that you
19   produced in response to discovery is a number of
20   documents that are Bates stamped 316 to 342 and these
21   are in your handwriting, correct?
22   A. Yes, that's correct.
23   Q. Okay. And what's the -- they were not
24   presented to me in any order. What's the time period
25   that they were prepared?

1    A. I'm so -- The --
2    Q. The time period when they were prepared. Were
3    they prepared on the same date that they're written or
4    are these just your recollection of something that --
5    of things that occurred?
6    A. It was over a period of many, many days.
7    Q. When?
8    A. From -- from January 2003 all the way to
9    December.
10   Q. Of 2003?
11   A. Yes. January 2 -- of 2003 to basically
12   September I would say.
13   Q. Well, they're not in any order --
14   A. Okay.
15   Q. -- sir.
16   A. It was in the year 2003, ma'am.
17   Q. Okay. It was in the year 2003 and you prepared
18   them in the year 2003 --
19   A. Yes.
20   Q. -- correct?
21   A. Uh-huh.
22   Q. And what was your purpose in preparing them?
23   A. They were just self notes, ma'am.
24   Q. Okay. It's like a journal that you kept?
25   A. Yes.

1    Q. And this is something you provided to the EEOC,
2    correct?
3    A. I believe so.
4    Q. And this was -- in your opinion this was
5    evidence of discrimination against you; is that right?
6    A. Yes.
7    Q. When did you prepare them?
8    A. In -- throughout time, like in --
9    Q. But what time of day would you prepare them?
10   Would you prepare them at your house?
11   A. This would be at home or at the library
12   after -- not during working hours.
13   Q. Okay. So this would be after work?
14   A. Yes.
15   Q. And you said or at the library?
16   A. Uh-huh, yes, ma'am.
17   Q. Is that the Port Isabel library or some other
18   library?
19   A. Brownsville library.
20   Q. The Brownsville library?
21   A. Uh-huh.
22   Q. Is there any reason why you would prepare them
23   at the Brownsville library instead of going home?
24   A. Just an atmosphere. It's a better atmosphere
25   that I can write in and better light.

1    Q. Okay. And so you would go to the library after
2    work and -- and write out what had happened that day;
3    is that right?
4    A. Yes.
5    Q. Okay. Did you keep any other journals for any
6    other years?
7    A. Everything I -- I kept I had turned in to Ms.
8    Esparza.
9    Q. Did you keep any other journals for any other
10   years?
11   A. No, ma'am.
12   Q. Did you have any other journals for any other
13   years?
14   A. For several years, yes.
15   Q. Okay. What years did you keep journals?
16   A. I believe from 2000 to 2000 -- to the present.
17   Q. 2000 until 2005?
18   A. Yes. Well, 2004.
19   Q. Do you have a journal for 2004?
20   A. In 2000 -- it would be 2000 to 2003 because
21   2004 I basically -- I -- no. Just would be 2003 that I
22   know of.
23   Q. Okay. Well, let's try this again. Did you
24   keep a journal in 2000?
25   A. Yes.

1    Q. And was that a journal about things that
2  occurred at the office?
3    A. Yes.
4    Q. Okay. And did you provide that to your
5  attorney?
6    A. Yes.
7    Q. Okay. And then did you keep a journal in 2001?
8    A. I believe so, yes, ma'am.
9    Q. And was that a journal that you provided to
10  your --
11    A. Yes, ma'am.
12    Q. -- attorney?
13    A. Yes, ma'am.
14    Q. An then you kept one for 2003?
15    A. Yes, ma'am.
16    Q. And we have a copy of that, right?
17    A. Yes, ma'am.
18    Q. And then the one for 2004 you don't have one?
19    A. No, ma'am. I don't believe I do.
20    Q. You quit -- you quit keeping a journal?
21    A. Right.
22    Q. Why did you quit keeping a journal?
23    A. I -- in 2004 the finance department has -- a
24  lot of things changed for the better in 2004. It was
25  less tension, less in the sense up to a certain point.

1    Q. Okay, you're happier there now?
2    A. Yes.
3    Q. And how about in 2000? Why did you start
4  keeping a journal in 2000?
5    A. I believe -- I believe I was being
6  discriminated.
7    Q. Okay. So that was the first year that you
8  thought you were being discriminated against was in
9  2000?
10    A. Yes, ma'am.
11    Q. From 1993 until 2000 you did not feel you were
12  being discriminated against, correct?
13    A. I also felt I was being discriminated those
14  years, too.
15    Q. And -- but you waited until 2000 to start
16  keeping a journal because --
17    A. Yes, ma'am.
18    Q. -- things got worse or what?
19    A. Yes.
20    Q. Isn't it true that the reason you started
21  keeping a journal in 2000 is because you were upset
22  because you got the receptionist's duties?
23    A. No, ma'am.
24    Q. Okay. From 1993 until 2000 things weren't
25  severe enough that you felt that you needed to keep a

71

1  journal, correct?
2    A. Correct.
3    Q. And how have things changed for the better in
4  2004?
5    A. 2004, it's -- there's been -- there's been a
6  lot of -- there's been less tension atmosphere to -- to
7  work in.
8    Q. And what do you attribute that to?
9    A. To my lawsuit.
10    Q. When did you actually file your EEOC complaint?
11    A. I believe in 2001, ma'am.
12    Q. How about your second one?
13    A. In 2003.
14    Q. In -- well, I just made copies of it in here
15  somewhere. In a document that you provided to me and
16  it's a three page letter to the EEOC written in 2003
17  you indicate that, I enclose a cassette tape of our
18  recording.
19    A. Yes, ma'am.
20    Q. Have you provided that recording to your
21  attorney?
22    A. Yes, ma'am.
23        MS. NEALLY: And I would ask for a copy of
24  that.
25        MS. ESPARZA: We're getting a copy.

72

1    Q. (BY MS. NEALLY) Okay. What's the -- what was
2  the recording of, a conversation that you had with Ms.
3  Duke?
4    A. A reprimand.
5    Q. Okay. And when was that?
6    A. That was in 2003.
7    Q. What month?
8    A. I believe it was between August and November.
9    Q. August and November of 2003?
10    A. Right, I believe.
11    Q. And what was the reprimand about?
12    A. It was over an argument that Ms. Duke had
13  started with me out in the hallway.
14    Q. And what was the argument about?
15    A. The argument was about Ms. Duke had listened to
16  something that -- that was not -- it was in reference
17  to some invoices that needed to be paid and it turned
18  out to be different vendors. She thought she heard one
19  vendor and I -- I had clearly told her another vendor
20  and it just escalated from there.
21    Q. Okay. Did she know you were recording her?
22    A. Yes, once we were in her office.
23    Q. Okay. And was anybody else present during that
24  conversation?
25    A. No, ma'am.

74

1    Q. Does the cassette tape indicate the date of the
2  recording?
3    A. I believe in the beginning of the -- of the
4  tape I -- I placed the date --
5    Q. Okay.
6    A. -- on that.
7    Q. And that is something that we will be --
8    A. The original -- I'm sorry.
9    Q. I'm sorry?
10    A. The original copy the EEOC has.
11    Q. But you made a copy of it?
12    A. I made a duplicate of it.
13    Q. And then you gave that to your attorney?
14    A. Right.
15    Q. How long ago did you give it to your attorney?
16        MS. ESPARZA: Objection.
17    Q. (BY MS. NEALLY) How long ago did you give it to
18  your attorney?
19        MS. ESPARZA: You can go ahead and answer.
20        THE WITNESS: Oh, okay.
21    A. It was at the very beginning when we first met
22  I believe --
23    Q. Okay.
24    A. -- in December of -- of 2003 I believe.
25        MS. ESPARZA: For the record, I'm in the

75

1  that was attached to the request for production. You
2  can't tell from that who it's even from. Does that say
3  November 2000 at the bottom that's stamp numbered 16?
4    A. October 31st, 2000. The invoice number -- the
5  invoice date?
6    Q. No, the -- the stamp at the bottom.
7    A. Oh, I'm sorry. Yes, November 1st -- 2nd --
8    Q. Of 2000?
9    A. -- of 2000, yes.
10    Q. Okay. And why did you attach a copy of that
11  document?
12    A. Oh, okay. On here I had -- she started --
13  Veronica, Ms. Ramos, started stamping herself as the
14  accounts payable and I believe that she -- I thought
15  that she was an accounting clerk just the same way I
16  was.
17    Q. Okay. And that was in 2000?
18    A. 2000, yes, ma'am.
19    Q. Okay. And she would use a stamp that was
20  marked accounts payable?
21    A. That's correct.
22    Q. Did you have any discussions with anyone about
23  her position?
24    A. With Ms. Duke.
25    Q. And when was that?

76

1  process of getting the original because the copy is
2  garbled. You can't tell anything.
3        MS. NEALLY: Okay.
4    Q. (BY MS. NEALLY) This was attached to your
5  documents. What is that, the invoice for Southwestern
6  Bell?
7    A. I don't -- I don't recall what this was about.
8    Q. Is this a Port of Brownsville record?
9    A. Yes.
10    Q. But you kept a copy of it?
11    A. Yes.
12    Q. Did you keep any other copies of any other
13  documents that were from the Port of Brownsville?
14    A. Only what I have submitted. That's it.
15    Q. For instance, did you keep copies of the checks
16  that you would look at?
17    A. No, no, ma'am, not at all.
18    Q. And why did you keep a copy of this document?
19    A. I don't -- I don't recall, ma'am. I really
20  don't.
21    Q. Okay.
22    A. Not on this particular vendor.
23        MS. NEALLY: Let's mark that as Exhibit 1.
24        (Exhibit No. 1 marked.)
25    Q. (BY MS. NEALLY) Okay. Here's another invoice

76

1    A. I -- it would be possibly around 2001 or 2002.
2  I don't recall the exact dates.
3    Q. Okay. What's Veronica's last name?
4    A. Ramos.
5    Q. Do you know what her experience was before she
6  came with the port?
7    A. No, ma'am, I don't.
8    Q. Do you know what her education was?
9    A. No, ma'am, I don't.
10    Q. When did she start?
11    A. She started -- she started sometime in -- she
12  started as a -- as a summer help and then she got
13  hired.
14    Q. When?
15    A. I believe in 2000.
16    Q. Okay. Do you -- do you have a stamp that you
17  use when you receive documents?
18    A. It's not a stamp. That's accounts payable.
19  It's just a -- just a regular that says receipt and
20  then I put VC on it.
21    Q. And why did you discuss this stamp with Ms.
22  Duke?
23    A. Because I believe that this was a higher
24  position than an accounting clerk and I believe that I
25  should have been trained for that first before she was.

77

1    Q. And what -- what did Ms. ○e tell you?
2    A. Ms. Duke had mentioned to me I believe at that
3    time -- actually this was discussed during the EEOC the
4    first time around.
5    Q. It was discussed during the mediation?
6    A. Yes, ma'am.
7    Q. And that's the only discussion you had with Ms.
8    Duke --
9    A. Yes, that I can recall, yes.
10   Q. -- regarding the position that was held by --
11   A. Ms. Ramos.
12   Q. -- Veronica?
13   A. Yes.
14   Q. And what was said?
15   A. In -- in the meeting or --
16   Q. Yes.
17   A. Okay. In the meeting about -- that Ms. -- that
18   she believed Ms. Ramos was better qualified than I was
19   and that she believed that Ms. Ramos picked things up
20   at a faster pace than I did and basically that she felt
21   that she was better qualified than I was.
22   Q. Okay. And that's what she told you?
23   A. That's what she told me.
24   Q. That was her response to your concerns about
25   her being the accounts payable clerk?

78

1    A. Yes, m○n.
2    Q. So basically these documents that are Bates
3    stamped from ten and there's -- they go through 19 that
4    have the stamp, the reason that you have them in here
5    is because they indicate that she was accounts -- she
6    had an accounts payable stamp; is that right?
7    A. Yes, ma'am.
8    Q. And then you filed your first EEOC complaint in
9    when?
10   A. 2002 I would say, 2001, 2002.
11   Q. Your first one?
12   A. 2001 I believe. I can't recall exactly the
13   date -- the year, 2001 or 2002.
14   Q. Well, certainly by January 2nd, 2001 you were
15   already writing to the EEOC?
16   A. Right, so it would be 2001.
17   Q. And I'm going to show you what we can mark as
18   Exhibit --
19        MS. NEALLY: Go ahead and mark this as
20   Exhibit 2 and this as Exhibit 3.
21        (Exhibit Nos. 2 and 3 marked.)
22   Q. (BY MS. NEALLY) This document provided by your
23   attorney is dated January 2nd, 2001 and it's a letter
24   to the -- it says to the CRTI supervisor, so is that a
25   letter to the EEOC?

79

1    A. Yes, I believe --
2    Q. Okay.
3    A. -- so, ma'am.
4    Q. So you had already written to them if you
5    already knew who the CRTI supervisor was, right?
6    A. Yes, ma'am.
7    Q. Okay. And you were complaining in here that --
8    you say, throughout the years I have had countless
9    discussions with both of my female bosses in reference
10   to being allowed the opportunity to learn more in this
11   department. Who were your two female bosses?
12   A. Ms. Deborah Lee Duke and Cristina Valdez.
13   Q. Okay.
14   A. But I would have to answer to Ms. Cristina
15   Valdez from 1994 to about 2001 I would say.
16   Q. Okay. What happened in 2001?
17   A. Ms. -- from what I had understood Ms. Valdez
18   was brought down from comptroller to just senior
19   accountant.
20   Q. Okay. And she was no longer your supervisor?
21   A. Exactly, yes, ma'am.
22   Q. But it's your testimony both of these
23   individuals were discriminating against you or was it
24   just Ms. Duke?
25   A. Both, ma'am.

80

1    Q. Okay. On page two of that document, which is
2    Bates stamp 21, you indicate in here that -- it's about
3    the third paragraph, the one that says, once Veronica
4    was made full-time, you say, about a year ago Debbie
5    had told me that Mr. Besteiro wanted me to take care of
6    the switchboard during the receptionist's morning
7    breaks, lunch hour and even afternoon breaks. That's
8    what Debbie told you?
9    A. I'm sorry, ma'am. Where was this at?
10   Q. Paragraph three. Do you understand what I'm
11   saying by paragraph? Because you don't have paragraphs
12   here. You just have it all kind of running together,
13   but at certain points you stop, all right? So it's the
14   paragraph that begins, once Veronica was made
15   full-time. Are you there? Look, this would be the
16   first paragraph. Here's the second paragraph. Here's
17   the third paragraph.
18   A. Okay. Oh, okay.
19   Q. You see that?
20   A. Yes, ma'am.
21   Q. The third sentence?
22   A. Yes, ma'am.
23   Q. This is in your handwriting, right? I mean,
24   it's not your handwriting, but you typed this, right?
25   A. That's correct.

1    Q. You say, about a year ago, Debbie had told me
2    that Mr. Besteiro wanted me to take care of the
3    switchboard during the receptionist's morning breaks,
4    lunch hour and even afternoon breaks.
5    A. That's what Ms. Duke had told me.
6    Q. Okay. And she told you that that -- that order
7    came from Mr. Besteiro?
8    A. Yes.
9    Q. Did you ever have a conversation with Mr.
10   Besteiro about whether or not he wanted you to do that?
11   A. No, ma'am.
12   Q. But that's what Debbie told you --
13   A. Yes, ma'am.
14   Q. -- at the time, correct?
15   A. Yes, ma'am.
16   Q. Did she ever tell you anything differently?
17   A. Like --
18   Q. That it didn't come from Mr. Besteiro?
19   A. No, ma'am. It came from Ms. Duke.
20   Q. That's what Ms. Duke told you?
21   A. Yes, ma'am.
22   Q. That's the only thing -- that's the only
23   explanation you've ever been given, correct?
24   A. Yes, ma'am.
25   Q. Okay. Did you ever file any grievances against

1    either Ms. Duke or Ms. Valdez, internal grievances, at
2    the port?
3    A. I have filed -- I filed -- Ms. -- no, because
4    Ms. -- I don't believe I did. There might have been a
5    time or two, but Ms. Duke was also the personnel
6    manager.
7    Q. Okay.
8    A. She was --
9         MS. NEALLY: Object to the response of the
10   answer.
11   Q. (BY MS. NEALLY) Did you ever file any
12   grievances, formal grievances, against Ms. Duke or Ms.
13   Valdez or anybody else at the port --
14   A. Yes. There are some.
15   Q. -- internal ones?
16   A. There are some.
17   Q. Okay. And when did you file those?
18   A. 2 -- I would say 2002, 2003.
19   Q. What's the grievance procedure at the -- the
20   port?
21   A. The grievance procedure is that you need to --
22   I believe you need to file it with your -- your
23   immediate supervisor.
24   Q. Right. And you have to fill out an official
25   complaint, correct?

1    A. I believe so, yes. And then five days after --
2    after that date you have up to five days whenever
3    you're going to file something, if it was a situation
4    that came up or something like that and then there
5    would be a -- a meeting held.
6    Q. Okay. Do you know when you filed your first
7    one?
8    A. I would say there was one around probably 1996
9    or something. I recall one.
10   Q. Okay. You -- when?
11   A. I'm sorry?
12   Q. When did you say? I'm sorry?
13   A. 1997.
14   Q. 1996?
15   A. 1997.
16   Q. And who was that against?
17   A. That was -- it would had to have been against
18   Ms. Duke.
19   Q. For what?
20   A. I don't recall.
21   Q. And your testimony is that you filed an
22   official formal grievance. I'm talking about an
23   official grievance --
24   A. Uh-huh, right.
25   Q. -- right?

1    A. Uh-huh.
2    Q. Is it your testimony you filed an official
3    grievance against her in 1997?
4    A. No, I don't believe.
5    Q. Okay. That's what I'm trying to find out is
6    what grievances, going through the grievance procedures
7    for the port of Brownsville have you filed, if any.
8    I'm not talking about just making a complaint. I'm
9    talking about an official grievance that you filed and
10   you follow the chain that they have within the
11   procedures and policies.
12   A. In around 2001, 2002, around there, 2003 I
13   would say.
14   Q. Okay. And you think you filed how many?
15   A. Possibly about four or five.
16   Q. And they're all against Ms. Duke?
17   A. Yes, ma'am.
18   Q. And you remained employed during that entire
19   time, right?
20   A. Yes, ma'am.
21   Q. You filed a complaint against a Mr. Salinas,
22   who's Mr. Salinas, in 1999?
23   A. He was the marketing director.
24   Q. Okay. And there was an incident where he --
25   A. Pushed me.

85

1   Q. -- pushed you. Why did he push you?
2   A. Because he was aggravated. He was -- he had
3 just coming out -- come out of the port director's
4 office and I was going in with the -- the box of the
5 vendor checks and I asked him if he -- there was no one
6 else available at that time. I was -- I asked him if
7 he was going back to his office so I can give -- give
8 him those checks and he says, no, get out of my way and
9 he pushed me like that and as he pushed me I hit myself
10 on the -- on the wall and like -- it was like a counter
11 and a witness, one of my co-workers, witnessed it.
12   Q. Okay. And then you filed a complaint about
13 that, correct?
14   A. Yes, ma'am.
15   Q. And this is your complaint, right?
16   A. Yes.
17   Q. And this is the response you got back from Ms.
18 Valdez, right?
19   A. Yes, ma'am, that's correct.
20   Q. Did you take it any further after that?
21   A. No, ma'am.
22   Q. Did you file any kind of a -- the -- did you
23 file any type of a workers' compensation complaint or
24 anything?
25   A. No, ma'am.

86

1   Q. Okay. That was the end of that matter?
2   A. Yes, ma'am.
3   Q. Okay. We had previously discussed the -- the
4 incident in December 2003 when you were suspended with
5 pay, correct?
6   A. Yes, ma'am.
7   Q. This was the document that was provided to you
8 regarding the suspension, correct?
9   A. Yes.
10   Q. Let's attach that. And you did receive a copy
11 of that, right?
12   A. Yes, ma'am, I did.
13   Q. And that also advises you of the dispute
14 resolution process, right?
15   A. Yes, it does.
16   MS. NEALLY: Okay. Let's mark that as
17 Exhibit -- the next exhibit.
18   (The reporter confers with counsel.)
19   (Exhibit Nos. 4 through 6 marked.)
20   Q. (BY MS. NEALLY) You also complained of -- in
21 addition to that '99 incident you also complained about
22 Ketta Garcia pushing you in the back; is that right?
23   A. Yes, that's correct.
24   Q. That was in 2003?
25   A. Yes. This was also out in the hallway.

87

1   Q. Okay. Anybody else that you complained about
2 at the port?
3   A. No, ma'am, I don't believe so.
4   Q. Okay. This was -- and that's --
5   MS. NEALLY: Let's mark that as Exhibit 7
6 and then mark this as Exhibit 8.
7   (Exhibit Nos. 7 and 8 marked.)
8   Q. (BY MS. NEALLY) This was the response that you
9 got on this? Did you file a dispute over that?
10   THE REPORTER: Excuse me.
11   (The reporter confers with counsel.)
12   (Exhibit No. 9 marked.)
13   Q. (BY MS. NEALLY) You did not file a dispute
14 about that?
15   A. No, ma'am.
16   Q. Okay. You mentioned that in 2003 it was -- you
17 filed a number of grievances against Ms. Duke; is that
18 right?
19   A. I believe so, yes.
20   Q. And these were through the dispute resolution
21 system, right?
22   A. Yes.
23   Q. Okay. What was the first one about?
24   A. There was -- there was -- they were more like
25 verbal grievances.

88

1   Q. I'm not talking about complaints. I'm talking
2 about actual grievances that went through the dispute
3 resolution process. For instance, you did file one,
4 okay, in January of 2001 because I've got a copy of the
5 response to you, okay?
6   (Exhibit No. 9 marked.)
7   A. Yes. She turned it down.
8   Q. Right. Other than that one, are there any
9 other ones that went through a formal dispute
10 resolution process?
11   A. I can't recall, ma'am.
12   Q. Have you talked to any of your co-workers about
13 your problems with Ms. Duke?
14   A. I've just -- we've conversed in conversations
15 just back and forth just regular activities that might
16 have happened throughout the day, but I never have
17 spoken to any one of them that I have a -- a lawsuit
18 pending, you know. Well, we spoke just basically about
19 your -- things that have occurred throughout the day.
20   Q. Do you believe that any of your co-workers are
21 discriminating against you or retaliating against you
22 in some way?
23   A. They did at one time and I believe we worked on
24 it and we've come to a -- a better working environment.
25   Q. Who do you believe discriminated against you?

1    A. One would be Ricky Rodriguez.
2    Q. Ricky Rodriguez?
3    A. Uh-huh.
4    Q. And how did he discriminate against you?
5    A. Not him personally, but through -- through the
6    way our work assignments have been assigned and what --
7    I've had to cross train with -- I've had to cross train
8    him what I do.
9    Q. Okay. My question to you was, how do you
10    think -- which co-workers have discriminated against
11    you? Which co-workers have retaliated against you?
12    That was my question and you said Ricky Rodriguez.
13    A. Okay.
14    Q. Do you believe Ricky Rodriguez has
15    discriminated against you or retaliated against you?
16    A. Yes, I do.
17    Q. How?
18    A. I believe that he wants my job.
19    Q. He wants your job?
20    A. Right.
21    Q. Okay. And how is that discrimination?
22    A. I have no comment about that.
23    Q. Well, I mean, are you refusing to answer the
24    question?
25    A. No.

1    Q. Is the answer, I don't know?
2    A. The answer is I don't know.
3    Q. Okay. And who else do you think of your
4    co-workers has discriminated against you or retaliated
5    against you?
6    A. No one else.
7    Q. Okay. And you said Ricky Rodriguez wants your
8    job. Why -- why do you think Ricky Rodriguez wants
9    your job.
10    A. My co-worker -- well, my co-worker told me.
11    Q. Which co-worker?
12    A. Petra Champion, that he's after my job.
13    Q. And what did she say to you when she told you
14    this?
15    A. He said that he's after your job.
16    Q. Okay. He's an accounting clerk, right?
17    A. Right.
18    Q. And you're an accounting clerk, right?
19    A. Right.
20    Q. So why does he want your job?
21    A. Because I do the accounts payable partial
22    processing.
23    Q. So you have more duties than he does or better
24    duties?
25    A. Just a little bit different duties.

1    Q. So there's no reason to want that if it's just
2    different duties?
3    A. I don't know.
4    Q. Let me show you a document that's -- that was
5    provided to us by your attorney. It's dated March 8th,
6    2002 and that was when you were relieved of the duties
7    of switchboard relief, correct?
8    A. Okay.
9    Q. Actually let me -- let me back up for a minute.
10    This is another, didn't copy the second page, another
11    document we need to copy the page, is Bates stamp 292.
12    A. Okay. Yes.
13    Q. That's March 6th, right?
14    A. Yes, ma'am.
15    Q. Okay. And there was an incident --
16    A. Yes.
17    Q. -- with Ms. Gonzalez and you were --
18    A. Yes, ma'am.
19    Q. -- unable to get along with her?
20    A. Yes, ma'am.
21    Q. Okay. And so you complained about this to Ms.
22    Duke?
23    A. Yes, ma'am.
24        (Exhibit No. 10 marked.)
25    Q. (BY MS. NEALLY) And then the next

1    correspondence is dated March 8th?
2    A. Yes, ma'am.
3    Q. And this was to advise you -- advise you that
4    you had been relieved of doing the lunch hour duties
5    and that was going to be done by someone else, right?
6    A. Yes, ma'am, that's correct.
7        (Exhibit No. 11 marked.)
8    Q. (BY MS. NEALLY) Okay. This is -- what are we
9    on, 11?
10    A. 12. 12 would be the next.
11        (Exhibit No. 12 marked.)
12    Q. (BY MS. NEALLY) This is a reprimand to you?
13    A. Yes.
14    Q. Okay. What was the -- what was your
15    understanding of why you received that reprimand?
16    A. What was my understanding?
17    Q. To why you received the reprimand.
18    A. I didn't -- I really didn't understand the --
19    this -- it was a meeting that took place in reference
20    to some quarrels that I had with my co-workers and I
21    believe this was just Ms. Duke's method of bringing to
22    my attention the situations that were occurring.
23    Q. And what were the quarrels you were having with
24    your co-workers?
25    A. Okay. One of my co-workers blurted out of

93

1  the blue that while I was working with some -- the
2  yellow statement invoices that I was entering data
3  into, which is basically numbers, that she had -- that
4  she had spent several months correcting my errors and
5  that she basically blew up and went on by saying that
6  it took her a very long time to correct those errors
7  and my response to her was, why did you wait several
8  months and led me to believe that I was entering them
9  correctly and why didn't you allow me an opportunity to
10  correct them myself and that was one of my -- and then
11  she was saying that I was walking away while she was
12  trying to discuss something with me and --
13      Q.  Who, the co-worker?
14      A.  That co-worker and --
15      Q.  What was the name of the co-worker?
16      A.  Rose, Rose Hinojosa and Ms. Duke had told us at
17  a prior meeting that whenever we felt that something
18  was getting out of hand for whatever reason that we --
19  we could walk away from that situation if we felt that
20  it was just escalating and that's what I felt, that it
21  was just -- I didn't see no point in the way she went
22  about it on addressing me.
23      Q.  Who accused you of using sarcasm and profanity?
24      A.  I believe that was Ricky Rodriguez and Cristina
25  Valdez.

94

1      Q.  And what profanity or sarcasm did you use with
2  them?
3      A.  I don't recall using any profanity with them
4  or --
5      Q.  So if they said that you used profanity then
6  they would be lying?
7      A.  I would say that they -- I wouldn't say that
8  they would be lying.  I just don't recall that.  I
9  don't recall anything that they've accused me of at
10  that point in time.
11      Q.  Is it your -- your testimony that you never
12  used profanity in the workplace?
13      A.  No.  I'm not saying that I never used it.  I'm
14  just saying at that point in time when they accused me
15  of it I don't recall that.
16      Q.  Okay.  You would agree that profanity is not
17  and sarcasm are not appropriate in the workplace,
18  correct?
19      A.  I agree.
20         (Exhibit No. 13 marked.)
21      Q.  (BY MS. NEALLY) Okay.  Let me show you what's
22  been marked as Exhibit 13, two pages, yeah.
23      A.  That was the one that I recorded.
24      Q.  Okay.  That's the one that you recorded?
25      A.  Yes.  This is the one I recorded.

95

1      Q.  Okay.  Can I see that?
2      A.  Yes.
3      Q.  So you had a -- is this the date of the actual
4  recordation on July 15th, 2003?
5      A.  Yes.  The date that she took me to her office
6  and gave me that -- and typed that up.
7      Q.  Okay.
8      A.  She typed it up in a matter of five minutes.
9      Q.  In this she stated to you, this morning you
10  spoke to me in a tone that was disrespectful despite
11  several warnings to modify the tone you were taking
12  with me, right?
13      A.  It was circumstances involving that.
14      Q.  Do you think there's a conspiracy by your
15  co-workers to undermine your work?
16      A.  I believe that Ms. Duke had something -- that
17  she's -- she's had -- she's had talks with them, you
18  know, on editing my work or whatever.
19      Q.  What talks has she had with them about your
20  work?
21      A.  I have no idea.  Those are -- I know that they
22  had a meeting behind closed doors for about two -- two
23  and a half hours complaining about me and that was --
24      Q.  Who had a meeting complaining about you?
25      A.  Debbie Duke, Cristina Valdez, Ricky Rodriguez,

96

1  Rose Hinojosa, Letty Trevino.
2      Q.  And they were complaining about your work?
3      A.  Yes, about me.
4      Q.  And when was that?
5      A.  That was -- I don't-- it was -- I don't
6  remember the specific date, but that was -- I believe
7  that was in 2004.
8      Q.  It wasn't around the same --
9      A.  No.
10      Q.  -- time as this letter?
11      A.  I'm sorry, I'm sorry.  It was in 2003, 2003.
12      Q.  It was in the summer of 2003?
13      A.  Right, yes.
14      Q.  Around the same time as this meeting?
15      A.  Yes, everything that this was happening.
16      Q.  Okay.
17      A.  It was one thing after another.
18      Q.  And do you know who initiated the meeting?  Did
19  the co-workers go and talk to her or did she tell them
20  to come in and talk to her?
21      A.  I believe that they spoke about it, that they
22  spoke with each other or something because when I came
23  back at 1:00 o'clock and I sat at my desk none of them
24  went to the -- to the desk.  They went straight into
25  Debbie's office and Debbie was already in.  Debbie had

1  just arrived. They all came around the same time.
2      Q. How do you know you were the topic of
3  conversation?
4      A. Because I was the only one left out, outside,
5  me and Irma Gawenda.
6      Q. Did you talk to anybody about what was said
7  during that meeting?
8      A. I don't know what was said during that meeting.
9      Q. You have no idea what was discussed in that
10  meeting?
11      A. No. That's what I wanted to know.
12      Q. Okay.
13      A. Right. Well, right after that -- let me --
14  after that meeting Debbie called me in and -- and we
15  discussed some of those things that they had --
16      Q. Did she relay to you that she had been told
17  that in the meeting, information that she had been told
18  in the meeting?
19      A. Yes. When she called me in her office after
20  they all went out.
21      Q. And that's your -- that's your basis for that
22  there's a conspiracy?
23      A. Yes.
24      Q. Do you have any other basis where there's some
25  type of conspiracy?

1      A. That would be the major one.
2      Q. That meeting that occurred --
3      A. Yes.
4      Q. -- in July of 2003; is that right?
5      A. Yes.
6      Q. Any other evidence that there was some type of
7  conspiracy for them to conspire about the quality of
8  your work or how you behaved?
9      A. May I say something? On this -- on this --
10      Q. Can you answer my question? Then you can say
11  something, okay?
12      A. I'm sorry. I'm sorry. What was your question?
13          MS. NEALLY: Let's read it back.
14          (Question read back.)
15      A. Prior to this, on this very date, prior -- on
16  that very morning.
17      Q. Okay. What happened that same morning, July
18  15th, 2003?
19      A. Yes, ma'am. That -- in the morning I was
20  instructed by Ms. Duke to hand over invoices that I was
21  having trouble in solving, you know, that needed some
22  additional assistance and I was told to hand that over
23  to Ms. Trevino, Letty Trevino, and I handed it to her
24  and she said, what's this, what are you giving me and I
25  said, well, Ms. Duke instructed me, well, maybe I

99

1  should be accounts payable, maybe I should be doing
2  that, you're not doing your own work, you know, I've
3  already -- I'm real tired of that, I have a lot of work
4  to do. It was an argument that started between me and
5  her, so after that I went into Ms. Duke's office and
6  I -- and I told her behind closed doors what had -- the
7  situation that occurred between me and Letty Trevino
8  and that very day in the afternoon they all went and
9  complained against me for about two and a half hours.
10      Q. Any other evidence of a conspiracy against you
11  by your co-workers and Ms. Duke?
12      A. That would be about it, ma'am, I mean, that I
13  can recall.
14      Q. Okay. In your correspondence to the EEOC you
15  accuse Deborah Duke and Cristina Valdez, this is in
16  2003, and you accuse them of playing mind games with
17  you.
18      A. Yes.
19      Q. That they are in cahoots with one another to
20  make it difficult for you to pick up on training.
21      A. Yes.
22      Q. Okay. How were they playing mind games with
23  you to make it difficult for you to be able to pick up
24  the training?
25      A. I was being accused of being -- of -- of

100

1  misplacing invoices. When I would go to Ms. Valdez
2  for -- I believe she was still my boss at that time,
3  for a question that I had or something she'll say, no,
4  you can't talk to me, go ask Debbie, I'm too busy right
5  now. Then I go to Debbie and said, well, you need to
6  ask Cristina and it was just like a back and forth
7  thing.
8      Q. Any other evidence of them being in cahoots or
9  playing mind games with you?
10      A. Yeah. I would say there was -- I believe they
11  both did not want me to -- they both were the main
12  reason that I was never cross trained with my other
13  co-workers. I sat in that department and seen all of
14  my co-workers cross train with one another except
15  myself.
16      Q. Eventually you were cross trained, right?
17      A. Partial.
18      Q. Okay. But you have been partially cross
19  trained, correct?
20      A. Yes, ma'am.
21      Q. What haven't you been trained in that you feel
22  like you are entitled to be trained in?
23      A. The -- everything that Ms. Ramos used to do,
24  all the -- all the duties and assignments that she
25  was -- that she was doing at that time. For example,

1    like the bank reconciliations tha⊘assigned to Petra
2    Champion, some of the -- the -- the statements of the
3    harbor -- of -- I don't know, harbor master that were
4    taken away from me that I think now -- I don't know if
5    it's Ricky that's doing them or Letty is entering them.
6    Payroll, a little bit -- I mean, a broader knowledge of
7    the accounting firm.
8        Q.  Okay.  I'm sorry, but I'm not following you.
9    You said payroll?
10       A.  Yes, ma'am.
11       Q.  And what else in the accounts -- the finance
12   department that you feel like you should be trained
13   for?
14       A.  The -- the bank reconciliation, accounts, bank
15   accounts and the -- the yellow statements that were
16   taken away from me.
17       Q.  Okay.  Anything else in the finance department
18   that you think you --
19       A.  Payroll.
20       Q.  -- deserve training?  You already said payroll.
21       A.  Oh.
22       Q.  Payroll, bank reconciliation, accounts, yellow
23   statements?
24       A.  Yes, ma'am.
25       Q.  Anything else?

1        A.  I belie⊘hat would be about it.
2        Q.  Is Mr. Rodriguez cross trained in those?
3        A.  Yes, I believe he is.
4        Q.  And you base that on what?
5        A.  From what I've seen -- I've seen them cross
6    train with each other.
7        Q.  Okay.  Are those the duties he performs?
8        A.  The duties that he performs would be entering
9    the software, I mean, the invoices, my packing ticket
10   in -- accounts payable vouchers and the -- and payroll
11   and some work having to do with general ledgers.
12       Q.  Does he do the work that you do?
13       A.  No.
14       Q.  He hasn't been cross trained to do the work
15   that you're doing?
16       A.  No -- yes, he has.  I've had to cross train him
17   what I do, yes, and whenever I'm not there he picks
18   up -- he does what I do.
19       Q.  How often have you met with Ms. Eymard?
20       A.  I think we've had like three meetings.  One
21   lasted from 8:30 in the morning till 1:00 o'clock in
22   the afternoon.
23       Q.  Okay.  When was that?
24       A.  That was sometime in 2000 -- in 2003.  The year
25   was 2003.  I think it was in the summer, around the

1    occurrences of all this.
2        Q.  Okay.  And when else did you --
3        A.  When we had that meeting, then we had another
4    meeting, Ms. Saban and myself and Ms. Eymard and Ms.
5    Duke in Ms. Saban's office and Ms. Duke was not happy
6    about that meeting and --
7        Q.  You know, right now I'm just asking you about
8    the -- whether you had meetings and when they were,
9    okay?
10       A.  Okay, 2003.
11       Q.  Follow my question.  Okay.  So you had a
12   meeting in the summer 2003 that lasted from 8:00 to
13   3:00?
14       A.  I'm sorry?
15       Q.  You had a meeting in the summer of 2003 that
16   lasted from 8:00 in the morning till 3:00 in the
17   afternoon?
18       A.  No.  Around 8:30 till about 1:00 o'clock,
19   8:30 a.m. to 1:00 o'clock.
20       Q.  And then who was present at that
21   meeting?
22       A.  Ms. Donna Eymard and Jo Lynn Saban and myself.
23       Q.  Okay.  And then you had a second meeting when?
24       A.  Right about a week or two after that myself,
25   Ms. Eymard and Ms. Saban and Ms. Duke.

1        Q.  Ms. Saban, Ms. Eymard, Ms. Duke and you --
2        A.  Yes, ma'am.
3        Q.  -- right?
4        A.  Yes, ma'am.
5        Q.  And how long did that meeting last?
6        A.  I would say that meeting was probably like an
7    hour.
8        Q.  Okay.  And then when was the third meeting?
9        A.  The third meeting after that was -- I can't
10   think right now.  It doesn't come to my head right now.
11       Q.  Was it before or after these two meetings
12   you've already told me about?
13       A.  Well, after that meeting, then these things
14   started happening, more or less.
15       Q.  What things started happening?
16       A.  These occurrences started happening.  It was
17   around -- some of them had already happened.  Some of
18   them happened after that.
19       Q.  Okay.  You told me that the first meeting you
20   had was in the summer.  That was the long meeting.  Was
21   that before or after that you had gotten the reprimand?
22       A.  That was before I got a reprimanded I believe,
23   yes.
24       Q.  The one you had a week or two later, was that
25   before or after another reprimand?

**105**

1    A. That second meeting was a response to that
2    other meeting and I believe I've only -- I think I've
3    only gotten three reprimands. I don't know. Maybe
4    four.
5        Q. You've only gotten three reprimands in 2003?
6        A. No. Throughout the whole processing of that
7    I've been there in -- for the port.
8        Q. Okay. So in the -- since you've been there
9    since 1992 you've only received --
10       A. No, 1990 - 1993.
11       Q. Okay. Since you've been there since 1993
12   you've only received three reprimands?
13       A. One with Cristina. One was over a Christmas
14   party and then the -- the third one was this one and
15   then the suspension without pay that I -- that I can
16   recall.
17       Q. Okay. Before we move onto that let's go back
18   to -- you said you had three meetings with Ms. Eymard.
19   You can only recall two?
20       A. Two. There was -- okay. There was one before
21   that meeting with my -- with me and Ms. Saban and Ms.
22   Eymard, it was just me and Ms. Eymard.
23       Q. Well, you told me about one that lasted from
24   8:30 till 1:00.
25       A. But this is another one. This is prior to

**106**

1    those two.
2        Q. All right. So that was when? What month?
3        A. 2003. Maybe about a month or two before that.
4        Q. May or June?
5        A. Possibly, yes.
6        Q. Okay. And those are the only meetings you ever
7    had with Ms. Eymard that you're aware of?
8        A. Yes.
9        Q. And those all happened in 2003 after you had
10   already filed your EEOC complaint --
11       A. Yes, ma'am.
12       Q. -- which was filed in 2001?
13       A. 2001 and then 2003.
14       Q. Pardon?
15       A. 2001 was the first time and 2003 was the second
16   time.
17       Q. Okay. When in 2003 did you file your EEOC
18   complaint?
19       A. January of 2003.
20       Q. Of January 2003?
21       A. Yes, ma'am.
22       Q. So your meetings with Ms. Eymard occurred after
23   you filed both your first and your second EEOC
24   complaint, correct?
25       A. I believe so, yes.

**107**

1        Q. Okay. And you met with her three times. What
2    was the first time that you met with her? What -- why
3    did you meet with her?
4        A. I was -- I went to her because Ms. Duke was
5    accusing me that I was not producing, that I was losing
6    documents, that vendors were calling in late -- that we
7    were paying vendors late and I went to her for -- for
8    advice and also it was just a meeting that was like
9    between her and I.
10       Q. And what did she tell you in that meeting?
11       A. She mentioned to me for me to hang in there and
12   she didn't -- that perhaps I should start writing down
13   all the -- the packets that I -- and take -- prepare
14   and maybe I should start writing them down, you know,
15   like for future reference, for back up and that maybe
16   that will eliminate that I'm losing documents or
17   whatever, you know, the things I was being accused
18   of.
19       Q. And did that -- did you regard that meeting
20   as -- did she act in a professional manner?
21       A. Yes, ma'am.
22       Q. And was she helpful?
23       A. Yes. She was very helpful. She was helpful.
24       Q. Were you satisfied with that meeting?
25       A. Yes, I was.

**108**

1        Q. Okay. And then the second meeting was in July
2    of '03?
3        A. Uh-huh.
4        Q. Prior to your receiving these -- the reprimand?
5        A. No. I believe it was after that. It was a
6    response to that.
7        Q. Okay. And did you request the meeting?
8        A. I had written them -- I had written a grievance
9    at that time and we -- we -- about the reprimand I
10   received and my response to that and it was a follow-up
11   on that -- on that --
12       Q. Okay.
13       A. -- on that -- my grievance.
14       Q. Okay. So it was a follow-up to your grievance.
15   Was it a part of the grievance, one of the steps that
16   you needed to take?
17       A. It didn't result in my satisfactory --
18       Q. No.
19           MS. NEALLY: No. Object to the
20   responsiveness of the answer.
21       Q. (BY MS. NEALLY) Was the meeting part of the
22   grievance step? Let me see these exhibits. One of the
23   things you were provided -- had been provided in
24   December '03 at least was the dispute resolution
25   process, right?

1    A. Uh-huh.
2    Q. And in this dispute resolution process there
3  are several levels, right?
4    A. Uh-huh.
5    Q. Is that yes?
6    A. Yes.
7    Q. Okay.
8    A. Yes, ma'am.
9    Q. And was this part of one of the levels that you
10  were going through when you met with Ms. Eymard?
11    A. Yes.
12    Q. Okay. So that second meeting was level two?
13    A. Level two.
14    Q. Okay. And the only persons present were you
15  and Ms. Eymard?
16    A. Yes, on that one.
17    Q. Okay. And what transpired during that meeting?
18    A. That meeting led to another meeting and --
19    Q. No. I just want to know about this meeting,
20  this meeting that happened sometime after July 15th,
21  2003.
22    A. Uh-huh.
23    Q. What happened at that meeting that lasted so
24  long? What did you guys talk about?
25    A. Okay. The -- okay. Are you -- you're

1  referring to ( )one that Ms. Eymard and I and Ms.
2  Saban had. Okay. We -- I had -- there was -- there
3  was a discussion about -- about all my grievances, all
4  my complaints and what have you and we discussed --
5  personnel just came into effect in 2003. It wasn't
6  there prior to that, you know, personnel manager and
7  how my boss was just -- not only my boss, but she was
8  also the personnel manager and how I felt that that
9  was -- I was -- my complaints would have gone nowhere
10  from the -- from 1994 to 2002.
11    MS. NEALLY: Okay. Object to the response
12  of the answer.
13    Q. (BY MS. NEALLY) You had a meeting on July 15th,
14  2003 and I'm sorry. It was with Ms. Saban and with Ms.
15  Eymard, right? Both of them were present?
16    A. Yes.
17    Q. And that was the one --
18    A. Yes.
19    Q. -- that lasted four and a half hours --
20    A. Yes.
21    Q. -- right?
22    A. Yes, ma'am.
23    Q. Okay.
24    A. Yes.
25    Q. And that was as part of your grievance

111

1  procedure, right?
2    A. Yes.
3    Q. Were they trying --
4    A. It was a verbal thing.
5    Q. Okay. And that was as a result of the -- the
6  reprimand that you got?
7    A. Yes.
8    Q. Okay. And that did not result in a
9  satisfactory -- you weren't satisfied with the meeting;
10  is that right?
11    A. Exactly, yes.
12    Q. And why weren't you satisfied?
13    A. Because I -- I knew that I wanted this
14  reprimand to be erased from my files. I believe that
15  this reprimand had no bearing whatsoever. It was -- I
16  mean, you can hear that clearly on the tape and --
17    Q. Well, we don't have the tape, so --
18    A. Yeah. Well --
19    Q. -- I can't hear it.
20    A. It was -- how can I put this?
21    Q. I'm not asking about that reprimand. I'm
22  asking about why you weren't happy with the meeting
23  that occurred.
24    A. Because they had told me that -- that I had
25  made an agreement with the EEOC and it was based on

112

1  several things about the switchboard, also about the --
2  the reprimand. It was also in reference to the -- my
3  denied cross training and that's when she said that she
4  couldn't take back the reprimand, that the reprimand
5  was to stay in my file --
6    Q. Okay.
7    A. -- and that I had been in agreement with the
8  EEOC about the -- as far as the switchboard is
9  concerned.
10    Q. Okay. What was the third meeting that you had?
11    A. The third meeting was --
12    Q. What was the subject of the third meeting?
13    A. For Ms. -- the -- the purpose of it or -- or
14  the subject? The subject was about my complaints that
15  I've had with Ms. Duke.
16    Q. This meeting was actually with Ms. Duke, right?
17    A. Yes.
18    Q. And was it to facilitate some type of
19  understanding between the three of you?
20    A. Yes.
21    Q. Between the two of you I mean?
22    A. Uh-huh.
23    Q. Is that what the purpose was?
24    A. Yes.
25    Q. Okay.

**113**

1  A. But it didn't happen.
2  Q. Did you record any of these meetings?
3  A. That one, no.
4  Q. Did you record any of the three meetings?
5  A. The one -- only one meeting I recorded was this
6  one, this one.
7  Q. I'm still talking about these meetings with Ms.
8  Eymard present, okay?
9  A. You asked me what?
10  Q. Did you record any of these three meetings is
11  what I said. You told me you had three meetings with
12  Ms. Eymard?
13  A. No.
14  Q. How many meetings did you have with Ms. Eymard?
15  MS. ESPARZA: I think he answered whether
16  or not those were recorded.
17  MS. NEALLY: Okay. I'm sorry.
18  Q. (BY MS. NEALLY) You didn't record any of the
19  three meetings with Ms. Eymard?
20  A. No, I didn't.
21  Q. Okay. Thank you.
22  A. Can we take a break, please?
23  Q. Actually let's break for lunch. It's 12:00
24  o'clock.
25  (Lunch recess.)

**114**

1  Q. (BY MS. NEALLY) We're back on record. You --
2  when we were on our last break you had referenced a
3  letter in 1994 that you said was your basis for saying
4  that you did not have to perform receptionist's --
5  receptionist's duties and your attorney related to me
6  that that was document number 304 when we were on a
7  break. I'm going to show you what we're going to mark
8  as the next exhibit. I think it's Exhibit 14.
9  (Exhibit No. 14 marked.)
10  Q. (BY MS. NEALLY) Bates stamp 304. This is the
11  document you were referring to?
12  A. Yes, ma'am.
13  Q. Okay. Where in that document does it say that
14  you do not have to perform receptionist's duties?
15  A. Under our hiring policy in the case of an
16  internal transfer there is allowed a transition period
17  during which the employee will be expected to continue
18  performing his former responsibilities. This
19  transition period should not exceed three weeks. The
20  transition period will be coordinated between Cristina
21  Valdez and Irma Gawenda.
22  Q. And that's what you claim states that you do
23  not have to perform receptionist's duties as part of
24  your duties; is that right?
25  A. Yes, ma'am.

**115**

1  Q. Even relief duties, right?
2  A. Yes, ma'am.
3  Q. Okay. Now, when you were a receptionist you
4  didn't perform relief duties for the receptionist,
5  right?
6  A. Okay. When I was a receptionist?
7  Q. You did not perform relief duties for the
8  receptionist?
9  A. No.
10  Q. Okay.
11  A. No, ma'am.
12  Q. Let me go back to your earlier testimony. You
13  had told me right before lunch that you had had four
14  grievances -- I mean, sorry, four reprimands given to
15  you, correct?
16  A. One second. Three. I believe it was three,
17  three and then the -- that -- that suspended without
18  pay. That would be the fourth.
19  Q. Okay. So we've seen the July 2003, right?
20  A. Uh-huh, yes, ma'am.
21  Q. We've discussed that, correct?
22  A. Yes, ma'am, the --
23  Q. The July 2003 --
24  A. Right.
25  Q. -- regarding your not getting along with your

**116**

1  co-workers and performing your duties, correct?
2  A. Correct.
3  Q. Okay. Then we talked about your suspension
4  with pay which was in December '03 --
5  A. Yes, yes, ma'am.
6  Q. -- right?
7  A. Yes.
8  Q. And that had to do -- well, we've discussed
9  that. And then you said there was another one
10  involving a Christmas party?
11  A. Yes, ma'am.
12  Q. And what was -- when was that one?
13  A. That was the last Christmas party that we had
14  annually. I believe that might have been around --
15  anywhere from '97 to '99, one of those years.
16  Q. Okay. So that predated even your first EEOC
17  complaint, correct?
18  A. Yes, ma'am.
19  Q. And that was -- what was that reprimand for?
20  A. We were to show up to a Christmas function at a
21  certain time because Ms. Duke was the personnel manager
22  and I came late to the Christmas party because we were
23  supposed to be there to greet the employees that were
24  coming in and -- and to help out on food and stuff like
25  that, you know, like serving and I had to go -- that

1  day I got paid and I wanted to go and buy some blue
2  jeans at the Amigoland mall and I got caught by a train
3  and I explained this to Ms. Duke and it didn't matter
4  to her.
5      Q. Did you provide a copy of that grievance -- I
6  mean, that reprimand?
7      A. I believe so, ma'am. It should be, yes. I
8  believe it should be in that file.
9      Q. All right. And what was the first reprimand
10  that you received? I have initial CV. I don't know
11  what that means.
12      A. CV is Cristina Valdez.
13      Q. Okay. That was the one by Cristina Valdez?
14      A. Yes, ma'am. It was about -- that was in 1994.
15  That was -- she had accused me that I was not getting
16  along I guess with, I don't know what it was about, my
17  co-workers or that I was using profanity and for me --
18  it was during the March -- near the Easter holiday and
19  I responded to that -- to that -- to that reprimand.
20      Q. So that was back in 1994, correct?
21      A. Yes, ma'am.
22      Q. So you had one in 1994?
23      A. Uh-huh, yes, ma'am.
24      Q. One between 1997 and 1999?
25      A. Right, yes.

1      Q. The second -- the third one was in July 2003?
2      A. Yes.
3      Q. And then the last was December 2003?
4      A. Yes, ma'am.
5      Q. Okay. And those are all the reprimands --
6      A. Yes.
7      Q. -- you've ever had?
8      A. Yes, ma'am.
9      Q. Who at the port of Brownsville, and I asked
10  you -- I tried to ask you this earlier, but I don't
11  know that I ever got a thorough answer, do you believe
12  has discriminated or retaliated against you besides
13  Cristina Valdez and Deborah Duke?
14      A. That would be it, ma'am.
15      Q. That's it?
16      A. Just them, yes.
17      Q. Your contentions are solely against those two
18  individuals, correct?
19      A. Ms. Duke now because Cristina is no longer my
20  supervisor, but she was my supervisor for many years.
21      Q. Was she your supervisor in 2003?
22      A. No, ma'am. Ms. Duke was.
23      Q. Okay. So your -- this lawsuit is filed solely
24  as far as your complaint of discrimination there
25  against solely Ms. Duke; is that correct?

119

1      A. That's correct.
2      Q. You have no complaints of discrimination
3  against any of your other co-workers?
4      A. No, no, ma'am.
5      Q. Or anyone else at the Port of Brownsville; is
6  that correct?
7      A. That's correct.
8      Q. In your petition -- I just want to go over some
9  of the facts that are alleged in your petition. You --
10  you indicate that January 2002 Ms. Duke became aware
11  that you had filed another claim with the EEOC in
12  January of 2002?
13      A. Yes.
14      Q. How do you know she became aware in January of
15  2002 of your complaint? Did she talk to you about it?
16      A. No, ma'am. She didn't talk to me about it.
17      Q. Have you ever talked to Ms. Duke about the EEOC
18  complaints that you have filed outside of the mediation
19  conciliatory you had?
20      A. I brought to her -- to her, how do you say it,
21  to her attention, you know, steps about the EEOC since
22  that first time, after that first time.
23      Q. All right.
24      A. Like the cross training and like the
25  switchboard. These were things that we discussed on

120

1  several -- verbally.
2      Q. You've had discussions about the interpretation
3  of the -- of the agreement. In fact, you have been
4  accused of not living up to the agreement; is that
5  right?
6      A. Not me, her.
7      Q. No. You have been accused in meetings. You
8  told me that you've been accused in meetings of not
9  living up to the agreement.
10      A. No, that's -- that's incorrect.
11      Q. That you weren't doing your switchboard duties
12  pursuant to the agreement.
13      A. No, that's incorrect.
14      Q. Well, we'll let the record stand for itself
15  because in your earlier testimony that's what I recall
16  you saying.
17      A. No.
18      Q. So January 2002 you don't -- well, you filed
19  your claim in January 2002. Did you go to her
20  immediately and tell her you had filed?
21      A. No, ma'am.
22      Q. Okay. So you don't know when she first learned
23  about the EEOC complaint, do you?
24      A. No, I don't.
25      Q. Okay. You filed your complaint in January of

1   2002 and then you filed suit in [ ] 12th, 2004,
2   correct?
3       A.  That's correct.
4       Q.  What defamation has or untrue false statements
5   has Ms. Duke made about you and published to a third
6   party?
7       A.  You mean what she said about me to someone else
8   or --
9       Q.  Right.
10      A.  Okay.  I -- I can't recall right now.
11      Q.  Well, you've made a claim of defamation against
12   Ms. Duke and I'm entitled to know what statements that
13   you have made to Ms. -- that Ms. Duke has made, what
14   statements Ms. Duke has made that are false or untrue
15   that she has published, told to another third party
16   that you regard as being false or untrue or defamatory.
17      A.  I don't know how to answer that question.
18      Q.  What part of the question do you not
19   understand?
20      A.  Okay.  The way I'm understanding that is that
21   you're asking me if -- if Ms. Duke has said things
22   about me to another person and that I'm aware of; is
23   that correct?
24      Q.  That you claim are false and untrue.
25      A.  I have no comment about that.

1       Q.  I'm n[ ] asking if you have a comment, sir.  I'm
2   asking you what statements -- you have filed a lawsuit
3   against Deborah Duke saying that she has made false and
4   untrue statements, defamatory statements against you
5   with malice and I want to know what those statements
6   are and to whom they were made and I'm entitled to know
7   that.
8       A.  I plead the fifth amendment on that.
9       Q.  So you're refusing to answer?
10      A.  It's not that I'm refusing.  I just don't know
11   how to answer that.
12      Q.  What part of it do you not know how to answer?
13   I mean, can I explain it to you better?  I --
14      A.  No.
15      Q.  -- don't know --
16      A.  Uh-huh.
17      Q.  You're not aware of any?
18      A.  No.  I mean, I --
19      Q.  You're not aware of any?
20      A.  I just -- I don't -- I don't know where that's
21   coming from.
22      Q.  Okay.  What actions by Deborah Duke do you
23   regard as being extreme and outrageous conduct which
24   were committed intentionally or recklessly for the
25   purpose of inflicting emotional distress of a severe

123

1   nature on you?
2       A.  When -- outside in the hallway when she gave me
3   that last reprimand and the way she approached me and
4   the things that she said to me and in the tone of way
5   that she told me the thing -- what she told to me.
6       Q.  Okay.  Now, are you talking about the December
7   '03 when you were --
8       A.  No, no, ma'am.  I'm talking about the -- the
9   one that I have the recording on.
10      Q.  Okay.
11      A.  December 8th, 2003, yes.
12      Q.  December 8th, 2003?
13      A.  Yes.
14      Q.  And you actually recorded that meeting, right,
15   so that the court can conclude for itself as to the
16   tone of the conversation, correct?
17      A.  One second, please.  I think it's -- yes.  I
18   think it's that one, yes.
19      Q.  Well, I need to know which one it is, sir.
20   You've made this allegation against my client.
21      A.  Yes.  The December 8, 2003.
22      Q.  Okay.  So the December 8th, 2003 meeting you
23   regard as being extreme and outrageous conduct by Ms.
24   Duke; is that right?
25      A.  Yes.

124

1       Q.  And you claim that her conduct occurred in the
2   hallway?
3       A.  Yes.
4       Q.  And how long did that conversation last in the
5   hallway?
6       A.  Approximately five minutes.
7       Q.  Okay.  And who overheard that conversation?
8       A.  Anyone who might have been passing through the
9   hallways.
10      Q.  Sir, who do you know to have overheard that
11   conversation?
12      A.  Maybe inside the offices they might have heard
13   because the hallway of the copier where this took place
14   was near to the finance department.
15          MS. NEALLY:  Object to the responsiveness
16   of the answer.
17      Q.  (BY MS. NEALLY)  Sir, who do you know, and I
18   would like the names, please, of anyone who overheard
19   the conversation, not your speculation about who might
20   have overheard it, but who do you know?
21      A.  No one.  I don't know of any -- any --
22   physically I didn't see anyone at that time, but I'm
23   pretty sure some people heard.
24      Q.  So you know of no one who actually overheard
25   it?

1    A. I didn't see anyone because it was just me and
2    Ms. Duke.
3        Q. Okay. And you haven't had any conversations
4    with anyone where they related to you they overheard
5    it?
6        A. That's correct.
7        Q. Other than that five minute conversation that
8    occurred in the hallway, what other extreme and
9    outrageous conduct had been committed intentionally or
10    recklessly with the purpose of causing you severe
11    emotional distress?
12        A. When she came up to me and started telling me
13    that I was not producing, the vendors were calling in
14    and that we were being late on payments and she just
15    told me a whole bunch of things from A to Z and there
16    was a heated argument between her and I.
17        Q. When was that conversation?
18        A. It was sometime in 2003.
19        Q. When?
20        A. I don't know when. It was just in 2003.
21        Q. Sir, there's 365 days in 2003. I'd just like
22    to try to pin it down a little bit.
23        A. Okay. I would say around -- anywhere from June
24    to August --
25        Q. Okay. So --

---

A. -- possibly.
2        Q. It was around the same time as --
3        A. Yes.
4        Q. Let me finish my question, please. It was
5    around the same time as the reprimand that you received
6    in July of 2003?
7        A. Yes, ma'am.
8        Q. Okay. And who was present during that
9    conversation?
10        A. Cristina was in her office. Let me see. My
11    other employees were at their -- at their desk. Ricky
12    was at his desk. Letty Trevino was at her desk. That
13    was before Ms. Champion was moved back there, so --
14        Q. Okay. So those people could have possibly
15    overheard it?
16        A. Oh, yes, I'm sure.
17        Q. Have you talked to them about whether or not --
18        A. No.
19        Q. -- they overheard it?
20        A. No.
21        Q. Have you had any conversations with them about
22    whether they overheard it?
23        A. No, ma'am.
24        Q. Okay. And other than telling you that you
25    weren't producing, that vendors were calling, that

---

1    there were problems with your work performance, what
2    else was said?
3        A. That she's -- she's had enough of my behavior.
4    She's not going to tolerate it anymore. She thinks if
5    that keeps up she's just going to have to terminate me.
6        Q. She said that in that meeting?
7        A. She said disciplinary action.
8        Q. Okay. She didn't use the word, I'm going to
9    terminate you. She said --
10        A. Not at that --
11        Q. -- there will be disciplinary action --
12        A. Yes.
13        Q. -- right?
14        A. Right.
15        Q. What else?
16        A. That's -- those are the things that she said to
17    me.
18        Q. Anything else that she said to you?
19        A. That's about it that she said to me.
20        Q. That you -- anything else that she said that
21    you regard as being extreme and outrageous conduct at
22    this meeting? We're just talking about this meeting.
23        A. Yes, uh-huh. She was -- she was outraged. She
24    was -- she was hostile. I mean --
25        Q. Sir, I'm not asking about how she appeared. I

---

1    want to know what she said.
2        A. Those are the things that I -- that she said.
3        Q. Anything else that she said that you regard as
4    being extreme or outrageous at that meeting?
5        A. That's about it, ma'am.
6        Q. Now, when I talk to these other employees about
7    this meeting, how are they going to say that you acted
8    during this meeting? Did you argue with her?
9        A. I stated my points and I -- I -- I felt that
10    right there and then that she was going to fire me.
11        Q. Well, she didn't fire you, did she?
12        A. Yeah, but I felt.
13        Q. Okay. Right. I don't want to know how you
14    felt. I'm asking you, what did you do at that meeting?
15        A. I just stated my points and responded to her --
16    to her allegations against me.
17        Q. Did you argue back with her?
18        A. I would not say argue back. I would just say
19    I -- I stated my concerns.
20        Q. Is it your testimony that you acted in a
21    professional manner and did not raise your voice?
22        A. We were both about in the same level of -- of
23    speaking to each other.
24        Q. Okay. What other occasion do you think that
25    Deborah Duke acted in an extreme and outrageous manner

129

1    with the intent of causing you mental anguish,
2    emotional distress?
3        A. I think that's about it right there.
4        Q. Okay. Your claims of intentional infliction of
5    emotional distress are limited to two occasions, one on
6    December 8th, 2003 and the second --
7        A. December 18th.
8        Q. -- in the summer of --
9        A. December 18th.
10       Q. Okay. December 18th --
11       A. 2003.
12       Q. -- 2003 and the second sometime in the summer
13   of 2003; is that correct?
14       A. I'm sorry. December 18th, 2000 -- yeah, 2003,
15   yes.
16       Q. Okay. I'm going to ask the question again.
17   Your claims of intentional infliction of emotional
18   distress are limited to these two occasions that
19   occurred on December 18th, 2003 and sometime during --
20   the second one on -- sometime in the summer of 2003,
21   correct?
22       A. Correct.
23       Q. There are no other incidents when you believe
24   that Ms. Duke acted in an outrageous --
25       A. No, ma'am.

130

1        Q. -- manner to cause --
2        A. Those are the --
3        Q. -- to cause -- sir, please let me finish my
4    question, okay? There are no other occasions when you
5    think that she acted in an extreme and outrageous
6    conduct with the intent to cause you emotional
7    distress, correct?
8        A. That's correct.
9        Q. We previously -- well -- previously discussed
10   the only contract that you're aware of is the -- the
11   conciliatory agreement, which is attached as Exhibit B
12   to your pleadings, correct? Because you have claimed
13   breach of contract and that's the contract you're
14   claiming that was breached, correct?
15       A. Yes, ma'am, with the EEOC.
16       Q. Right. And that was entered into on -- was
17   signed by the parties on May 20 -- I'm sorry, May 29th,
18   2001, correct?
19       A. That's correct.
20       Q. Okay. And in this agreement it provides that
21   within ten days of receipt of a finalized copy of this
22   agreement Brownsville Navigation District will increase
23   the wage or salary rate of the charging party to $9 per
24   hour, correct?
25       A. Correct.

131

1        Q. Was that done?
2        A. That part was done.
3        Q. And now, in fact, you're making almost $10 an
4    hour?
5        A. That's correct.
6        Q. The second part of it was, charging party will
7    continue his relief switchboard operator duties as is
8    stated in his job description of accounting clerk
9    position during the morning, lunch and afternoon
10   breaks, correct?
11       A. Correct.
12       Q. And, in fact, that part of the agreement you no
13   longer have to do the lunch breaks, right?
14       A. The lunch hour, ma'am.
15       Q. Right?
16       A. The lunch --
17       Q. The lunch hour, right?
18       A. The lunch hour, yes, ma'am. The morning break
19   and the afternoon break I still have to do it.
20       Q. Right. The third part of the agreement
21   provides -- but that's part of this agreement. You
22   were -- you agreed to do that in 2001, right?
23       A. With all those things intact, yes.
24       Q. Okay. The third part of the agreement says,
25   within ten days of receipt of a finalized copy of this

132

1    agreement charging party will institute the following
2    training in the areas of posting accounts receivable,
3    preparing accounts payable vouchers and maintaining --
4    and maintain accounts receivable logs with no assurance
5    of promotions at this level, correct? And you can read
6    it.
7        A. Yes, that's correct, but that didn't happen.
8        Q. Sir --
9            MS. NEALLY: Object to after the words
10   that's correct.
11       Q. (BY MS. NEALLY) I hadn't asked my question yet.
12   That's what this says, right?
13       A. That's what that says --
14       Q. Okay.
15       A. -- yes.
16       Q. Now, have you ever been trained in the area of
17   posting accounts receivable?
18       A. Until January 2003.
19       Q. So the answer to that is yes?
20       A. On January 2003.
21       Q. So the answer to that is yes? Yes, January
22   2003, correct?
23       A. Yes, which should have been done in 2001.
24           MS. NEALLY: Object to the responsiveness
25   of the answer.

1    Q. (BY MS. NEALLY) Can you wait until I ask a
2  question, please?
3    A. Can we take a break, please?
4    Q. Yes.
5        (Off the record.)
6    Q. (BY MS. NEALLY) Okay. We're back on the record
7  after --
8        (The videographer confers with counsel.)
9    Q. (BY MS. NEALLY) We're back on record after you
10  had a short break and you've had an opportunity to
11  confer with your attorney, correct?
12    A. That's correct.
13    Q. Okay. Now, you have been trained in the areas
14  of posting accounts receivable, correct, as of -- of
15  January 2003, correct?
16    A. Correct.
17    Q. Okay. Have you been trained in preparing
18  accounts payable vouchers?
19    A. Okay. I'm sorry. What was the question right
20  before that one? That --
21    Q. Have you been trained in the areas of -- have
22  you been trained to post accounts receivable? Do you
23  know how to do that?
24    A. Accounts receivable? No, no, ma'am.
25    Q. Okay. Do you know how to prepare accounts

1  payable vouchers?
2    A. Yes.
3    Q. Okay. Is that some training that you received
4  in January 2003?
5    A. Yes, ma'am.
6    Q. Have you been trained to maintain accounts
7  receivable logs?
8    A. Accounts receivable logs? No, ma'am.
9    Q. This agreement doesn't specify what type of
10  training as far as in those areas that you're supposed
11  to be trained, what type of training you were to get.
12  It could have been 30 minutes. It could have been an
13  hour. It could have been ten days, correct?
14    A. It was supposed to be in ten days.
15    Q. Okay. The training was supposed to occur in
16  ten days, but as far as how much training you got, this
17  does not specify, correct?
18    A. No. It doesn't specify. Yeah, that's correct.
19    Q. And it's your claim that they did not train
20  you, right?
21    A. That's my claim.
22    Q. Now, you claim that they did not train you in
23  the area -- in these areas, the two areas that we've
24  indicated or in a timely fashion, correct?
25    A. That's correct.

1    Q. And is it your contention that at all times
2  that you -- you perform the relief switchboard operator
3  duties that you were assigned to do?
4    A. I didn't understand the question.
5    Q. Is it your testimony that you performed the
6  switchboard operator duties at all times that you were
7  asked to do it?
8    A. Yes.
9    Q. That you never breached this contract? Is that
10  your testimony?
11    A. That's my testimony.
12    Q. Do you know what training Ms. Duke has -- has
13  received regarding discrimination?
14    A. What training she has received?
15    Q. Correct.
16    A. I'm not sure I'm following the question.
17    Q. Do you know what training Ms. Duke has received
18  regarding discrimination?
19    A. I'm sorry. The question doesn't make sense to
20  me.
21    Q. Do you know --
22    A. I know what you're saying, but --
23    Q. -- if --
24    A. -- I don't --
25    Q. Do you know if Ms. Duke received any training

1  regarding discrimination?
2    A. No. I don't know.
3    Q. If you're so unhappy at the port, how come
4  you've never quit?
5    A. I never said I wasn't happy at the port.
6    Q. So you are happy at the port?
7    A. And why should I quit? I'm -- I'm a hard
8  worker. I'm reliable and dependable. Why should I
9  quit?
10    Q. Have you ever been insubordinate?
11    A. I'm not sure what that phrase means.
12    Q. Have you ever acted in a manner where you were
13  insubordinate, where you did not adhere to your
14  supervisor's directives?
15    A. No, ma'am.
16    Q. During the time when you've been employed at
17  the port?
18    A. I'm a very obedient person.
19    Q. Okay. Is it your testimony that you've had
20  no -- that you get along well with all of your
21  co-workers?
22    A. That I do or that I don't?
23    Q. That you do.
24    A. I do get along with them.
25    Q. You get along well with them?

137

1   A. Yes.
2   Q. And you've had no trouble with any of them?
3   A. Well, I've had -- other than that incident we
4   talked about that's about it.
5   Q. Which incident?
6   A. The -- when they all went behind closed doors
7   in that.
8   Q. Okay. Other than their going to talk to --
9   A. To Ms. Duke.
10  Q. -- Ms. Duke you've had no problems with them?
11  A. Not that -- you know, to --
12  Q. Okay.
13  A. -- to comment on.
14  Q. Well, not comment. I'm -- maybe you don't want
15  to comment, but I want to know whether or not you have
16  any problems with any of them. Have you had any
17  problems with any of them or do you get along well with
18  all of them?
19  A. I get along well with them.
20  Q. When did you have -- when did you think you had
21  a tumor in your head?
22  A. Around -- around 2002 I would say. I went two
23  or three -- I went at least two times to get x-rays on
24  my head because I have -- I have that tension right
25  now.

138

1   Q. You get tension headaches?
2   A. Yes, right now, yeah.
3   Q. What other symptoms do you have besides tension
4   headaches?
5   A. High blood pressure, depression.
6   Q. But why would you think you have a tumor in
7   your head?
8   A. Because my -- all of my head would pound and
9   inside and it will go over to the -- to the right-hand
10  side and the pain was just unbear -- unbearable. It
11  was --
12  Q. So you had two CAT scans done in --
13  A. Uh-huh.
14  Q. -- in 2002?
15  A. I don't know if they were in the same year.
16  Bless you. One was done probably in 2002 and maybe one
17  might have been done in 2001 in different hospitals.
18  Q. Were they both negative?
19  A. It turned out to be that I didn't have a tumor.
20  Q. Do you still have the same headaches?
21  A. Yes.
22  Q. Have they gotten better, worse, stayed the
23  same?
24  A. Sometimes they're really -- they're really bad.
25  Q. But over all, have they gotten better, worse or

139

1   have they stayed the same?
2   A. They've gotten worse.
3   Q. Are they as bad this year as they were last
4   year?
5   A. Yes.
6   Q. You were treated by a Dr. Antonio Diaz,
7   correct?
8   A. That's correct.
9   Q. Okay. And he's the one that's prescribed the
10  Zoloft for you and the Diovan, correct?
11  A. Yes, ma'am.
12  Q. And you've been taking Zoloft since October
13  2002? Does that sound about right?
14  A. That sounds about right.
15  Q. Okay. You listed another doctor and I've tried
16  to get records from him, Dr. Geuvara, Jorge Geuvara?
17  A. Dr. Ochoa, Dr. Ochoa in Harlingen, a family
18  health specialist on the --
19  Q. When did you see him?
20  A. About two weeks ago.
21  Q. Two weeks ago?
22  A. Yes.
23  Q. For what?
24  A. About a week and a half. With my tension of my
25  headache.

140

1   Q. Is that the first time you had seen that
2   doctor?
3   A. No. This would be around the third time.
4   Q. What other times have you seen him?
5   A. I started seeing another doctor there, but he
6   was never there when I needed to go, so -- I can't
7   think of his name right now. So they asked me if I
8   wanted to see another one, so it's basically been Dr.
9   Ochoa, but I -- I saw -- I just came to another doctor
10  Monday over here in Brownsville on -- for -- for my
11  infection on my ear and over here at the Valley Day and
12  Night Clinic.
13  Q. Okay. You saw a doctor -- my question
14  originally was, you listed on your medical record, I
15  mean, on your supplemental interrogatories that you've
16  seen Dr. Jorge Geuvara and Dr. Geuvara is a heart
17  doctor.
18  A. Oh, okay, yes, the -- the Heart Specialist
19  Institute. That's where I was diagnosed with the high
20  blood pressure. I was referred to him by Dr. Antonio
21  Diaz.
22  Q. Okay. But there are no medical records with
23  that doctor.
24  A. Yes.
25  Q. He has no medical records from you.

1    A. There's --
2    Q. Is that the -- sir, I'm trying to ask a
3  question. Please let me finish it. Is that the right
4  name?
5    A. Yes, for the -- the Heart Institute.
6    Q. The Heart Institute at which --
7    A. Of Brownsville.
8    Q. Which office? Maybe we have the wrong office.
9    A. The Heart Institute of -- it's over here by --
10 it's on Price Road. It's over here on the -- on these
11 white buildings over here toward the very end.
12   Q. And you did see Dr. Jorge Geuvara or --
13   A. Yes.
14   Q. -- was it another doctor?
15   A. Yes, at one time, yes. During the time that I
16 was diagnosed with high blood pressure.
17   Q. Okay. When were you first diagnosed with high
18 blood pressure?
19   A. When I -- on that day that I -- I went to go
20 see -- I was at my desk and my heart was pounding
21 really fast and my --
22   Q. Sir, my question was just when, not what
23 happened, but when. Do you recall what year?
24   A. I don't know. It should be there on file.
25   Q. But it's not, okay? I mean, I'm just letting

143

1    A. (Witness complies.)
2    Q. Why did you fill that out?
3    A. I was asked to.
4    Q. By Dr. Diaz?
5    A. Yes, ma'am.
6    Q. This was prior to the time that he would
7  prescribe -- so he would prescribe the Zoloft for you?
8    A. After that, then that's when he described --
9  prescribed the Zoloft for me.
10   Q. Right. Let me ask you these questions. On
11 that date you said, I feel downhearted, blue and sad
12 some of the time. Is that still the same? Has it
13 gotten worse or better?
14   A. Worse.
15   Q. Okay. The morning is when I feel the best.
16 Has that gotten worse or better?
17   A. It's gotten a little better.
18   Q. I have crying spells or feel like it. Has that
19 gotten worse or better?
20   A. It's gotten -- it's the same.
21   Q. I have trouble sleeping through the night. Has
22 that gotten worse or better?
23   A. Worse.
24   Q. I eat as much as I used to. Has that gotten
25 worse or better?

Page 144

1  you know I tried to get those records. They don't
2  exist. They say they don't have any records for you,
3  so what year, more or less?
4    A. Okay. 2000, 2001.
5    Q. Okay. Now, who did you go --
6    A. Maybe 2002.
7    Q. Who did you go to see about the hypertension?
8    A. I went to go see Antonio -- Dr. Antonio Diaz
9  who referred me to him.
10   Q. Okay.
11   A. I had to go from his office to this office
12 because --
13   Q. All right.
14   A. -- I was in bad shape.
15   Q. Let me show you what we'll mark as Exhibit -- a
16 copy of it as Exhibit 15.
17       (Exhibit No. 15 marked.)
18   Q. (BY MS. NEALLY) Is that your handwriting up at
19 the top? I'll represent to you that's a portion of
20 your medical records that we received from Dr. Diaz.
21   A. Yes. That's my handwriting, uh-huh.
22   Q. And that was prepared October 10th, 2002? Look
23 up at the top.
24   A. Yes, ma'am.
25   Q. Can I see that, please?

144

1    A. It's the same.
2    Q. A good part of the time?
3    A. Uh-huh.
4    Q. I enjoy looking at, talking to or being with
5  attractive women/men. You answered some of the time.
6  Has that gotten worse or better?
7    A. That's gotten -- that's gotten worse.
8    Q. I notice that I am losing weight and it says
9  none of the time. Is it the same?
10   A. It's the same.
11   Q. My heart beats faster than usual. Is that the
12 same, which you said a good part of the time?
13   A. It's worse.
14   Q. My mind is as clear as it used to be and you
15 said a good part of the time. Is that the same?
16   A. Yes. That's -- that's gotten better.
17   Q. That's gotten better? Your mind is clearer?
18   A. My mind is clearer.
19   Q. I got -- I get tired for no reason. Is that
20 most -- you said most or all of the time was your
21 former answer. Is that the same?
22   A. It's -- it's worse.
23   Q. Okay. I find it easy to do the things I used
24 to do. You put some of the time. Has that gotten
25 worse or better?

1   A. It's gotten better.
2   Q. Okay. I am restless and can't keep still and
3   it says good part of the time. Is that worse or
4   better?
5   A. Worse.
6   Q. I feel hopeful about the future. You've
7   written -- marked some of the time. Is that worse or
8   better?
9   A. Worse.
10   Q. I am more irritable than usual. You put most
11   of or all of the time. Has that gotten worse or
12   better?
13   A. It's gotten better.
14   Q. I find it easy to make decisions. You put a
15   good part of the time. Has that gotten worse or
16   better?
17   A. That's gotten better.
18   Q. I feel that I am useful and needed. Has that
19   gotten worse or better?
20   A. It's gotten worse.
21   Q. You put my life is pretty full and you put some
22   of the time. Worse or better?
23   A. That's gotten worse.
24   Q. I feel that others would be better off if I
25   were dead and you put some of the time. Has that

1   gotten worse or better?
2   A. That's gotten better.
3   Q. And I still enjoy the things I used to do and
4   you put some of the time. Is that worse or better?
5   A. It's better.
6   Q. Do you think the Zoloft has helped you based on
7   the answers you just gave me?
8   A. I don't know.
9   Q. You said you hadn't taken it in the last five
10   days because of your antibiotic medication. Had you
11   been on it continuously prior to that?
12   A. Prior to that, yes. I take it every night.
13   Q. Have you talked to your doctor about a
14   different kind of antidepressant medication?
15   A. No, I haven't. I need a little break.
16   (Off the record.)
17   Q. (BY MS. NEALLY) We're back on record and you
18   took another break and had an opportunity to talk to
19   your attorney. Are you ready to proceed?
20   A. Yes, ma'am.
21   Q. Because, sir, if you're not feeling up to this
22   we can reschedule it and continue it.
23   A. No, ma'am. I want to get it over with.
24   Q. Okay. I previously was referring to the
25   mediation settlement agreement. I just want to attach

147

1   a copy of it, so we'll mark this as Exhibit 16.
2   (Exhibit No. 16 marked.)
3   Q. (BY MS. NEALLY) Going back to Exhibit 14, it's
4   dated May 1st, 1994 and it indicates that when you
5   started -- in 1994 you were earning $6.10 an hour,
6   right?
7   A. Yes, ma'am.
8   Q. Okay. And that you were to continue with that
9   rate, right?
10   A. Uh-huh.
11   Q. We were previously talking about some of the --
12   the journal that you kept in 2003 that was provided to
13   us in responses to discovery. Did you keep this in
14   a -- one place or were these just little notes you made
15   or was it kept in like a notebook?
16   A. I kept them in -- in one little place in a
17   notebook I had.
18   Q. Okay. And I'm assuming when you provided them
19   to your attorney that they were in the same order that
20   you kept them?
21   A. Yes, ma'am.
22   Q. Okay. On September 23rd, 2003 you said that
23   you thought that -- I can't -- I can't read this, the
24   last sentence.
25   A. I know she's waiting for these vendors to call

148

1   in angry about their payment so that I would look bad
2   to Mr. B and --
3   Q. Sir, I'm sorry. I asked you to read the last
4   sentence.
5   A. Because Debby and Cristina are evil.
6   Q. Oh, it's Debby?
7   A. Debby.
8   Q. Do you believe that they are evil?
9   A. Yes.
10   Q. And you believe that because why?
11   A. Because they both have tried to fire me.
12   Q. Okay. Let me ask you something. And there are
13   some entries from 2002. They're just scattered into
14   2003. Is this also your handwriting?
15   A. Yes, ma'am, it is.
16   Q. Were you taking a different kind of medication
17   in 2002 than you were taking in 2003?
18   A. No, ma'am, not to my knowledge.
19   Q. The only medication you've ever taken has
20   been -- has been Zoloft?
21   A. Other than my blood pressure and Diovan.
22   Q. What's TxDOT?
23   A. Texas Department of Transportation.
24   Q. Okay. You have a notation in here that
25   September 12th, 2002 that Debby finally called me in

150

1    her office to train me on something called TxDOT.
2    What -- what was the training you received on that?
3        A. Okay. That was -- it was -- it was like a
4    notebook that she had and there was just some thing on
5    the computer with some numbers and it was basically
6    feeding in some information into the computer.
7        Q. Okay. That occurred September 12th, 2002,
8    correct?
9        A. Yes, ma'am.
10       Q. August 3rd, 2002 you have a notation that --
11   that on this day I was allowed to start entering the
12   yellow invoices that Rosie entered?
13       A. Right.
14       Q. Okay. You have a note here, January 23rd,
15   2003. The port's lawyer had to answer questions to the
16   EEOC about my grievances and then you have a notation,
17   January 30th, 2003. The port's lawyer had to answer
18   questions to the EEOC about my grievances. How did you
19   know that?
20       A. Those were on the Renfro files. It's a file
21   that we have.
22       Q. What do you mean it's a file that you have?
23       A. We have a section where we -- we file things
24   and I -- and I came across it.
25       Q. When you were doing your filing you were --

---

1        A. Uh-huh.
2        Q. -- reading the information; is that right?
3        A. Uh-huh.
4        Q. Is that yes?
5        A. Yes. I would have to -- I would enter some of
6    these transactions.
7        Q. Why did you write that down?
8        A. Why?
9        Q. Why did you write that down? Did it make
10   you --
11       A. Because --
12       Q. -- happy?
13       A. Because that's around the time that Ms. Duke
14   was giving me some problems, you know.
15       Q. In January 2003?
16       A. Yes, ma'am.
17       Q. That's when she started training you for your
18   position, right?
19       A. For -- for two days.
20       Q. Right. In January 2003, correct?
21       A. In January 2003 for one hour.
22           MS. NEALLY: Object to the responsiveness
23   of the answer.
24       Q. (BY MS. NEALLY) Really? It was for one hour?
25   Because, you know, in --

151

1        A. It was for --
2        Q. -- in these -- in these -- you put January 2nd,
3    2003 and January 3rd, 2003, the only two days Debby
4    ever sat with me for training and left out a world of
5    details. I mean, she did train you on two days,
6    January 2nd and January 3rd, correct?
7        A. Just --
8        Q. And the other things that are in here are true
9    and correct, right?
10       A. Yes, ma'am.
11       Q. Okay. I think I'm almost finished. If we can
12   take a short break and let me make sure.
13           (Off the record.)
14       Q. (BY MS. NEALLY) I'm going to attach as Exhibit
15   17, the documents that we referred to, which were Bates
16   stamp 316 through 342 which are portions of your notes
17   and that we previously discussed.
18           (Exhibit No. 17 marked.)
19       Q. (BY MS. NEALLY) Would you take a look at Bates
20   stamp 316 and tell me why you -- why you included that
21   in this -- in your responses to discovery, the
22   relevance that it has to this lawsuit?
23       A. Those were just personal notes that I had.
24       Q. You can't --
25       A. I don't remember why I wrote that.

---

152

1        Q. Okay.
2        A. I really don't.
3        Q. And all it says is, Ms. Eymard left at noon on
4    Friday, April 16th, 2004 -- April 16th, 2004, out for
5    the day.
6        A. Uh-huh. I don't know why I wrote that. I
7    mean, I did write it, but I don't know why.
8        Q. Was it your job to keep track of where these
9    people went?
10       A. No, ma'am. Those were just my personal notes.
11       Q. Okay. Page 363 you have a note -- I mean,
12   Bates stamp 363, Friday, February 6th, 2004 and it
13   says, Debby got a call from Renfro law firm around
14   3:30 p.m. She closed her door for about 20 minutes?
15       A. Yes.
16       Q. And these are just your personal notes?
17       A. Yes, ma'am. They're just my personal notes.
18       Q. And these are things that you're writing down,
19   not at the office. You wait until you go home to
20   write --
21       A. Yes.
22       Q. -- them down; is that correct?
23       A. Yes.
24       Q. How do you remember whether or not somebody is
25   out for the day unless you make a note of it somewhere?

153

1    A. I just make a notation in my head.
2    Q. Now, let me show you what I'm going to mark as
3 Exhibit 18.
4        (Exhibit No. 18 marked.)
5    Q. (BY MS. NEALLY) When did you prepare these
6 documents?
7    A. Those were -- those were the packets that I
8 would get ready to be turned in to my co-workers so we
9 can enter them.
10    Q. Why did you keep a copy of that?
11    A. Because these are -- she was accusing me of not
12 producing and this was my way of saying that these were
13 the days of how busy I was throughout the day, you
14 know.
15    Q. When did you prepare that document?
16    A. The dates are all right here.
17    Q. Well, but -- you prepared that regarding
18 information that you had -- got at the office and then
19 you took the information home with you?
20    A. This information, all it is is just the number
21 of transactions, the number of packets that I did.
22        MS. NEALLY: Object to the responsiveness
23 of the answer.
24    Q. (BY MS. NEALLY) That's information that you
25 took home with you, right, from the port? You took

154

1 that packet home from the port?
2    A. No. I didn't take that packet home from the
3 port.
4    Q. Well, how did it get in your -- your documents
5 then?
6    A. These were just my personal notes of what I was
7 doing. That's what --
8    Q. Okay.
9    A. -- I'm telling you.
10    Q. And you made those personal notes at the office
11 and then brought it home?
12    A. I don't remember where I -- where I did them.
13    Q. Okay. So you might have done that at the
14 office --
15    A. Uh-huh.
16    Q. -- is that right?
17    A. Yes.
18    Q. Okay.
19    A. That's --
20    Q. And then turn to the next page, not that one,
21 the next one, next one. Those are more of your notes
22 that you made?
23    A. Uh-huh.
24    Q. And you don't know where you made them?
25    A. This was one -- this is a vendor that

155

1 Ms. Duke --
2    Q. Sir, my question was just, do you know where
3 you made it?
4    A. No.
5    Q. And then the rest of those documents are all
6 invoices, correct?
7    A. The invoices.
8    Q. And those are documents that belong to the Port
9 of Brownsville, correct?
10    A. Some of them. These belong to me.
11    Q. The handwritten notes belong to you, right?
12    A. The handwritten notes belong to me.
13    Q. Okay. But the rest of those documents belong
14 to the Port of Brownsville. Let me show you what we're
15 going to mark as Exhibit 18 -- oh, I'm sorry, 19.
16        (Exhibit No. 19 marked.)
17    A. Cost of living increase.
18    Q. Cost of living increase, right?
19    A. Yes, ma'am.
20    Q. So you did receive a cost of living increase
21 in --
22    A. 2004.
23    Q. -- 2004, right?
24    A. That's correct.
25    Q. And that makes your annualized salary 20,000

156

1 what?
2    A. Seven fifty ninety-one.
3    Q. I'm going to show you what we'll mark as
4 Exhibit 20.
5        (Exhibit No. 20 marked.)
6    Q. (BY MS. NEALLY) You did receive a cost of
7 living increase in 2003 also?
8    A. Yes, ma'am, 1.6 percent.
9    Q. Where did you get a copy of this document?
10    A. I don't remember where I got this from.
11    Q. That's not something that just gets handed out,
12 right?
13    A. No.
14    Q. Pardon?
15    A. I don't remember where I got that from.
16    Q. That's not something that just gets handed out,
17 correct?
18    A. I have no comment.
19    Q. Are you refusing to answer the question?
20    A. No. I just plead the fifth amendment.
21    Q. Why are you refusing to answer the question?
22 It's a document that you weren't supposed to have that
23 you got a copy of, correct? Correct? Are you refusing
24 to answer the question?
25    A. I have no comment.

1    Q. Are you -- sir, no comment, not an
2    appropriate question. I mean, we have to go to the
3    judge and we have to ask -- order the judge to order
4    you to answer the question, okay? So you're refusing
5    to answer the question, correct? I take it by your
6    silence that you're refusing to answer the question.
7    Let me show you what was provided me as Bates stamp 406
8    and 407 that we'll mark as Exhibit 21.
9        (Exhibit No. 21 marked.)
10    Q. (BY MS. NEALLY) This is the document that your
11    attorney provided to us and I notice that you've drawn
12    an arrow by Ricky Rodriguez's name in several places?
13    A. Yes, ma'am.
14    Q. And then you have a note that you were unhappy
15    that he was doing --
16    A. Payroll.
17    Q. -- tasks that you thought you should be -- have
18    been assigned to do --
19    A. That's correct.
20    Q. -- is that correct?
21    A. That's correct.
22    Q. Also attached to your request for production
23    were several evaluations that I would just like to
24    attach for the record.
25        (Exhibit No. 22 marked.)

160

1    Q. (BY MS. NEALLY) And this is for the period
2    8/26/93 -- I'm sorry. That's not -- this is for the
3    January 2004 evaluation that you got; is that right?
4    A. Yes, ma'am.
5    Q. And you were given a good rating; is that
6    correct?
7    A. Yes, ma'am.
8    Q. This one is for January 2003 and you were again
9    given a good rating. Is that exhibit -- what are we
10    on?
11    A. 23.
12        (Exhibit No. 23 marked.)
13    Q. (BY MS. NEALLY) Correct?
14    A. Correct. You put 24.
15    Q. I'm sorry. What is it?
16    A. It's 23.
17    Q. Oh, that's the next exhibit. I thought you
18    said that one was 23.
19    A. No. That's 23.
20    Q. You did not receive an evaluation in 2002 or
21    you just didn't have a copy of it?
22    A. I probably don't have a copy of it, ma'am.
23    Q. Do you remember what your evaluations were for
24    2002 or 2001?
25    A. No. I don't remember. I don't remember.

159

1    Q. Okay. You made a statement that you were
2    hospitalized for a tumor. Were you ever actually
3    hospitalized for a tumor or you just got CAT scans?
4    A. CAT scans.
5    Q. How many absences would you say you had last
6    year?
7    A. Not including like vacation, just absences?
8    For the whole year? I guess maybe seven or eight days.
9    Q. Okay. How about this year?
10    A. This year?
11    Q. Yeah.
12    A. Because of my ill -- sickness maybe a total of
13    four days, maybe five --
14    Q. Okay.
15    A. -- because I have gone to see a doctor here and
16    there.
17    Q. And that's because you have an ear infection I
18    think you said?
19    A. Yes, and, you know --
20    Q. I want to make sure that I'm clear on the
21    adverse employment action that you claim has been taken
22    against you and from what I understand you're claiming
23    two things -- well, three things. One is the
24    receptionist's duties --
25    A. Yes, ma'am.

160

1    Q. -- right? You regard that as an adverse
2    employment duty?
3    A. Yes, ma'am.
4    Q. And then the second thing is that you did not
5    get a raise?
6    A. Not the raise that I was -- that -- that was
7    coming to me.
8    Q. Well, you didn't get the raise that you -- that
9    you perceived in the budget, correct?
10    A. That's correct.
11    Q. Did you ever -- who did you talk to about not
12    getting that raise?
13    A. I brought it up to Ms. Eymard and to Ms. Saban
14    on -- on that date that we had that discussion for
15    those hours. I brought -- that's one of the things I
16    brought up.
17    Q. In July of 2003?
18    A. Yes, ma'am.
19    Q. Now, this was a raise you were -- you claim
20    that you were supposed to have gotten --
21    A. Yes.
22    Q. -- in 2002?
23    A. In 2002, yeah.
24    Q. The prior year, correct?
25    A. Prior, yes.