# BROWNSVILLE NAVIGATION DISTRICT
## INTEROFFICE MEMORANDUM

To: Vidal Cantu
From: Debby Duke
Subject: Switchboard Relief
Date: March 6, 2002

---

I wanted to reply to the concerns that you expressed to me in your memo dated March 5, 2002, regarding Ms. Letty Gonzalez. We have discussed them privately, but I understand your desire to have a written response as well.

We have discussed the fact that you and Ms. Gonzalez have not been able to establish an easy working relationship with each other. This is unfortunate due to the fact that it is an assigned part of your job to relieve Ms. Gonzalez at the switchboard several times daily.

I believe, gathered from my discussions with you and Ms. Gonzalez, and my own observations of the situation, that the majority of your problems with Ms. Gonzalez arise when Ms. Gonzalez takes it upon herself to correct you on small details either in your conversation with her, or in your performance of your duties. I agree that it is not her place to take this upon herself to do, nor have I noted anything in the performance of your switchboard relief duties that needs to be remarked upon. To that end, I have discussed this situation with Ms. Mercado and have requested that Ms. Gonzalez be instructed to cease these types of actions immediately. I know that this meeting has taken place.

Other points of discord between yourself and Ms. Gonzalez have been as varied as, and as difficult to pin down as, the tone of voice used in talking to you, facial expressions and body language. All of these, I agree, combine to give you a sense of what Ms. Gonzalez may be thinking, but, unfortunately, we cannot correct these things through discipline. We can, however, deal with the words that are spoken to you.

We have discussed the fact that you dread having to go to the switchboard, fearing an unpleasant confrontation or experience. This cannot help you to interact with Ms. Gonzalez in a positive manner, even when she is not being critical of you. We have discussed ways in which you can begin to build a better outlook on this duty and to help to diffuse this situation. I have instructed you that you are to stop having conversations with Ms. Gonzalez. When she begins to correct you for any reason, you are to excuse yourself and return to the department. I would expect that with a sufficient number of times in which you are able to come and go from the switchboard without a confrontation, you will be able to look forward to this duty without dread, and so approach Ms. Gonzalez with a more relaxed attitude.

While this does not change the way that Ms. Gonzalez may act toward you, I would hope that you can make a change in the way that you react to Ms. Gonzalez. We all tend to rub


EXHIBIT 5

EXHIBIT

0291

each other the wrong way on occasion. I would hope that you will become able to see that it is not worth your worry and concern to react so strongly to Ms. Gonzalez in the future.

It is frustrating not to be accepted at face value by another person, which I believe is one of the reasons that this situation is so difficult for you. I would hope that you will eventually be able to accept this as the other person's problem, that they are missing out on a valuable working relationship with you, and that this is not a failing on your part. By taking the initiative to stop negative contact, you are taking control of the situation, instead of letting the situation take control of you. You will be happier in the long run when you do not feel that you are out of control in this interpersonal relationship.

Again, I would reiterate, Ms. Gonzalez cannot say anything to you that you will take offense to if you are not there to hear it. If a situation such as you have been describing to me starts, you have my permission, and encouragement, to walk away. You are not expected to allow any of your co-workers to speak to you in a manner that offends you or that you feel is intended to belittle you. You are the better person if you simply turn your back and walk away.

I hope that you will continue to bring these problems to me so that we can continue to monitor the progress of this situation. However, I believe that after a few occasions in which you have not let Ms. Gonzalez "get to you," that this situation may be resolved. Not especially because Ms. Gonzalez will change, but because you will. I would hope that you will take my encouragement to heart, and take charge of the confrontation by ending it.

Debby

## BROWNSVILLE NAVIGATION DISTRICT
### INTEROFFICE MEMORANDUM

To: Vidal Cantu
From: Debby Duke
Subject: Switchboard Relief
Date: March 8, 2002

---

This morning, I had a meeting with Ms. Mercado in which we discussed ways in which to bring the situation between you and Ms. Gonzalez to an end. We both agree that it is in the best interests of both of you as employees to be able to work in an environment that is as free of conflict as we can make it.

I had previously mentioned to you that I felt that by building up a period of time in which you had positive feelings regarding the switchboard relief would help to resolve this situation.

To that end, we have this morning made arrangements that are intended to give you some relief from the situation that has developed between you and Ms. Gonzalez.

Beginning on Monday, March 11, 2002, and continuing for a period of 6 months, you will no longer be the assigned relief person for the lunch hour at the switchboard. Another employee will be utilized for this duty. You will still be responsible for the morning and afternoon breaks. Ms. Gonzalez will call you when she is ready for you to relieve her.

Ms. Gonzalez may take additional time at either the morning or afternoon break to attend to duties that require her to be away from her workstation.

As you will no longer be required to be at the switchboard during the noon hour, you will now use this as your regular lunch break. Should you have a special need to have a lunch break from 1:00 to 2:00, you may request that from time to time.

In the event that either Ms. Gonzalez or the new assigned lunch relief person are absent, it may be necessary for you to assist in this relief duty during the absence.

I would anticipate that with the breathing room that you are being given that you will be able to work toward resolving your conflict and achieving a better working relationship with Ms. Gonzalez.

*Debby*



EXHIBIT 11



EXHIBIT E-6

0290

# BROWNSVILLE NAVIGATION DISTRICT
## INTEROFFICE MEMORANDUM

**To:** To the File
**CC:**
**From:** Debby Duke
Brownsville Navigation District
**Subject:** Vidal Cantu
**Date:** June 2, 2003

Today I had a meeting with Vidal Cantu in my office in the morning at his request. He was having problems with Letty Trevino in the manner in which she related to him in regard to approval of the Accounts Payable packets that he prepares. She was reported to state to him that she had a lot of work to do and that verifying the packets and problem invoicing was taking up too much of her time. She was reported to comment to Rosie Hinojosa that she probably be better off being the Accounts Payable Clerk as she was doing so much of the job.

I reassured Mr. Cantu that it was her assignment as bookkeeper to check and approve the accounts payable voucher packets and to assist him with any invoices that he was having trouble getting the documentation completed for payment that went over three weeks. I explained that I had relieved Letty Trevino of job assignments so that she did have the time available to do this.

One of the items that was discussed was the fact that on several occasions, Mr. Cantu had brought to me (and to others in the department) the same invoice or other item for assistance more than one time. Each time it is as though it is the first time he is working with the item, and he does not remember previous conversations regarding the item. I instructed him that he is to make notes and attach them to the invoice. This is for two reasons, one is to remind Mr. Cantu what steps and conversations have already taken place and the other is to notify any other department member of the status of the item if they need to respond to an inquiry.

I attempted to discuss this with Letty Trevino directly after the meeting with Mr. Cantu, but she was on the phone with a vendor at the time.

After lunch, Cristina Valdez, Rosie Hinojosa, Ricky Rodriguez and Letty Trevino requested that I speak with them. They stated that in the past, when they had reported that Mr. Cantu was disrespectful to them, that I had instructed them to treat him with care due to the fact that he seems to have a difficult time controlling his temper. They informed me that they were at the end of their tolerance for the treatment they have been receiving from Mr. Cantu in the department and were requesting that I take action to stop it.

I asked for specific examples of the behavior that was objectionable to them. Some of their responses were:


00086
EXHIBIT E-7

1. When Mr. Cantu asks them for assistance, he often times walks off abruptly with a sign of disgust, not listening to their answer to his question.
2. Passing by their desks mumbling under his breath. What they can understand of these comments are sometimes un-kind references to co-workers, but usually, none of the comments are understandable.
3. On at least one occasion, Mr. Cantu has come out of Cristina Valdez' office referring to Ms. Valdez a "bitch". This was overheard clearly by Ms. Valdez and Ricky Rodriguez.
4. Ending conversations regarding work with comments such as "I just can't win".
5. Responding in an angry manner and voice when a mistake is brought to his attention.
6. Questioning the fact that other employees, especially Letty Trevino, are getting involved in his business. (The fact is that Letty Trevino has as one of her assigned duties the review of work completed by Mr. Cantu and to assist him in problems he cannot easily resolve.)
7. Mr. Cantu has developed a habit of requesting assistance for an item, and when the co-worker gives instructions or advice on processing the item rather than taking the item to process themselves, they later find that the item has been returned to their desk (usually underneath other items on their desk and when they are away from their desk). When they return it to Mr. Cantu for processing, he then drops it on another co-worker's desk. The usual sequence it to Cristina Valdez first and then to Rosie Hinojosa, neither of whom has been assigned to assist in processing accounts payable.
8. Dismissing problem items with the comment "That's before my time" and refusing to accept responsibility for working on them.
9. In their review of completed work by Mr. Cantu, the employees find errors and return them to him for correction. He is sarcastic and abusive with them when this occurs. This is so distressing to the employees that they have begun to correct the errors themselves rather than confronting Mr. Cantu's behavior. In one instance, Mr. Cantu took documents showing that he prepared voucher packets for payment that would have resulted in duplicate payments of invoicing from Letty Trevino's desk where he knew them to be so that she could illustrate how these duplicate voucher packets were occurring to me. He then shredded the documents so that she could not show them to me.
10. He has told his co-workers that no one can touch him, that he is protected. He also talks to himself at his desk, using comments such as "I'll fix her" and has commented that he can talk (I would infer that he is referring to the EEOC grievances).
11. While they had not observed any directly threatening actions, all four expressed that at times they had concern for their safety. They had a hard time expressing specific actions that caused this, only a comparison to accounts of other employee-rage situations. Mr. Cantu is a loner, and generally very quiet and well-mannered, he seems to have episodes of the behavior noted above in which he is aggressive and lashes out at his co-workers. These episodes are followed by periods of time in which he is friendly and cooperative. The aggressive episodes seem to follow periods of stress for Mr. Cantu, and are especially pronounced when he is dealing with his personal financial problems or when mistakes are brought to his attention.

I discussed the fact that I could not take action without a written grievance. The group's comments were that grievances could be filed daily because the objectionable actions occurred frequently. I told them that if there was a problem, they needed to report it so that it could be resolved. I told them to have interaction with Mr. Cantu only in pairs, to avoid one-on-one interaction. I also instructed the employees not to incite any confrontation with Mr. Cantu. Errors that are discovered are to be brought to my attention so that I may address them with Mr. Cantu.

I discussed this problem with Jo Saban and Donna Eymard to give them a "heads up" on the situation.

I called Vidal Cantu into my office to discuss the concerns of his co-workers. I explained to him that his interactions with his co-workers were causing them distress. He expressed to me surprise that this was so. He disclaimed using profanity, and I reminded him that I had had a conversation regarding his use of profanity in the office in the past. In that instance, he had used profanity in my presence several times one day (and had denied it at the time as well).

He also denied ever being sarcastic with his co-workers. I asked him to be sure he really felt that he never was sarcastic, and he again replied that he was not. He later stated that his co-workers were sarcastic with him, and he was only giving them back what he received. When pressed, he denied being sarcastic, yet maintained that his co-workers were sarcastic with him so he was only being sarcastic back. (We went back to this subject a couple of times in the conversation, and each time the same answers were given, he was never sarcastic, but his co-workers were and he was returning it in kind.) I reminded him that I had overheard comments he had made regarding Letty Trevino, and had seen notes attached to voucher packets referring to the fact that Letty Trevino questioned the use of copies in lieu of original documents in the voucher packets. These questions are asked due to instructions that Ms. Trevino has been given by me to assure that duplicate payments are avoided. He continues to make these comments regarding Ms. Trevino despite the fact that I have explained to him on several occasions that she is instructed to do exactly what she is doing (and in fact, has prevented a number of duplicate payments by doing so). I explained that this was, to my mind, an example of the sarcastic comments that his co-workers were referring to, and he maintained that as Letty Trevino would not approve a voucher packet based on copies, he was justified in saying and writing the things he did. To my knowledge Letty Trevino does approve a voucher packet based on copies when she is satisfied that it is not a duplicate payment, and that all original documents have been removed from the system.

I reminded Mr. Cantu that the bookkeepers, Letty Trevino and Rosie Hinojosa, and the Accountant, Cristina Valdez, have the responsibility of the final check of the voucher packets prior to processing for payment. They affix their approval to the packet and therefore, I do not expect them to approve anything they are not comfortable with. As to the copies, they are aware that the use of copies is a leading contributor to the issuance of duplicate payments, and as such, I have encouraged

000088

them to be certain that voucher packets that contain copies do so for legitimate reasons.

Mr. Cantu expressed to me that he felt he should have been allowed to attend the meeting with the other employees in which they brought their concerns to me, to defend himself. I reminded him that when he complained about his co-workers, he was given the courtesy of a private meeting, without me calling in the other party, and I extended the same to this group. (He had, in fact met with me that morning in private). He was being given a chance to hear their concerns, and to defend himself to me. I expressed to him my belief that had he been included in the meeting, personal attacks would have ensued, and that I would have been refereeing the meeting, a would not have been able to understand the issues raised. I would have been unable to hear either side.

He continued on to state that he was sure that his co-workers were conspiring against him, and they were banding together against him. I asked why he thought they would do so, and he said it should be obvious because they met with me. I asked him again why he thought they would conspire against him, and he had no answer. I informed him that his co-workers had individually brought some of these concerns to me at various times, and I had asked them to try to work with Mr. Cantu in a manner that would not cause him to lash out at them. The fact that the four of them came to me together to express their disappointment in the way that I had heretofore handled this conflict indicated to me that they were at the end of their tolerance, and that I could no longer place the burden of resolving these conflicts solely on them. I must address this at the source, with Mr. Cantu, at this time.

Mr. Cantu expressed his feeling that his co-workers had knifed him in the back, and that as of this date, he was no longer their friend as they had shown they were not his. He would come in to work, do his job, and wanted nothing personal to do with them. I told him that this was what I expected. The workplace is not intended to be a social area, nor is it necessary for him to like his co-workers in order to get his job done. It is necessary for him to interact with them, and I informed Mr. Cantu that I expected his interactions with his co-workers to be business-like and professional.

I discussed with Mr. Cantu that the resolution of this problem was in his hands. He could examine his prior interaction with his co-workers to discover what was making them uncomfortable in their workplace, or he could ignore this meeting and continue to interact in the same manner as before. It is his choice at this point what path this matter takes. He said that he still did not feel that he was in the wrong, and that this was all an attempt by his co-workers to discredit him. I again asked him to what end they would want to discredit him, and he knew of no reason, just that they did. He stated that they could go ahead and file grievances against him, he would file them right back. I discussed with him my feeling that this was not the best course for the department, as it would interfere with the department's efficiency, and therefore threaten everyone's jobs. He said that he was not afraid of that, he knew what to do.

I again stated that I believed that his co-workers came to me with an intention to give me the opportunity to resolve this matter without having to resort to the grievance

procedures, and he expressed that he felt they had already filed a grievance against him. I responded that the grievance they had was against me at this point because I had failed to take action when they had brought earlier concerns to me. I had failed to request that they begin to file written grievances so that I would have to take action about the situation.

I again stressed that Mr. Cantu himself would determine the course that this issue would take. He was very agitated by this time, and we ended the meeting, with him leaving the office for home due to his distress. The time was 4:30.

I would note that the job assignment that Mr. Cantu holds is one that has a considerable level of stress associated with it. It is extremely repetitive work with no variance in the day-to-day activities. There is contact with other employees in regard to failures to submit paperwork as required, and some resultant stress. There are some items that require significant research and follow-up, demanding patience of the clerk handling them. The work for this position had a considerable backlog when Mr. Cantu took the position. This was cleared by transferring Veronica Ramos to the Facilities Maintenance Department where she worked on the backlog from that end, and by distributing the other items to the bookkeepers and accountant in the department for resolution. I am informed that in mid-May, Mr. Cantu announced to the department that he was completely caught up.

I have been informed that Mr. Cantu is still receiving assistance from the other members of the department. Errors are being caught and corrected without my involvement, so I have been unaware of the extent that Mr. Cantu may still be making errors in the processing of the accounts payable. I have instructed the department staff to bring all errors detected to me for resolution. I need to see if there is a significant gap in the accuracy that I expect from Mr. Cantu and what he is achieving.

I believe that the "statute of limitations" on the concerns brought to me by the four employees today have expired. I have informed them that I do not want to hear complaints of prior actions, only actions that occur in the future. I noted them down as a reference to what has been occurring in the past, so that I may refer to them to compare future occurrences. I neglected to make this point with Mr. Cantu in the meeting today.

I am documenting this memo to Mr. Cantu's personnel file. I am also issuing a confirmation memo to Mr. Cantu of the overall conversation I had with him today, in which I will remind him of the time limit in which to file a grievance (10 days).


*Dobby*

# BROWNSVILLE NAVIGATION DISTRICT
## INTEROFFICE MEMORANDUM

**To:** Vidal Cantu
**CC:**
**From:** Debby Duke
Brownsville Navigation District
**Subject:** June 27, 2003 Meeting
**Date:** June 30, 2003

I wanted to put down in writing the points covered in our meeting on Friday afternoon. We had discussed several items that had been brought to my attention by your co-workers regarding your interpersonal relations with them, and their request that I take some action to give them relief.

I requested that you take the following actions:

1. Please take care in your conversations with your co-workers to be professional and business-like at all times. Sarcasm and profanity are to be avoided at all costs.
2. When you have requested assistance from a co-worker, and they are providing it to you, please have the courtesy of not walking away until the end of the conversation.

To assist in alleviating conversations that have resulted in stressful situations, I have instructed your co-workers as follows:

1. All errors that need correction are to be brought directly to my attention. I will deal with them with you personally.
2. Conversations regarding the approval of voucher packets are to continue as needed so that the person approving the processing of the payment is comfortable that the payment is appropriate.
3. Any additional requests for information regarding voucher packets are to be routed through me.

Should the dispute resolution process be initiated, it is to be remembered that the process must be started within 10 days of the action under discussion. Prior acts are not subject to the dispute resolution process.

It is my hope that this matter will be resolved by following the above guidelines. Common courtesy extended to those you work with is what is being asked, and expected, of all of the department employees.


*Debby*


EXHIBIT E-8

# BROWNSVILLE NAVIGATION DISTRICT
## INTEROFFICE MEMORANDUM

**To:** Vidal Cantu
**CC:**
**From:** Debby Duke
Brownsville Navigation District
**Subject:** Reprimand – Interpersonal Relations
**Date:** July 15, 2003

You brought an invoice to me this morning from the McAllen Monitor. The dates of the publication were in early June. You informed me that you had just taken this back to Nino Gutierrez to see what the status of the invoices were.

I questioned why you still had this invoice as it was over three weeks old, and why you had not passed it off to Letty Trevino for resolution. Your response was that I had not told you to pass off problem invoices at three weeks, but at one month. You continued to make several comments indicating that you had spoken to Irma Gawenda regarding this invoice as well as to Nino Gutierrez. You admitted that you had not been able to get a straight answer to your questions regarding the invoice status, but had not asked Cristina Valdez, who resolved the same issue for the McAllen Monitor in May, Letty Trevino, who is assigned to assist you in these issues, nor myself. These are the three persons who are in a position to resolve your questions, yet you chose not to bring this issue to any of us. I would like to see you progress in your work to a point at which you can resolve these problem invoices, but you seem to go in circles by not using the resources you have available to you.

It has been a standing instruction to you since you were assigned the Accounts Payable position that you are to refer all items you cannot easily resolve to Letty Trevino. When I discovered, due to the fact that we were losing credit with some of our vendors, that you were not doing this, I was forced to set a time limit. **That time limit was three weeks, not one month as you claim.** We want to pay our invoices within the net 30 days terms, and therefore, if you wait one month before referring a problem item to Letty Trevino, you have allowed that item to become delinquent. To discover that you have an item that you claim you have been unable to get a straight answer that you have not referred to Ms. Trevino for resolution is an indication that we still have a problem in your work performance.

It is important to the smooth operation of this department that you fulfill your work assignments as instructed. Accounts Payable invoices are not to be held at your desk beyond three weeks. In fact, when you encounter an invoice that you cannot resolve, it should be referred to Letty Trevino as soon as you discover that fact. The District's credit rating is important to the financing of our large projects, and continued late payments affect our ability to sell bonds.

**EXHIBIT E-9**

Please go through your desk and check to see that you do not have any additional unpaid items that are over three weeks past due. These are to be referred to Letty Trevino at once. In addition, you are to make sure that she receives the vendor statements as soon as they arrive in the mail.

This morning, you spoke to me in a tone that was disrespectful, despite several warnings to modify the tone you were taking with me. As your supervisor, and the Director of the Department in which you are employed, I have the responsibility to oversee your work. It is your responsibility to respond to questions regarding your work process, and to accept correction when you have not followed instructions. As I informed you this morning, I do not intend to accept this type of confrontation with you over work issues. You immediately jump on the defensive when approached regarding an error, and instead of listening to the correction or instructions being given, you attack your co-workers and myself. There is no conspiracy to undermine your work. This type of accusation does not help you concentrate on doing your work.

This memo is a letter of reprimand for the manner in which you responded to me this morning. Further instances of this type of behavior will result in further disciplinary action, up to and including time off without pay or termination.

As always, should you dispute anything in this disciplinary action, you have the right to request a review of the action following the District's Dispute Resolution Procedure, a copy of which is attached.

*Deborah Lee Duke*