# EXHIBIT 40

# BROWNSVILLE NAVIGATION DISTRICT
## INTEROFFICE MEMORANDUM

**To:** Donna Eymard
**CC:** Jo Saban
**From:** Deborah Lee Duke
**Subject:** Response to Memo Dated 07/21/03 by Vidal Cantu
**Date:** July 28, 2003

My first comment to you regarding the memorandum from Vidal Cantu is that it represents a violation of the District's Dispute Resolution Procedure. As such, the proper response to Mr. Cantu is to direct him to file the proper request for review of the disciplinary action with the proper person, with a copy to the Personnel Department. This request should not have been directed to Ms. Saban but to me. This is typical of Mr. Cantu's handling of problems with discipline in the department, he by-passes the District's established procedures for handling these problems and takes them to the EEOC or to supervisors outside of the department.

With that said, I would address the disciplinary action that Mr. Cantu is disputing. The reprimand was not issued over work performance. It was issued over Mr. Cantu's manner in responding to my questions regarding a work-related issue. This was made clear to Mr. Cantu during our meeting to discuss the reprimand. This meeting was taped, and should this issue be pursued, a review of the tape will indicate that Mr. Cantu was informed that this was the basis for the reprimand, not the work issues.

In reading Mr. Cantu's memorandum regarding the use of tape recordings during any meeting, I agree that he should not be made to attend any meeting that he feels necessary to record, but I do not agree to be recorded in all of my dealings with Mr. Cantu. Any further communications that need to be made to Mr. Cantu will be made in a written memorandum, and he will not be allowed to attend any meetings that he would insist on recording. I will inform Mr. Cantu of this in a memorandum.

Mr. Cantu makes an issue of the cross-training in the department. This is standard in the department, and is necessary to the smooth operation of the department during vacation or other absences. The **training** for contracts that is referenced is the same **training** as is given for the open purchase orders. Mr. Cantu has the training, but he has not been assigned the responsibility. These are two separate issues.

Ricky Rodriguez was hired as an accounting clerk. One of the qualifications that he had that made him stand out in the hiring process was his training in payroll. He was hired specifically to run the payroll as one of his primary duties, at the same time that Mr. Cantu was assigned Accounts Payable as his primary duty. The clerical staff in the department has three areas of primary responsibility: Accounts Payable, Accounts Receivable and Payroll. As I do not have three Accounting Clerks, Accounts Payable and Payroll

currently have been assigned to the two Accounting Clerks, and Accounts Receivable is currently handled by the two Bookkeeping Specialists. In a previous filing with the EEOC, Mr. Cantu has charged me with discrimination in not assigning him the payroll duties. I responded to those charges then, as I do today, that Mr. Cantu has never requested of me that he be assigned to those duties. He did, however, file charges with the EEOC in his first complaint that he did not get training for the Accounts Payable duties. In response to the ruling from the first EEOC complaint, he has received the training, as well as the assignment of the responsibilities, for Accounts Payable.

I do not usually assign additional primary duties to the Accounting Clerk that is handling Accounts Payable. Mr. Cantu's case is no exception.

Mr. Cantu brings up the issue of the switchboard relief. In the first EEOC mediation, Mr. Cantu agreed to accept this duty in exchange for an increase in pay. He also agreed that this would cease to be an issue. The District increased Mr. Cantu's pay in accordance with the EEOC decision, yet Mr. Cantu continues to violate this provision by repeatedly bringing this up as an issue in his complaints. I understand that Mr. Cantu claims that his training for Accounts Payable was not started as required by the EEOC decision. I dispute this allegation. One of the skills needed to perform the Accounts Payable function in this department is a basic understanding of and ability to work with an Excel spreadsheet. Mr. Cantu was given additional worksheet projects to develop these skills. He continued to require assistance in these projects, even up to the time we began the Accounts Payable training. He continues to have some problems in working with Excel, and needs to have his formulas verified periodically.

Mr. Cantu compares the situation that Veronica Ramos had in dealing with past-due invoices to the situation we are now in. During Ms. Ramos' tenure in my department, the majority of the past-due invoices were due to a backlog of paperwork in the Facilities Maintenance Department. With her transfer into that department, she has cleared the backlog. Now, any past-due invoices are usually due to other factors. I have given Mr. Cantu instructions that he is to give Letty Trevino **any and all** invoices that are over three weeks of age that he is not able to immediately process for payment. She is to work on these invoices to resolve the issues that have caused the hold-up in payment. Our goal is to pay all invoices within the terms of 30 days. I have discussed with Mr. Cantu the fact that there are a large number of invoices that can be processed for payment without pending issues. These are to be his focus. Those that were not able to be processed were taking too large a part of his time, and were causing a backup of work.

Mr. Cantu brings up an issue with an invoice from the Bank of New York. This is for an investment-tracking software that I allowed the licensing to expire on in November, 2002. The Bank of New York has been invoicing the District in the hopes that we would re-license the software, but until we again began to invest our funds, there was no need for the software. (The software is not active until the registration key is received.) Mr. Cantu brought this invoice to me several times, and I had this discussion with him regarding the fact that I was not ready to pay it each time. In May, I processed the purchase requisition,

and passed a copy of the invoice on to Mr. Cantu. In late June, we received a phone call asking if we were ever going to re-license the software. At that time, I discovered that the purchase requisition had not been processed, and I asked Mr. Cantu if he had the invoice. His response was that he did not, nor did he remember ever seeing it. I made no further comments to him regarding this invoice at that time. I later found that Mr. Cantu had approached his co-workers to look for the invoice. Mr. Cantu later came into my office and told me I had better have the vendor fax a copy of the invoice because I never gave it to him. I told Mr. Cantu at that time that it was my decision how to get a copy of the invoice, and that I would handle it. I reminded him at that time that he had had the invoice, as he had asked me about it several times, and he responded that he had given the invoice to Letty Trevino.

One of the problems that Mr. Cantu is having in his position is the processing of the same invoice for payment twice. This is arising out of his use of copies of documents to substitute for originals. While this is permissible in limited instances, it does allow for the duplicate payment of invoices if it is not carefully monitored. I have instructed Ms. Trevino to be cautious when verifying a voucher that is based on copies of documents. Mr. Cantu takes exception to this verification, even though we are still catching duplicate vouchers at this point. He has been instructed to be certain that the original documents are not available to him before going to Ms. Gawenda to make copies of documents, but this instruction for caution causes a great deal of friction in the working of the department.

During our last discussion, Mr. Cantu reported feeling that his duties of Accounts Payable were preventing him from doing other duties in the department. We discussed a plan to have Ricky Rodriguez undertake the duties of Accounts Payable on Mondays and Fridays, and for Mr. Cantu to take over the duties performed by Mr. Rodriguez on those days as well as to be available for other job assignments. Mr. Cantu said at that time that he felt that would be very agreeable to him. We did discuss the fact that Mr. Rodriguez would be using his desk and files on those days, and Mr. Cantu indicated he understood and had no problem with that. Mr. Cantu did question me as to what Ms. Trevino was able to do to get the problem invoices resolved that he could not do. That was a valid question. We agreed that on the Mondays and Fridays that he was not going to be working on the Accounts Payable, that he would sit with Ms. Trevino as she worked on the problem invoices to see how she approached their resolution. I told Mr. Cantu I would consider this option during the week I was out. In reading the memo of July 21, 2003, Mr. Cantu seems to have taken exception to this part of the discussion. In light of this, I have reconsidered this plan to relieve Mr. Cantu of the stresses he reported to me from this position.

It is at Mr. Cantu's insistence that he was trained to the Accounts Payable. I believe that he has found that this job assignment is no more exciting than the one he held before. In this department, there are no easy or exciting assignments. Accounting work is tedious, repetitive work, no matter what the assignment. I find that there are certain personalities that find satisfaction in this type of work, and that there are those who do not.

At this point, I have assigned Mr. Cantu to job responsibilities that he is not handling well. The Accounts Payable duties seem to cause stress to Mr. Cantu which he is not able to cope with. At times, he is reasonable and easy to work with, at others, especially when he is under stress; he is a difficult employee to work with. The transfer to the Accounts Payable duties does not seem to have made Mr. Cantu any happier in his employment in the department. It has caused disruption in the operation of the department, as I have had to put additional support in place to assist with problem invoices. At this point, I would like to implement the following reassignments of duties; to put Mr. Cantu back into work he was able to be successful at:

**Duties – Vidal Cantu**

| | |
|---|---|
| Daily Roll Call | Voucher Copy Filing |
| Daily Cash Deposit | PUB Billing Log Book |
| Accts Payable Posting | Records Retention Assistance |
| Accts Payable Check Distribution | Dept. Mail Processing |
| Payroll Check Distribution | Capital Project File Copies |
| Accounts Payable Filing | Miscellaneous Copies |

**Duties – Ricky Rodriguez**

| | |
|---|---|
| Accounts Receivable Posting | EFT Filing |
| Leasing Invoicing/Services Billing | Accounts Receivable Filing |
| Agents Rebates | Payroll-Related Journal Posting |
| Service Charges | Invoice Register and Cash Book Posting |
| Payroll | Running Bank Balance Posting |
| Payroll Fund Transfer Vouchers | Bank Statement Reconciliation (except BND11) |
| BRG Fund Transfer Vouchers | Records Retention Assistance/Minutes Books |

**Duties – Letty Trevino**

| | |
|---|---|
| Accounts Payable | TxDOT Report |
| Accounts Payable Fund Transfer Voucher | Bank Statement Reconciliation (BND15) |
| Taxes Receivable Reconciliation | Backup for Purchasing Manager |
| Overweight Permit Log | Misc. G/L Reconciliations |

**Duties – Rosie Hinojosa**

| | |
|---|---|
| Accounts Payable Voucher Approval | Fixed Asset Reconciliation and Depreciation |
| Accounts Receivable Collections | Investment Interest Log |
| Review and Posting of Accounts Payable | Misc. G/L Reconciliations and Journal Entries |
| Review and Posting of Accounts Receivable | |

With your approval, I would like to implement these changes as soon as possible.


*Debby*

# BROWNSVILLE NAVIGATION DISTRICT
## INTEROFFICE MEMORANDUM

**To:** Donna Eymard
**CC:** Jo Saban
**From:** Deborah Lee Duke
**Subject:** Response to Memo Dated 07/21/03 by Vidal Cantu
**Date:** July 28, 2003

---

My first comment to you regarding the memorandum from Vidal Cantu is that it represents a violation of the District's Dispute Resolution Procedure. As such, the proper response to Mr. Cantu is to direct him to file the proper request for review of the disciplinary action with the proper person, with a copy to the Personnel Department. This request should not have been directed to Ms. Saban but to me. This is typical of Mr. Cantu's handling of problems with discipline in the department, he by-passes the District's established procedures for handling these problems and takes them to the EEOC or to supervisors outside of the department.

With that said, I would address the disciplinary action that Mr. Cantu is disputing. The reprimand was not issued over work performance. It was issued over Mr. Cantu's manner in responding to my questions regarding a work-related issue. This was made clear to Mr. Cantu during our meeting to discuss the reprimand. This meeting was taped, and should this issue be pursued, a review of the tape will indicate that Mr. Cantu was informed that this was the basis for the reprimand, not the work issues.

In reading Mr. Cantu's memorandum regarding the use of tape recordings during any meeting, I agree that he should not be made to attend any meeting that he feels necessary to record, but I do not agree to be recorded in all of my dealings with Mr. Cantu. Any further communications that need to be made to Mr. Cantu will be made in a written memorandum, and he will not be allowed to attend any meetings that he would insist on recording. I will inform Mr. Cantu of this in a memorandum.

Mr. Cantu makes an issue of the cross-training in the department. This is standard in the department, and is necessary to the smooth operation of the department during vacation or other absences. The training for contracts that is referenced is the same training as is given for the open purchase orders. Mr. Cantu has the training, but he has not been assigned the responsibility. These are two separate issues.

Ricky Rodriguez was hired as an accounting clerk. One of the qualifications that he had that made him stand out in the hiring process was his training in payroll. He was hired specifically to run the payroll as one of his primary duties, at the same time that Mr. Cantu was assigned Accounts Payable as his primary duty. The clerical staff in the department has three areas of primary responsibility: Accounts Payable, Accounts Receivable and Payroll. As I do not have three Accounting Clerks, Accounts Payable and Payroll

currently have been assigned to the two Accounting Clerks, and Accounts Receivable is currently handled by the two Bookkeeping Specialists. In a previous filing with the EEOC, Mr. Cantu has charged me with discrimination in not assigning him the payroll duties. I responded to those charges then, as I do today, that Mr. Cantu has never requested of me that he be assigned to those duties. He did, however, file charges with the EEOC in his first complaint that he did not get training for the Accounts Payable duties. In response to the ruling from the first EEOC complaint, he has received the training, as well as the assignment of the responsibilities, for Accounts Payable.

I do not usually assign additional primary duties to the Accounting Clerk that is handling Accounts Payable. Mr. Cantu's case is no exception.

Mr. Cantu brings up the issue of the switchboard relief. In the first EEOC mediation, Mr. Cantu agreed to accept this duty in exchange for an increase in pay. He also agreed that this would cease to be an issue. The District increased Mr. Cantu's pay in accordance with the EEOC decision, yet Mr. Cantu continues to violate this provision by repeatedly bringing this up as an issue in his complaints. I understand that Mr. Cantu claims that his training for Accounts Payable was not started as required by the EEOC decision. I dispute this allegation. One of the skills needed to perform the Accounts Payable function in this department is a basic understanding of and ability to work with an Excel spreadsheet. Mr. Cantu was given additional worksheet projects to develop these skills. He continued to require assistance in these projects, even up to the time we began the Accounts Payable training. He continues to have some problems in working with Excel, and needs to have his formulas verified periodically.

Mr. Cantu compares the situation that Veronica Ramos had in dealing with past-due invoices to the situation we are now in. During Ms. Ramos' tenure in my department, the majority of the past-due invoices were due to a backlog of paperwork in the Facilities Maintenance Department. With her transfer into that department, she has cleared the backlog. Now, any past-due invoices are usually due to other factors. I have given Mr. Cantu instructions that he is to give Letty Trevino any and all invoices that are over three weeks of age that he is not able to immediately process for payment. She is to work on these invoices to resolve the issues that have caused the hold-up in payment. Our goal is to pay all invoices within the terms of 30 days. I have discussed with Mr. Cantu the fact that there are a large number of invoices that can be processed for payment without pending issues. These are to be his focus. Those that were not able to be processed were taking too large a part of his time, and were causing a backup of work.

Mr. Cantu brings up an issue with an invoice from the Bank of New York. This is for an investment-tracking software that I allowed the licensing to expire on in November, 2002. The Bank of New York has been invoicing the District in the hopes that we would re-license the software, but until we again began to invest our funds, there was no need for the software. (The software is not active until the registration key is received.) Mr. Cantu brought this invoice to me several times, and I had this discussion with him regarding the fact that I was not ready to pay it each time. In May, I processed the purchase requisition,

and passed a copy of the invoice on to Mr. Cantu. In late June, we received a phone call asking if we were ever going to re-license the software. At that time, I discovered that the purchase requisition had not been processed, and I asked Mr. Cantu if he had the invoice. His response was that he did not, nor did he remember ever seeing it. I made no further comments to him regarding this invoice at that time. I later found that Mr. Cantu had approached his co-workers to look for the invoice. Mr. Cantu later came into my office and told me I had better have the vendor fax a copy of the invoice because I never gave it to him. I told Mr. Cantu at that time that it was my decision how to get a copy of the invoice, and that I would handle it. I reminded him at that time that he had had the invoice, as he had asked me about it several times, and he responded that he had given the invoice to Letty Trevino.

One of the problems that Mr. Cantu is having in his position is the processing of the same invoice for payment twice. This is arising out of his use of copies of documents to substitute for originals. While this is permissible in limited instances, it does allow for the duplicate payment of invoices if it is not carefully monitored. I have instructed Ms. Trevino to be cautious when verifying a voucher that is based on copies of documents. Mr. Cantu takes exception to this verification, even though we are still catching duplicate vouchers at this point. He has been instructed to be certain that the original documents are not available to him before going to Ms. Gawenda to make copies of documents, but this instruction for caution causes a great deal of friction in the working of the department.

During our last discussion, Mr. Cantu reported feeling that his duties of Accounts Payable were preventing him from doing other duties in the department. We discussed a plan to have Ricky Rodriguez undertake the duties of Accounts Payable on Mondays and Fridays, and for Mr. Cantu to take over the duties performed by Mr. Rodriguez on those days as well as to be available for other job assignments. Mr. Cantu said at that time that he felt that would be very agreeable to him. We did discuss the fact that Mr. Rodriguez would be using his desk and files on those days, and Mr. Cantu indicated he understood and had no problem with that. Mr. Cantu did question me as to what Ms. Trevino was able to do to get the problem invoices resolved that he could not do. That was a valid question. We agreed that on the Mondays and Fridays that he was not going to be working on the Accounts Payable, that he would sit with Ms. Trevino as she worked on the problem invoices to see how she approached their resolution. I told Mr. Cantu I would consider this option during the week I was out. In reading the memo of July 21, 2003, Mr. Cantu seems to have taken exception to this part of the discussion. In light of this, I have reconsidered this plan to relieve Mr. Cantu of the stresses he reported to me from this position.

It is at Mr. Cantu's insistence that he was trained to the Accounts Payable. I believe that he has found that this job assignment is no more exciting than the one he held before. In this department, there are no easy or exciting assignments. Accounting work is tedious, repetitive work, no matter what the assignment. I find that there are certain personalities that find satisfaction in this type of work, and that there are those who do not.

At this point, I have assigned Mr. Cantu to job responsibilities that he is not handling well. The Accounts Payable duties seem to cause stress to Mr. Cantu which he is not able to cope with. At times, he is reasonable and easy to work with, at others, especially when he is under stress; he is a difficult employee to work with. The transfer to the Accounts Payable duties does not seem to have made Mr. Cantu any happier in his employment in the department. It has caused disruption in the operation of the department, as I have had to put additional support in place to assist with problem invoices. At this point, I would like to implement the following reassignments of duties; to put Mr. Cantu back into work he was able to be successful at:

**Duties – Vidal Cantu**
Daily Roll Call
Daily Cash Deposit
Accts Payable Posting
Accts Payable Check Distribution
Payroll Check Distribution
Accounts Payable Filing

Voucher Copy Filing
PUB Billing Log Book
Records Retention Assistance
Dept. Mail Processing
Capital Project File Copies
Miscellaneous Copies

**Duties – Ricky Rodriguez**
Accounts Receivable Posting
Leasing Invoicing/Services Billing
Agents Rebates
Service Charges
Payroll
Payroll Fund Transfer Vouchers
BRG Fund Transfer Vouchers

EFT Filing
Accounts Receivable Filing
Payroll-Related Journal Posting
Invoice Register and Cash Book Posting
Running Bank Balance Posting
Bank Statement Reconciliation (except BND11)
Records Retention Assistance/Minutes Books

**Duties – Letty Trevino**
Accounts Payable
Accounts Payable Fund Transfer Voucher
Taxes Receivable Reconciliation
Overweight Permit Log

TxDOT Report
Bank Statement Reconciliation (BND15)
Backup for Purchasing Manager
Misc. G/L Reconciliations

**Duties – Rosie Hinojosa**
Accounts Payable Voucher Approval
Accounts Receivable Collections
Review and Posting of Accounts Payable
Review and Posting of Accounts Receivable

Fixed Asset Reconciliation and Depreciation
Investment Interest Log
Misc. G/L Reconciliations and Journal Entries

With your approval, I would like to implement these changes as soon as possible.


*Debby*

000230